# EXHIBIT 1

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Middle District of Pennsylvania

| | |
|---|---|
| Clarity Sports International LLC and Jason Bernstein | ) |
| *Plaintiff* | ) |
| v. | ) |
| CAA Sports et al. | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.   1:19-cv-305

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                Kenny Golladay

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Deposition will be conducted via video conference | Date and Time:  12/03/2020 10:00 a.m. est |
|---|---|

The deposition will be recorded by this method:   Stenography and video

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See attached Exhibit A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    11/2/2020

        *CLERK OF COURT*

                                                OR

| | |
|---|---|
| *Signature of Clerk or Deputy Clerk* | /s/ John D. Comerford |
| | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Plaintiffs Clarity Sports International LLC and Jason Bernstein                                        , who issues or requests this subpoena, are:

John D. Comerford, Dowd Bennett LLP, 7733 Forsyth Blvd. Suite 1900, St. Louis, MO 63105

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:19-cv-305

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*

    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A
## ATTACHMENT TO SUBPOENA

Please produce for inspection and copying the documents requested below, as required by the attached Subpoena, to John D. Comerford of Dowd Bennett LLP, in accordance with the Definitions and Instructions below.

## INSTRUCTIONS

1.      The response to each requests for production of documents ("request") shall include all documents within your possession, custody, or control, regardless of their location and regardless of whether such documents are held by your agents, employees, representatives, attorneys, accountants, or any other person. The phrase "possession, custody, or control" means a document in your physical custody; or, that you own in whole or in part; or, have a right by contract, statute, or otherwise to use, inspect, examine, or copy on any terms; or you have, as a practical matter, the ability to use, inspect, examine, or copy such document. You are to produce all documents responsive to one or more of the document production requests contained herein.

2.      If you encounter any ambiguity in construing any request or any applicable definition or instruction, you shall set forth the matter deemed ambiguous and the construction you selected or used in responding to the request.

3.      If you have a good faith objection to any portion of a request, you shall identify the portion of the request to which you object, state the specific nature of the objection, and respond to the remainder of the request.

4.      If you object to any request by contending the request is overbroad, you shall provide a response that narrows the request in a way that eliminates the purported over-breadth, and state the extent to which you have narrowed the request for the purpose of your response.

5.      All documents (including electronically stored information) that respond, in whole or in part, to any portion of any request shall be produced in their entirety, including all attachments and enclosures thereto.

6.      If you withhold information on the grounds of attorney-client privilege, work product immunity, or any other privilege or immunity, you shall identify the justification for the withholding (the nature of the privilege being claimed) and any privilege rule being invoked. For any documents and materials withheld from production (including by redaction) on the grounds of any claim of privilege or immunity, you shall furnish a log of such documents providing at least the following information for each such document: the document's date, signatory or signatories, author(s), addressee(s), each other person who received a copy, the subject matter of the document, and the basis for the claim of privilege. Such log shall include sufficient information to enable Defendants to assess the applicability of the privilege or protection claimed.

7.      Any purportedly privileged or discovery-exempt information or thing that also contains matter that is not privileged or exempt from discovery must be produced with the purportedly privileged or discovery-exempt section excised.

8.      If production of any requested document is objected to on the grounds that production is unduly burdensome, describe the burden or expense associated with producing the requested discovery.

9.      If the requested documents are maintained in a file, then the file folder is included in the request for production of those documents.

**<u>DEFINITIONS</u>**

1.      "You" and "your" refer individually to the persons or entities upon whom this subpoena was served, and each of their agents, employees, representatives, attorneys, accountants, affiliates, subsidiaries, officers, directors, and each and every other person acting or purporting to act on its behalf.

2.      "Document" or "documents" means the draft, the original and any non-identical copies of any written, recorded, or graphic material of any kind (including, but not limited to, handwritten, printed, mimeographed, lithographed, duplicated, typed, or other graphic, photographic, electronic, or computer-generated matter) and shall include, but not be limited to, all letters, emails, text messages, instant messages, telegrams, correspondence, drafts, contracts, agreements, notes, reports, medical reports, charts, graphs, pamphlets, calendars, calendar entries, schedules, guidelines, manuals, policies, methodologies, presentations, procedures, principles, evaluations, ratings, rankings, performance reviews, studies, articles, publications, literature, summaries, excerpts, memoranda, mechanical or electrical sound recordings or transcriptions thereof, memoranda and transcripts of telephone or personal conversations or of meetings or conferences, minutes, analyses, tests or results of tests, brochures, instructions, handouts, outlines, agendas, tickets, plans, inter-office communications, ledgers, books of account, worksheets, vouchers, receipts, cancelled checks, money orders, invoices, and/or bills, including telephone bills, that are in your possession, custody, or control, or that you know to exist.

3.      "Communication" or "communications" means any transmission of information (in the form of facts, ideas, conversations, inquiries, replies, agreements, or otherwise) by one or more persons and/or between two or more persons whether in person, in writing, by wired or wireless telephone, through the internet, or by means including electronic transmittal devices (e.g., email,

fax, or wired or wireless connections), and includes, without limitation, all associated correspondence, memoranda, or notes.

4.      "Complaint" means the Third Amended Complaint, filed in the Middle District of Pennsylvania, styled Clarity Sports International LLC and Jason Bernstein v. Redland Sports et al., Case No. 1:19-cv-00305-YK, and any subsequent amended complaints. A copy of the Complaint is attached hereto as Exhibit B.

5.      "Todd France" or "France" means NFLPA Certified Contract Advisor Todd France of CAA Sports LLC.

6.      "Jake Silver" or "Silver" means Jake Silver of CAA Sports LLC.

7.      "And/or" means "and" and, in the alternative, "or."

8.      "Relates to" and "relating to" mean: constitutes, mentions, concerns, contains, embodies, reflects, identifies, states, refers to, deals with or is in any way pertinent to.  Similarly, "concerns" or "concerning" has the same definition.

9.      The relevant timeframe for these requests is from January 21, 2018 to January 21, 2020, pursuant to Court Order in this matter attached hereto as Exhibit C.

**DOCUMENTS REQUESTED**

1.      Each and every communication between you and Jake Silver.

**RESPONSE:**


2.      Each and every communication between you and Todd France.

**RESPONSE:**

4

3.      Each and every communication between you and any employee of CAA Sports LLC, or anyone acting on its behalf.

**RESPONSE:**

4.      Each and every document or communication that concerns, relates to, or mentions the January 21, 2019 appearance and autograph signing by you in Lombard, Illinois that is referenced in the Complaint.

**RESPONSE:**

5.      Each and every document or communication that concerns, relates to, or mentions the negotiations and/or discussions for, about, or concerning the January 21, 2019 appearance and autograph signing by you in Lombard, Illinois that is referenced in the Complaint.

**RESPONSE:**

6.      Each and every communication between you and Todd France that concerns, relates to, or mentions the January 21, 2019 appearance and autograph signing by you in Lombard, Illinois that is referenced in the Complaint.

**RESPONSE:**

7.      Each and every communication between you and Jake Silver that concerns, relates to, or mentions the January 21, 2019 appearance and autograph signing by you in Lombard, Illinois that is referenced in the Complaint.

**RESPONSE:**

8.      Each and every communication between you and any employee of CAA Sports LLC, or anyone acting on its behalf, that concerns, relates to, or mentions the January 21, 2019 appearance and autograph signing by you in Lombard, Illinois that is referenced in the Complaint.

**RESPONSE:**


9.      Each and every communication between you and any person acting on behalf of Todd France.

**RESPONSE:**




Dated:  November 2, 2020                    Respectfully submitted,

                                            DOWD BENNETT LLP

                                            By: /s/ *John D. Comerford*
                                                John D. Comerford #60164MO
                                                James B. Martin #70219MO
                                                7733 Forsyth Blvd., Suite 1900
                                                St. Louis, Missouri 63105
                                                (314) 889-7300 (phone)
                                                (314) 863-2111 (facsimile)
                                                jcomerford@dowdbennett.com
                                                jbmartin@dowdbennett.com



                                            BUZGON DAVIS LAW OFFICES


                                            By:    /s/ *Scott L. Grenoble*
                                                Scott L. Grenoble
                                                Attorney I.D. #72808

525 South Eighth Street
 Post Office Box 49
 Lebanon, PA    17042-0049
 (717) 454-0805
 Fax: (717) 274-1752
 E-mail: sgrenoble@buzgondavis.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2020, notice of the foregoing was provided to Defendants in accordance with Rule 45 of the Federal Rules of Civil Procedure.

*/s/ John D. Comerford* _____

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLARITY SPORTS INTERNATIONAL LLC )<br>and JASON BERNSTEIN, )<br> )<br>        Plaintiffs, )<br> )<br>v. )<br> )<br>CAA SPORTS LLC, )<br>REDLAND SPORTS, GERRY OCHS, )<br>MVP AUTHENTICS, LLC, )<br>DARYL EISENHOUR, JASON SMITH, )<br>BOONE ENTERPRISES INC. d/b/a BOONE )<br>ENTERPRISES AUTHENTIC )<br>AUTOGRAPHS, and CRAIG BOONE, )<br> )<br>        Defendants. ) | Case No. 1:19-cv-00305-YK |

## THIRD AMENDED COMPLAINT

Plaintiffs Clarity Sports International LLC and Jason Bernstein (collectively, "Plaintiffs"), by and through counsel, and pursuant to the Court's Order of September 4, 2019 (Doc. 38), bring this Third Amended Complaint against Defendants CAA Sports LLC; Redland Sports; Gerry Ochs; MVP Authentics, LLC; Daryl Eisenhour; Jason Smith; Boone Enterprises Inc. d/b/a Boone Enterprises Authentic Autographs; and Craig Boone (collectively "Defendants").

## THE PARTIES

1.      Plaintiff Clarity Sports International LLC ("Clarity") is a limited liability company organized and existing under the laws of the State of Maryland.

Clarity's principal place of business is located at 9412 Crimson Leaf Terrace, Potomac, Maryland 20854.

2.    Plaintiff Jason Bernstein ("Bernstein") is the majority owner of Clarity and is a citizen and resident of the State of Maryland.

3.    Bernstein is one of two members of Clarity. Clarity's only other member is also an individual person who is a resident and citizen of the State of Maryland. Thus, both of Clarity's members are individual citizens of the State of Maryland.

4.    Defendant CAA Sports LLC ("CAA") is a wholly owned subsidiary of Creative Artists Agency, an international talent agency headquartered in Los Angeles, California. CAA, through one or more of its employees, worked with the other Defendants in this case, including Pennsylvania Defendants Ochs, Redland Sports, MVP Authentics, Eisenhour and Smith, to arrange for and carry out the autograph signing described in this Third Amended Complaint and to tortiously interfere with Plaintiffs' contracts.

5.    In addition, CAA regularly does business in the Commonwealth of Pennsylvania and in this judicial district and thereby has maintained systematic and continuous contacts with the Commonwealth of Pennsylvania.

6.    For example, CAA regularly works with the other Defendants in this case, including Pennsylvania Defendants Ochs, Redland Sports, Eisenhour, Smith,

and MVP Authentics, to arrange for and carry out autograph signings for their several mutual clients. These memorabilia events and autograph signings for shared clients of CAA and the other Defendants are described more fully herein.[1]

7.      Defendant Redland Sports does business in the Commonwealth of Pennsylvania, with its principal place of business located at 221 North Duke Street, York, York County, Pennsylvania, 17401.

8.      Defendant Gerry Ochs ("Ochs") is the owner of Redland Sports.  Upon information and belief, Ochs is an adult citizen of the Commonwealth of Pennsylvania with a residence address of 562 Magaro Rd., Enola, Dauphin County, Pennsylvania, 17025.

9.      Defendant MVP Authentics, LLC ("MVP Authentics") is a resident of and does business in the Commonwealth of Pennsylvania, with its principal place of business located at 11 W. 2nd St., Hummelstown, Dauphin County, Pennsylvania, 17036.

10.     Defendant Daryl Eisenhour ("Eisenhour") is the co-owner of MVP Authentics and is a resident of the Commonwealth of Pennsylvania.

---

[1] Plaintiffs will refer to Defendants Redland Sports, Gerry Ochs, MVP Authentics, LLC, Daryl Eisenhour, Jason Smith, Boone Enterprises and Craig Boone collectively as the "Memorabilia Dealer Defendants." As described below, the Memorabilia Dealer Defendants regularly work with Defendant CAA on autograph signings and memorabilia events. CAA typically represents the NFL players with whom the Memorabilia Dealer Defendants conduct these events—in other words, those players that sign the autographs at such events.

11.    Defendant Jason Smith ("Smith") is the co-owner of MVP Authentics and is a resident of the Commonwealth of Pennsylvania.

12.    Defendant Boone Enterprises Inc. d/b/a Boone Enterprises Authentic Autographs ("Boone Enterprises") is a resident of the State of New Jersey, with its principal place of business at 142 Route 23, Pompton Plains, New Jersey, 07444.

13.    Defendant Craig Boone is the owner and/or manager of Boone Enterprises, and is a resident of the State of New Jersey.

14.    Boone Enterprises and Craig Boone regularly do business in the Commonwealth of Pennsylvania and in this judicial district and thereby have maintained systematic and continuous contacts with the Commonwealth of Pennsylvania.

15.    For example, Boone Enterprises and Craig Boone co-host monthly autograph signings in Harrisburg, Pennsylvania. Boone Enterprises and Craig Boone also regularly partner with Defendants MVP Authentics and Redland Sports, both of which are Pennsylvania companies, including on the autograph signing described in this Third Amended Complaint.

## JURISDICTION AND VENUE

16.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over Defendants Redland Sports, Gerry Ochs, MVP Authentics, LLC, Daryl Eisenhour, and Jason Smith as they are residents of this Commonwealth, and/or have maintained systematic and continuous contacts with this Commonwealth.

18.     This Court has personal jurisdiction over Defendants CAA Sports LLC, Boone Enterprises, and Craig Boone pursuant to the Pennsylvania long-arm statute as they regularly do business in the Commonwealth of Pennsylvania, including in this judicial district, and thereby have maintained systematic and continuous contacts with the Commonwealth of Pennsylvania.  As described further herein, all of the Defendants have worked together to arrange for, organize and/or participate in multiple sports memorabilia signings in this judicial district.

19.     Plaintiffs' claims against CAA are not subject to mandatory arbitration in the National Football League Players' Association ("NFLPA").  NFLPA arbitrators have specifically held that entities such as CAA are not subject to the jurisdiction of the NFLPA for purposes of mandatory arbitration.

20.     Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and/or because all Defendants are subject to this court's personal jurisdiction with respect to this action.

## RELEVANT FACTUAL BACKGROUND

21.     Plaintiff Jason Bernstein is, and was at all times relevant to this action, a National Football League Players' Association ("NFLPA") certified contract advisor. Bernstein represents several players in the National Football League ("NFL") as their agent. At present, Mr. Bernstein has negotiated contracts for twenty players currently on NFL rosters.

22.     Mr. Bernstein is the majority owner of Clarity, a full-service sports management company with a focus on providing management and advisory services to professional athletes.

23.     As a Certified Contract Advisor, Bernstein represents NFL players in their contractual negotiations and dealings with the NFL, and in other matters to which the parties agree. Clarity represents NFL players in matters such as the representation of players in those players' marketing and endorsement contract negotiations.

24.     One of those players that Mr. Bernstein and Clarity represented was Kenny Golladay ("Golladay"), an NFL player currently under contract with the Detroit Lions.

25.     Defendants Redland Sports, MVP Authentics, and Boone Enterprises are sports memorabilia companies.

Case 1:19-cv-00305-WK Document 120-9 Filed 07/17/20 Page 7 of 80

26.     Redland Sports, MVP Authentics, and Boone Enterprises are each in the business of procuring and selling autographed sports memorabilia.

27.     As a part of its business, Redland Sports, through its owner Ochs, arranges and contracts for, stages, hosts and presents autograph signings with NFL players and then markets and sells the items signed by those NFL players. Redland Sports advertises and markets sports memorabilia signed by NFL players on its Facebook page.

28.     As a part of its business, MVP Authentics, through its owners Eisenhour and Smith, arranges and contracts for, stages, hosts and presents autograph signings with NFL players and then markets and sells the items signed by those NFL players. MVP Authentics advertises and markets sports memorabilia signed by NFL players on its Facebook, Twitter, and Instagram pages, and its website, www.mvp-authentics.com.

29.     As a part of its business, Boone Enterprises, through its owner and manager Craig Boone, arranges and contracts for, stages, hosts and presents autograph signings with NFL players and then markets and sells the items signed by those NFL players. Boone Enterprises advertises and markets sports memorabilia signed by NFL players on its Facebook, Twitter, and Instagram pages, and its Amazon store, www.amazon/com/shops/BooneEnterprises.

30.    In order to facilitate these autograph signings by NFL players, the Memorabilia Dealer Defendants contract with NFL players to pay those players for their appearances and autographs, typically on a per-autograph or per-appearance basis.

31.    The Memorabilia Dealer Defendants typically negotiate the contracts for NFL players' autograph signings with those NFL players' marketing representatives and/or Contract Advisors, including those from CAA.

32.    Further, all Defendants are and were aware that NFLPA Contract Advisors such as Bernstein are often in exclusive marketing arrangements with their player-clients through agencies such as Clarity Sports.

## PLAINTIFFS' CONTRACTS WITH GOLLADAY

### The Standard Representation Agreement

33.    On December 23, 2016 Mr. Bernstein and Golladay executed an NFLPA "Standard Representation Agreement" ("SRA"), under which Mr. Bernstein agreed to "represent, advise, counsel, and assist" Golladay in the negotiation and execution of Golladay's playing contracts in the NFL. Doc. 41-1.

34.    Under the SRA, Mr. Bernstein was the "exclusive representative" of Golladay for the purpose of negotiating playing contracts for Golladay with NFL clubs.

35.     In return, Golladay agreed to pay Mr. Bernstein three percent of the compensation Golladay earned under the playing contracts Mr. Bernstein negotiated for him.

36.     An SRA is a standard-form contract between NFL players and their agent-representatives; virtually all NFL players are represented by Contract Advisors pursuant to an NFLPA Standard Representation Agreement.

37.     Under its terms, the SRA continues perpetually and for an indefinite term. In the normal course, an SRA does not need to be renewed; it can continue for the entirety of the NFL player's career unless terminated. In fact, the SRA specifically provides that the SRA shall remain in effect until it is terminated. The SRA entered into between Bernstein and Golladay states, in relevant part: "The term of this Agreement shall begin on the date hereof and shall remain in effect until such time that it is terminated by either party in which case termination of this Agreement shall be effective five (5) days after written notice of termination is given to the other party."

38.     Golladay's playing contracts with any NFL team, and more precisely the monetary value of those contracts, are the source of revenue for Plaintiffs under the SRA.[2]

_____

[2] In this case, Plaintiffs allege that Defendants tortiously interfered with Plaintiffs' existing contractual relationships with Golladay rather than with prospective contractual

9

## The Endorsement and Marketing Agreement

39.     On December 23, 2016, in addition to entering into the SRA, Clarity and Golladay entered into an "Endorsement and Marketing Agreement." Doc. 41-2.

40.     Mr. Bernstein signed the Endorsement and Marketing Agreement on behalf of Clarity.

41.     Under the Endorsement and Marketing Agreement, Clarity agreed to "procure, negotiate, and manage 'Endorsement Opportunities'" for Golladay.

42.     "Endorsement Opportunities" included contracts for the endorsement of commercial products and services, paid personal appearances, and other opportunities related to the commercial exploitation of Golladay's status as an NFL player, including but not limited to autograph-signing appearances.

43.     In consideration of Clarity's services under the Endorsement and Marketing Agreement, Golladay agreed to pay Clarity fifteen percent of the endorsement monies he earned.

---

relationships. Plaintiffs are not alleging that Defendants tortiously interfered with any of Golladay's future playing or endorsement contracts, but rather are alleging that Defendants tortiously interfered with both the SRA and the Endorsement and Marketing Agreement that were in existence between Plaintiffs and Golladay and that are now terminated. Golladay's future playing and endorsement contracts would have provided revenue to Plaintiffs under the now terminated SRA and Endorsement and Marketing Agreement.

44.     The Endorsement and Marketing Agreement "create[d] an exclusive arrangement" between Clarity and Golladay with respect to opportunities such as autograph signings and other paid appearances available to Golladay.

45.     In other words, as under the SRA, Mr. Bernstein and Clarity were Golladay's exclusive representatives in the endorsement and marketing arena.

46.     Under the Endorsement and Marketing Agreement, Clarity contracted for, arranged, and helped execute multiple autograph signings and similar appearances for Golladay.

47.     Under its terms, the Endorsement and Marketing Agreement continues perpetually and for an indefinite term. In the normal course, an Endorsement and Marketing Agreement does not need to be renewed; it can continue for the entirety of the NFL player's career unless terminated.

48.     Golladay's endorsement and marketing contracts with any company, and more precisely the monetary value of those contracts, are the source of revenue for Plaintiffs under the Endorsement and Marketing Agreement.

## DEFENDANTS' INTERFERENCE WITH PLAINTIFFS' CONTRACTS WITH GOLLADAY

### Defendants' Interference with the Endorsement and Marketing Agreement

49.     Redland Sports announced on its Facebook page on January 2, 2019 that it would host, "in conjunction with Boone Enterprises and MVP Authentics," a private autograph signing with Golladay on January 21, 2019 ("the Signing").

50.     Plaintiffs did not arrange for Golladay's appearance at this event, nor were Plaintiffs aware of the then-upcoming Signing until after Redland Sports announced it on its Facebook page.

51.     In fact, Plaintiffs at that time were in the process of negotiating for Golladay a contract for a different autograph signing, pursuant to the terms of their exclusive Endorsement and Marketing Agreement.

52.     Instead, the Memorabilia Dealer Defendants worked with Defendant CAA, one of Plaintiffs' competitors, to set up the January 21, 2019 Signing for Golladay. Ex. 1 at 9-11.

53.     The Memorabilia Dealer Defendants communicated primarily with Jake Silver ("Silver"), a CAA employee, to arrange the details of and carry out the January 21, 2019 Signing. *Id.*

54.     Silver is a CAA Sports Football Coordinator and works in CAA's office in Atlanta, Georgia.

55.     Silver works for and with Todd France ("France"), who is an NFLPA certified Contract Advisor like Bernstein.

56.     France is a co-head of CAA's Football Division. He is the top agent in and runs CAA's office in Atlanta.

57.     Silver has worked for France at CAA since January 2016.

58.     Silver previously worked for over a year as an intern for France at France's former sports agency, Five Star Athlete Management.

59.     In or around December 2018, CAA, through Silver, asked Boone if Boone was interested in doing an autograph signing for Golladay. Ex. 1 at 9.

60.     At this same time, France (Silver's co-worker and superior at CAA) was engaged in an effort to encourage and/or induce Golladay to terminate his relationship with Plaintiffs and become France's client. At this time, Golladay had not terminated his relationship with Plaintiffs and was still Plaintiffs' client for all purposes.

61.     Mr. Silver told Boone that the Golladay Signing would need to take place in or near Golladay's hometown of Chicago, Illinois and would need to occur toward the end of January when Golladay would be visiting his mother in Chicago, Illinois. Ex. 1 at 9-10.

62.     CAA was fully aware that Golladay was under an exclusive marketing contract with Clarity at the time.

63.     Golladay had not switched his representation from Bernstein/Clarity to France/CAA at the time the Signing was set up by Defendants, nor did Golladay switch at any time after – until the very next day *after* the Signing took place. In other words, Golladay waited until the Signing took place before he made the switch.

64.     CAA was aware that Golladay would not switch until the Signing took place.

65.     On January 6, 2019, Clarity's Marketing Director, Emily Ries ("Ries"), became aware of Redland's January 2, 2019 Facebook post advertising the then-upcoming Golladay Signing being arranged for and hosted by Defendants.

66.     Ries performed a Google search of Redland Sports and located the telephone number of its owner, Ochs.

67.     Ries called Ochs on January 6, 2019.

68.     Ochs answered Ries's January 6, 2019 telephone call.

69.     Ries told Ochs that she was Golladay's marketing representative from Clarity and that Clarity had an exclusive marketing agreement with Golladay. Ex. 1 at 10.

70.     Ries further told Ochs that she was listed on the NFLPA's Marketing Representation Notice as the marketing representative for Golladay.

71.     Ries further told Ochs that Plaintiffs were Golladay's agent registered with the NFLPA.

14

72.    Ries further told Ochs that Clarity had previously completed signings for Golladay and was currently in discussions for future signings for Golladay.

73.    Ries further told Ochs that he should not proceed forward with the Golladay Signing. Ex. 1 at 10.

74.    Ochs responded to Ries and stated that another agency had arranged the Golladay Signing.

75.    Ochs further stated he was not comfortable saying which agency it was because "they're very big," and that Ochs and Redland Sports do a great deal of business with that large agency.

76.    Ries asked Ochs whether the agency that had arranged the Golladay Signing was a marketing agency or a full-scale sports agency.

77.    Ochs responded that it was a sports agency.

78.    Ochs' refused to disclose the name of the "big" sports agency with which the Memorabilia Dealer Defendants arranged the Golladay Signing because the Memorabilia Dealer Defendants desired to continue doing business with the "big" sports agency.

79.    The Memorabilia Dealer Defendants further desired to continue arranging signings for NFL players represented by the "big" sports agency.

80.    Ochs further stated that Golladay was "well aware" of the then-upcoming Signing.

81.     Ochs then discussed Ries's outreach with Boone.

82.     That same day, January 6, 2019, Boone and Ochs discussed the contact from Ries and devised a plan to conceal from Plaintiffs the fact that Ochs and Boone were the ones putting on the Signing. Ex. 2 at BOONE-007, -006, -005, -004.

83.     Ochs told Boone he was going to call Ries back and tell her "I am buying from another company. And ask who they sold a signing to." Boone responded: "That works she has no idea that we are running it." Ochs responded: "Correct." Ex. 2 at BOONE-004.

84.     Ochs never called Ries back.

85.     Following up on Ries's telephone call, Bernstein sent an email to Ochs on January 7, 2019 to inform him (again) that Bernstein was Golladay's NFLPA-licensed agent (meaning Bernstein had a Standard Representation Agreement with Golladay that was on file with the NFLPA) and that Clarity had an exclusive marketing agreement in place with Golladay. Ex. 3.

86.     Bernstein informed Ochs in pertinent part that he was writing as "Kenny Golladay's NFLPA-licensed agent" and "we [Clarity] have an exclusive marketing agreement in place with Kenny [Golladay], which includes handling all signings." *Id.*

87.     Also on January 7, 2019, Bernstein sent a text message to Ochs informing him of the same.  Ex. 4.

88.     In both Bernstein's January 7, 2019 email and text message to Ochs, he asked Ochs to remove the Facebook post advertising the January 21, 2019 Signing that the Memorabilia Dealer Defendants were organizing and contracting to hold "in conjunction with" one another. In addition, Bernstein asked that Ochs contact him by telephone.  Ex. 3, 4.

89.     Ochs ignored Bernstein's contacts and requests directed to him and did not call Bernstein back.

90.     Boone contacted Silver at Defendant CAA, with whom the Memorabilia Dealer Defendants had worked to set up the Golladay Signing, and informed him of the contacts that Ochs had received from Plaintiffs. Ex. 1 at 10.

91.     Silver told Boone he would check into what Bernstein and Ries had said and would call Boone back. *Id.*

92.     Thus, as of no later than January 7, 2019, all Defendants were aware of Plaintiffs' Standard Representation Agreement with Golladay and Plaintiffs' exclusive Endorsement and Marketing Agreement with Golladay if they were not aware already.

93.     Silver called Boone back and told him that CAA wanted the Memorabilia Dealer Defendants to go ahead with the January 21, 2019 Signing for Golladay in Chicago, Illinois. Ex. 1 at 10.

94.     CAA, through Silver, told the Memorabilia Dealer Defendants to go ahead with the Signing notwithstanding Plaintiffs' active contracts with Golladay, of which all Defendants were then aware.

95.     CAA told Boone to go ahead with the Signing because CAA desired to induce or encourage Golladay to terminate his relationship with Plaintiffs and become the client of CAA and Todd France.

96.     Thus, all Defendants were informed of and yet ignored Plaintiffs' exclusive arrangement with Golladay and did not negotiate the contract for Golladay's appearance with Plaintiffs.

97.     Rather, the Memorabilia Dealer Defendants worked with CAA on the January 21, 2019 Signing.

98.     Under that arrangement, Golladay was paid to appear and was paid for a number of his autographs signed at the January 21, 2019 appearance.

99.     CAA worked with the Memorabilia Dealer Defendants to arrange the logistics for Golladay's travel to the January 21, 2019 Signing in Lombard, Illinois.

100.    For example, Ochs communicated with Eisenhour and Boone about a limousine car service to transport Golladay from the Chicago airport to the Signing.

101.    On January 18, 2019, Ochs texted Eisenhour and Boone: "Car service for Kenny/mom/Todd CAA $336." Ex. 2 at BOONE-008.

102.    On information and belief, "Todd CAA" is Todd France of CAA.

103.   Thus, as of January 18, 2019, the Memorabilia Dealer Defendants expected Todd France to personally attend the Golladay Signing.

104.   At the Signing on January 21, 2019, Golladay signed approximately 600 items provided by the Memorabilia Dealer Defendants, which included full size helmets, mini helmets, footballs, jerseys and cleats. Ex. 1 at 13.

105.   On January 24, 2019, Redland Sports posted to its Facebook page an announcement advertising a number of sports memorabilia items, all signed by Golladay.

106.   Also on January 24, 2019, MVP Authentics posted to its Facebook page an announcement advertising autographed items for sale from its "#Massive #PrivateSigning" with Golladay.

107.   Also on January 24, 2019, Boone Enterprises posted to its Facebook page an announcement advertising autographed items for sale "from our private signing" with Golladay.

108.   The Memorabilia Dealer Defendants worked and coordinated with Defendant CAA to arrange the Signing, despite all Defendants' full knowledge and awareness that France was not Golladay's NFLPA certified contract advisor and CAA was not Golladay's marketing agent.

109.   There is a strong working relationship between the Memorabilia Dealer Defendants on the one hand, and CAA on the other hand.

110.    In fact, the Memorabilia Dealer Defendants work with CAA on a regular basis.

111.    The Memorabilia Dealer Defendants have coordinated numerous autograph signing and appearance deals for NFL player-clients of CAA and/or France in the past, including for star NFL players such as Alec Ogletree and Aaron Donald.

112.    Many of the NFL players with whom the Memorabilia Dealer Defendants have arranged autograph signings are clients of CAA and/or France.

113.    The NFL players with whom the Memorabilia Dealer Defendants have arranged autograph signings and who are also clients of CAA and/or France include but are not limited to Robby Anderson, Troy Fumagalli, Sam Darnold, Larry Ogunjobi, Denzel Ward, Darron Lee, Marquise Brown, D.K. Metcalf, A.J. Brown, Nasir Adderley, Alec Ogletree, and Aaron Donald.

114.    The Memorabilia Dealer Defendants advertise some of these player-clients of CAA and/or France as their "exclusive" athletes. For example, Defendant MVP Authentics has posted the following image to its Facebook page, which labels D.K. Metcalf, A.J. Brown, Nasir Adderley and Marquise Brown as "MVP Authentics Exclusive Athletes":

Case 1:19-cv-00305-YK Document 120 Filed 07/17/20 Page 21 of 38




115. In this instance, however, all Defendants were aware that Golladay was not represented by France and CAA, either under a Standard Representation Agreement or a marketing agreement.

116. Further, all Defendants were aware that Golladay in fact had an exclusive marketing agreement with Plaintiffs.

117. Despite this knowledge of the Endorsement and Marketing Agreement between Plaintiffs and Golladay, the Memorabilia Dealer Defendants negotiated the contract for Golladay's January 21, 2019 appearance, and all Defendants interfered with Plaintiffs' Endorsement and Marketing Agreement.

118. Despite Ochs having been told about Plaintiffs' contractual relationships with Golladay on January 6 and 7, 2019, Defendants entered into a contract for the Golladay Signing dated "As of January 8, 2019".

119.   The contract for the January 21, 2019 Signing is between Defendant Boone Enterprises and Golladay and is signed by Defendant Craig Boone.

120.   Defendant MVP Authentics issued a check to Golladay for the then-upcoming Signing on January 18, 2019. The check was signed by Defendant Jason Smith.

121.   Upon information and belief, the Memorabilia Dealer Defendants were also aware that CAA and France desired to represent Golladay, and that through negotiating a contract for Golladay's appearance, CAA and France hoped to encourage and/or induce Golladay to terminate his relationship with Plaintiffs and become a client of CAA (under an Endorsement and Marketing Agreement) and France (under a Standard Representation Agreement).

122.   The Memorabilia Dealer Defendants purposefully interfered with Plaintiffs' contracts with Golladay at the direction of and in coordination with CAA. They took these actions because they desired to please CAA so that they would continue to receive business from CAA, namely referrals of NFL players represented by CAA for whom the Memorabilia Dealer Defendants arrange signings, signings from which they profit.

123.   As one example, on or about January 21, 2019 (the day of the Signing) Silver told Boone he was upset about something concerning Golladay. In the same conversation, Silver told Boone that he (Silver) wanted the Memorabilia Dealer

Defendants to know that a competitor of theirs (on information and belief, Steiner Sports Memorabilia) had inquired about Aaron Donald, another CAA client with whom the Memorabilia Dealer Defendants had worked in the past. The implication was clear: the Memorabilia Dealer Defendants need to keep CAA happy to continue receiving business from CAA, including work with Aaron Donald. If not, that business would go to a competitor like Steiner Sports Memorabilia.

124.   On January 22, 2019, the day after Golladay's January 21, 2019 appearance and memorabilia Signing, Golladay called Bernstein and said he was going to terminate Bernstein as his NFLPA Contract Advisor.

125.   When Bernstein asked why he was being terminated, Golladay responded "resources."

126.   The Signing is an example of the resources that sports agencies such as CAA and Clarity can provide to their NFL player-clients.

127.   Golladay did not terminate Bernstein until he was shown a demonstration of CAA's resources: the January 21, 2019 autograph Signing.

128.   Shortly after midnight on January 24, 2019, Golladay sent an email to Bernstein to provide written confirmation of the termination of Bernstein as Golladay's NFLPA Contract Advisor. Golladay's email asked Bernstein to waive the provision of the SRA that states "termination of this Agreement shall be effective five (5) days after written notice of termination is given to the other party."

129.   The Memorabilia Dealer Defendants posted advertisements for the Golladay-signed items the very same day, January 24, 2019.

130.   The closeness in time between the Signing on January 21, 2019, on the one hand, and Golladay's January 22, 2019 call to Bernstein and January 24, 2019 formal termination of the SRA and Endorsement and Marketing Agreement with Plaintiffs, on the other hand, demonstrates that the Signing caused, in whole or in part, Golladay's decision to terminate his contracts with Plaintiffs.

131.   Defendants knew that arranging the Signing for Golladay was tortious and wrongful, and that doing so would assist CAA and France in purposefully violating the regulations and standards that govern France's profession. For example, the NFLPA Regulations Governing Contract Advisors expressly prohibit France from offering Golladay money or any other thing of value to induce or encourage Golladay to utilize France's services as an NFLPA Contract Advisor. *See* Doc. 11-6 at Section 3(B)(2).[3]

132.   Golladay's friend and "mentor", Kenneth Saffold, testified in a 2019 arbitration that he did not know whether CAA had anything to do with setting up the Golladay Signing. Ex. 5.

---

[3] Defendants have previously entered the NFLPA Regulations Governing Contract Advisors into the record at Doc. 11-6.

133.    Saffold testified he would find it a "red flag" and "improper" if he were to discover that CAA and/or France were involved. *Id.*

134.    Saffold testified that if he were to learn that CAA was connected to the Signing, and that connection was used to help sway Golladay's decision to change agents and agencies, then he would have reservations about the entire relationship with CAA and France. *Id.*

135.    Saffold testified that while Golladay was considering changing agents in December 2018, Saffold "told Mr. Golladay to wait and see what opportunities might be presented to him by Jason Bernstein and his company Clarity in the run-up to the Super Bowl in [February] 2019" and "advised Mr. Golladay [to] wait and see what opportunities you have during that time period[.]" *Id.*

136.    The Memorabilia Dealer Defendants worked in concert with CAA to purposefully interfere with Clarity's Endorsement and Marketing Agreement with Golladay.  The Memorabilia Dealer Defendants took these actions because they desired to please CAA so they would continue to receive business from CAA, namely referrals of NFL players represented by CAA for whom Defendants arrange signings, signings from which Defendants profit.

137.    Just as the Memorabilia Dealer Defendants acted in concert with CAA to arrange and carry out autograph signings for, among others, the NFL players noted

above, they acted in concert with CAA again to arrange and carry out the January 21, 2019 Signing for another NFL player, Golladay.

## Plaintiffs' Damages Because of
## Defendants' Interference with the Endorsement and Marketing Agreement

138. Plaintiffs secured about $144,900.25 in endorsement and marketing contracts for Golladay in 2017 and 2018, for an average of $72,095.13 per year.

139. Plaintiffs received approximately $10,814.27 per year in 2017 and 2018 in commissions under the Endorsement and Marketing Agreement.

140. Based on this history, Plaintiffs' damages caused by Defendants' tortious interference with the Endorsement and Marketing Agreement, in the form of lost future earnings, are at least $10,814.27 per year.

141. The amount of Plaintiff's annual lost future earnings caused by Defendants' interference with the Endorsement and Marketing Agreement will only increase in future years as Golladay experiences more success in his NFL career.

## Defendants' Interference with the SRA

142. In addition to Defendants' knowledge of Clarity's exclusive Endorsement and Marketing Agreement with Golladay, Defendants were also aware of Bernstein's SRA with Golladay. Plaintiffs incorporate the foregoing allegations.

143. Defendants knew or believed that France desired to represent and enter into a Standard Representation Agreement with Golladay.

144. Defendants, through their coordination with France and/or their actions taken at France's direction about the January 21, 2019 Signing, and knowledge of France's desire to represent Golladay, purposefully interfered with the SRA.

145. The Memorabilia Dealer Defendants worked in concert with CAA to purposefully interfere with Bernstein's SRA with Golladay. The Memorabilia Dealer Defendants took these actions because they desired to please CAA so they would continue to receive business from CAA, namely referrals of NFL players represented by CAA for whom Defendants arrange signings, signings from which Defendants profit.

146. On January 22, 2019, the day after Golladay's January 21, 2019 appearance and memorabilia Signing, Golladay called Bernstein and said he was going to terminate Bernstein as his NFLPA Contract Advisor.

147. Shortly after midnight on January 24, 2019, Golladay sent an email to Bernstein to provide written confirmation of the termination of Bernstein as Golladay's NFLPA Contract Advisor. Golladay's email asked Bernstein to waive the provision of the SRA that states "termination of this Agreement shall be effective five (5) days after written notice of termination is given to the other party."

148. Defendants posted advertisements for the Golladay-signed items the very same day, January 24, 2019.

27

149.  The closeness in time between the Signing on January 21, 2019, on the one hand, and Golladay's January 22, 2019 call to Bernstein and January 24, 2019 formal termination of the SRA and Endorsement and Marketing Agreement with Plaintiffs, on the other hand, demonstrates that the Signing caused, in whole or in part, Golladay's decision to terminate his contracts with Plaintiffs.

150.  Plaintiffs had a more than reasonable expectation the SRA and Endorsement and Marketing Agreement both would have continued indefinitely if Defendants had not interfered with those existing contracts.

151.  Bernstein and Clarity (including Clarity employee Emily Ries) had a very close relationship with Golladay and Golladay's family before Defendants interfered with the SRA and Endorsement and Marketing Agreement.

152.  In or about August and October 2018, Golladay recommended Plaintiffs' services to his former college teammate at Northern Illinois University, Albert Smalls. Golladay recommended that Albert Smalls use Plaintiffs as Smalls' NFLPA Contract Advisor and for endorsement and marketing work as well.

153.  As a further example, in January 2019, in the midst of what would turn out to be Defendants' interference, Bernstein was present with Golladay at an offseason surgery in Detroit. Bernstein also transported Golladay to and from the surgery. Around this time, in addition to accompanying his then-client to his

surgery, Plaintiffs were also working to obtain a rental apartment in Florida where Golladay would be rehabbing from his surgery and doing his offseason training.

154.   Plaintiffs also were working to arrange Golladay's rehabilitation from his January 2019 surgery.

155.   Also around this time, Plaintiffs were assisting Golladay by liaising with Golladay's accountant.

156.   Also around this time, and as yet another example, at Golladay's request, Plaintiffs had documents prepared in order for Golladay to create his own personal services entity. Bernstein brought these documents when he traveled to Detroit to accompany Golladay to his January surgery so that Golladay could sign them.

157.   Also around this time, Golladay asked Bernstein about changes or potential changes with both the wide receivers coach and lead contract negotiator for the Detroit Lions.

158.   Plaintiffs thus provided their full and loyal services to Golladay, and Plaintiffs had at least a reasonable expectation that the SRA and Endorsement and Marketing Agreement would continue throughout Golladay's NFL career and that Bernstein would negotiate Golladay's second playing contract with an NFL team at the end of this playing season.

159.   Bernstein's expectation that he would negotiate a second playing contract for Golladay is reasonable and well founded, as he has negotiated second (or third, fourth, or fifth) contracts and contract extensions for, among others, the following NFL player clients:

    a.  Colin Kaepernick – one contract extension and one contract renegotiation;

    b.  Jason Kelce, who Bernstein has represented from 2011 to the present – two contract extensions;

    c.  Alejandro Villaneuva, who Bernstein has represented from 2014 to the present – one free agent contract;

    d.  Andre Roberts, who Bernstein has represented from 2010 to the present – five free agent contracts;

    e.  Virgil Green, who Bernstein has represented from 2011 to the present – two free agent contracts;

    f.  A.J. Klein – two free agent contracts;

    g.  Beau Allen – two free agent contracts;

    h.  Connor Barwin, who Bernstein represented from 2009 to the present – three free agent contracts and one contract renegotiation.

    i.  Devin Smith – one free agent contract;

    j.  Jason Worilds – one contract extension;

k.  Bishop Sankey – three free agent contracts;

l.   Dadi Nicolas – four free agent contracts;

m. Cortez Allen – one contract extension;

n.  Jason Snelling – one free agent contract and one contract extension;

o.  Johnnie Dixon – one free agent contract;

p.  Jordan Brown – one free agent contract;

q.  Jalin Marshall – two free agent contracts;

r.   Bishop Sankey – three free agent contracts;

s.  Zach Sudfeld – one free agent contract;

t.   Darius Latham – one free agent contract;

u.  Dwayne Gratz – one free agent contract;

v.  Robert Blanton – three free agent contracts;

w. Mickey Shuler – five free agent contracts; and

x.  Joey Haynos – one free agent contract.

**Plaintiffs' Damages Because of Defendants' Interference with the SRA**

160.   Golladay is in the fourth year of a four-year rookie NFL playing contract with the Detroit Lions.  Pursuant to Article 7, Section 3, K(i) of the NFL Collective Bargaining Agreement, Golladay is currently eligible to negotiate a contract or contract extension with the Detroit Lions.

161.   Golladay is now a "number one" receiver for his team.  During the

2018-2019 season he had over 1,000 receiving yards and led the Lions in receptions, targets, and receiving yards at 25 years old. This past (2019-2020) season, Golladay led the entire NFL in receiving touchdowns, and was sixth in receiving yards with 1,190. He led his team, the Detroit Lions, in receptions, targets, receiving yards, touchdowns, yards per game, and average yards per catch.

162.   The annual salaries for the best young number one receivers, which Golladay has become, are in excess of $19,450,000 per year. As of June 10, 2020, this was the average annual value of the contracts of the top-five wide receivers in the NFL (Julio Jones, $22,000,000; Amari Cooper, $20,000,000; Michael Thomas, $19,250,000; Odell Beckham, Jr., $18,000,000; Tyreek Hill, $18,000,000).

163.   Because this market increases every year, and because the salary cap increased by $10,000,000 per NFL club in 2020, to $198,200,000,[4] a contract paying $19,450,000 per year is a conservative estimate of Golladay's Average Per Year on a future contract, taking into consideration his past performance and continued ascension.

164.   If Golladay's negotiations with the Lions do not result in a contract this season, he will be eligible for free agency at the end of the 2020-2021 season.

---

[4] 2020 was the seventh consecutive year in which the salary cap has risen at least $10,000,000 per NFL Club, and it rose $11,000,000 per Club from 2018 to 2019.

165.   As further evidence of the increasing market for wide receivers every season, Atlanta Falcons receiver Julio Jones recently received a three-year contract extension worth $66,000,000, or $22,000,000 per year. This extension was entered into two years before Julio Jones's current contract was set to expire.

166.   Golladay's conservatively projected three-year contract extension valued at $19,450,000 per year yields a contract total of $58,350,000.

167.   If Defendants had not interfered with the SRA, Bernstein would have received a commission of no less than $583,500 per year (and a total of $1,750,500 in commissions over the term of a three year playing contract) under the terms of the SRA because he would be entitled to 3% of the playing contract value.

168.   Plaintiffs' lost future earnings caused by Defendants' tortious interference with the SRA are at least $583,500 per year.

169.   Even if Golladay received a three-year contract extension worth only $5,000,000 per season—close to just a quarter of the conservative market for Golladay's services—Plaintiffs' lost earnings (in the form of lost commissions) would still be at least $150,000 per year, and would total at least $450,000.

170.   Defendants will prove the amount of their damages at trial.

## COUNT I – TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONSHIPS (ENDORSEMENT AND MARKETING AGREEMENT)

171.   Plaintiffs incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

172.   Plaintiffs had a valid contract with Golladay based on the December 23, 2016 Endorsement and Marketing Agreement.

173.   The Endorsement and Marketing Agreement was formed for the benefit of Plaintiffs.

174.   Defendants CAA, Redland Sports, Ochs, MVP Authentics, Eisenhour, Smith, Boone Enterprises, and Craig Boone knew that Clarity had a valid and exclusive Endorsement and Marketing Agreement in place with Golladay at the time they arranged for, promoted, and carried out the Golladay memorabilia Signing that took place on January 21, 2019.

175.   Defendants knew their actions risked harm to Plaintiffs.

176.   Defendants acted in conscious disregard of the risk of harm to Plaintiffs.

177.   Defendants' conduct was outrageous, intentional and malicious because of the Defendants' evil motive and/or reckless indifference to Plaintiffs' rights under the Endorsement and Marketing Agreement.

178.   The purposeful actions of Defendants, including but not limited to negotiating, contracting and arranging for, promoting, and carrying out the memorabilia Signing on January 21, 2019, interfered with performance of the Endorsement and Marketing Contract.

179.   Defendants were not privileged or justified in their actions.

180.   As a result of Defendants' interference, Plaintiffs sustained and will sustain in the future pecuniary losses in excess of $75,000, representing their lost fees under the Endorsement and Marketing Agreement.

## COUNT II – TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONSHIPS (STANDARD REPRESENTATION AGREEMENT)

181.   Plaintiffs incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

182.   Plaintiffs had a valid contract with Golladay based on the December 23, 2016 Standard Representation Agreement.

183.   The Standard Representation Agreement was formed for the benefit of Plaintiffs.

184.   Defendants CAA, Redland Sports, Ochs, MVP Authentics, Eisenhour, Smith, Boone Enterprises, and Craig Boone knew that Bernstein had a valid Standard Representation Agreement in place with Golladay at the time they arranged

for, promoted, and carried out the Golladay memorabilia Signing that took place on January 21, 2019.

185.   Defendants knew their actions risked harm to Plaintiffs.

186.   Defendants acted in conscious disregard of the risk of harm to Plaintiffs.

187.   Defendants' conduct was outrageous, intentional and malicious because of the Defendants' evil motive and/or reckless indifference to Plaintiffs' rights under the Standard Representation Agreement.

188.   The purposeful actions of Defendants, including but not limited to negotiating, contracting and arranging for, promoting, and carrying out the memorabilia Signing on January 21, 2019, interfered with performance of the Standard Representation Agreement.

189.   Defendants were not privileged or justified in their actions.

190.   As a result of Defendants' interference, Plaintiffs sustained and will sustain in the future pecuniary losses in excess of $75,000, representing their lost fees under the SRA.

**WHEREFORE,** Plaintiffs Clarity Sports International LLC and Jason Bernstein respectfully request that judgment be entered in their favor and against Defendants, individually and jointly, as follows:

(a)    For damages in an amount of at least $1,782,942.81 in lost future commissions caused by Defendants' tortious interference with Plaintiffs' SRA and Endorsement and Marketing Agreement with Golladay;

(b)    For punitive damages to punish Defendants' outrageous conduct, evil motive, and reckless indifference to Plaintiffs' contractual rights; and

(c)    For such other and further relief as this Court deems just and proper.

Dated:  July 17, 2020                    Respectfully submitted,

DOWD BENNETT LLP

By:  /s/ *John D. Comerford*
        John D. Comerford #60164MO
        James B. Martin #70219MO
        7733 Forsyth Blvd., Suite 1900
        St. Louis, Missouri 63105
        (314) 889-7300 (phone)
        (314) 863-2111 (facsimile)
        jcomerford@dowdbennett.com
        jbmartin@dowdbennett.com

BUZGON DAVIS LAW OFFICES

        Scott L. Grenoble
        Attorney I.D. #72808
        525 South Eighth Street
        Post Office Box 49
        Lebanon, PA    17042-0049
        (717) 274-1421
        Fax: (717) 274-1752
        E-mail: sgrenoble@buzgondavis.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2020 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system.

*/s/ John D. Comerford*

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CLARITY SPORTS INTERNATIONAL LLC and JASON BERNSTEIN, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | :    No. 1:19-CV-00305 (YK) |
| | : |
| REDLAND SPORTS, GERRY OCHS, MVP AUTHENTICS, LLC, DARYL EISENHOUR, JASON SMITH, BOONE ENTERPRISES, INC. d/b/a BOONE ENTERPRISES AUTHENTIC AUTOGRAPHS and CRAIG BOONE, | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| Defendants. | : |

## CRAIG BOONE'S AND BOONE ENTERPRISES, INC.'S SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendants Craig Boone ("Boone") and Boone Enterprises, Inc. ("Boone Enterprises") provide these Supplemental Responses to Plaintiffs' First Set of Interrogatories (collectively, the "Supplemental Reponses" and each a "Supplemental Response"), pursuant to the Court's written and oral Orders respecting discovery responses.

### Introduction And Statement As To Objections

Pursuant to the Court's directives, the Supplemental Reponses are provided without objection; provided, however, that nothing herein concedes or admits that the Interrogatories or Supplemental Reponses are in any way relevant or admissible at the trial of this action or otherwise, and all such objections are expressly preserved.

By way of example but not limitation, Kenny Golladay (the "Player"), made his decision to terminate Jason Bernstein ("Bernstein") as his registered contract advisor and Clarity Sports International LLC ("Clarity Sports") as his marketing representative in December 2018, specifically, on or about December 5, 2018. At the same time, the Player decided to hire Todd

France ("France") of a competing agency, CAA Sports, LLC ("CAA"). Consequently, any Interrogatories and related Supplemental Responses regarding the small autograph signing the Player attended on January 21, 2019 (the "Signing Event") are not relevant and are, thus, inadmissible pursuant to F.R.E. 401 and 402. To be clear, Bernstein and Clarity Sports have accused the defendants in this action of tortiously interfering with two contracts among them and the Player (specifically, an NFLPA Standard Representation Agreement, the "SRA," and an Endorsement and Marketing Agreement, the "EMA") merely by participating in the Signing Event; the Signing Event took place weeks after the Player had made his decision to terminate Bernstein and Clarity Sports and hire France and CAA; and the Signing Event had nothing to do with the Player's decision to terminate the SRA and EMA.

In summary, that the Signing Event was organized and took place cannot form the basis of a tortious interference with contract claim against the defendants; nor can it form the basis of a cause of action by Bernstein or Clarity Sports by any party. The Signing Event is, in fact, a non-event.

### Specific Supplemental Responses to Interrogatories

1.   **Identify each and every person who participated in any manner in the preparation of the responses to these interrogatories.**

*Response No. 1*:      *Craig Boone.*

   **For each person so identified:**

   **a.   Describe the nature of their involvement;**

*Response No. 2*:      *Craig Boone supplied the factual information set forth herein.*

   **and**

PHIL1 8935815v.1

b. **Identify which specific interrogatory answer or answers such person participated in any manner preparing response thereto.**

_Response No. 3:_      _Craig Boone answered all of the Interrogatories on behalf of himself (as a named defendant) and on behalf of Boone Enterprises._

2.    **Identify each and every person with knowledge of the facts alleged in the Second Amended Complaint, including:**

a. **Each person's last known address;**

b. **Each person's employer; and**

c. **Each person's job title.**

_Response No. 4:_      _The following individuals are believed to have such knowledge:_

A. _Jason Bernstein, Member, Clarity Sports (9412 Crimson Leaf Terrace, Potomac, MD 20854)_

B. _Emily Ries, Marketing Director of Clarity Sports (c/o 9412 Crimson Leaf Terrace, Potomac, MD 20854)_

C. _Jason Smith, Principal of MVP Authentics, LLC (11 West 2nd Street, Hummelstown, PA 17036)_

D. _Daryl Eisenhour, Principal of MVP Authentics, LLC (11 West 2nd Street, Hummelstown, PA 17036)_

E. _Craig Boone, Owner of Boone Enterprises, Inc. (142 Route 213, Pompton Plains, NJ 07444)_

F. _Gerry Ochs, Owner of Redland Sports (562 Magaro Road, Enola, PA 17025)_

G. _Kenny Golladay, NFL football player employed by the Detroit Lions, c/o Lions Facility, 222 Republic Drive, Allen Park, Michigan, 48101 (personal address unknown)_

H. _Stacy Wright-Whitaker, employer unknown (on information and belief, 8621 S. Euclid Avenue, Chicago, Illinois, 60617)_

I. _Kenneth Saffold, employer unknown (on information and belief, Columbia County, Georgia)_

-3-

> J.   Jake Silver, CAA marketing employee, address unknown.

**3.** **Identify each current or former employee, agent, or representative of Defendant MVP Authentics, LLC.**

_Response No. 5:_    _Upon information and belief, Jason Smith and Daryl Eisenhour are current employees, agents or representatives of MVP Authentics. The identities of any former employees, agents or representatives is unknown._

> **For each person identified, state:**

> **a.   Each person's last known address; and**

_Response No.6:_    _See Supplemental Response No. 4, above._

> **b.   Each person's job title.**

_Response No.7:_    _See Supplement Response No. 4, above.  ._

**4.** **Identify each person with whom you have had any communication about the events described in the Second Amended Complaint.**

_Response No.8:_    _With respect to discussing the Second Amended Complaint after this lawsuit was filed, Jason Smith, Daryl Eisenhour and Gerry Ochs (and my attorneys, which communications are subject to attorney-client privilege, which is not being waived).  If this Interrogatory is construed as requesting communications about the Signing Event prior to the filing of the lawsuit, Jason Smith, Daryl Eisenhour and Gerry Ochs._

> **For each person identified, state:**

> **a.   Each person's last known address;**

_Response No. 9:_    _For Jason Smith, Daryl Eisenhour and Gerry Ochs, see Supplemental Response No 4, above._

> **and**

PHIL1 8935815v.1

b.   **Each person's job title.**

_Response No. 10_:   _For Jason Smith, Daryl Eisenhour and Gerry Ochs, see Supplemental Response No. 5, above._

5.   **Identify each person with whom you have had any communication about Golladay. For each person identified, state:**

a.   **Each person's last known address; and**

b.   **Each person's job title.**

_Response No. 11_:   _Jason Smith, Daryl Eisenhour, Gerry Ochs and Jake Silver (and my attorneys, which communications are subject to attorney-client privilege, which is not being waived).  With respect to the job titles and last known addresses of these individuals, see Supplemental Responses Nos. 4 and 9, above._

6.   **Have you had or participated in any communication with Golladay?**

_Response No. 12_:      _No._

If so:

a.   **Identify the date of each communication;**

_Response No. 13_:      _Not applicable._

b.   **Identify the persons participating in each communication, including:**

_Response No. 14_:      _Not applicable._

i.   **Identify each person who communicated in any way;**

_Response No. 15_:      _Not applicable.  ._

ii.   **Identify each person who was present for or witnessed such communication;**

_Response No. 16_:      _Not applicable._

iii.   **Identify the intended recipient of each communication;**

_Response No. 17_:      _Not applicable._

and

    iv.    **Identify each person who was a copied recipient, or a cc or bcc recipient, of each communication.**

*Response No. 18*:    *Not applicable.*

    c.    **State verbatim the content of each communication or, if in written form, attach such communication in lieu of stating its content verbatim;**

*Response No. 19*:    *Not applicable.*

and

    d.    **Identify and describe in detail each and every document mentioning or related to each communication identified in this Interrogatory,**

*Response No. 20*:    *Not applicable.*

including:

    i.    **Identify each document summarizing each such communication, including any notes about, recapitulation, abstract, brief, compendium, restatement, digest, inventory, report, review, or synopsis;**

*Response No. 21*:    *Not applicable.*

    ii.    **State the verbatim content of each document or attach such document in lieu of stating its content verbatim.**

*Response No. 22*:    *Not applicable.* .

    7.    **Have you had or participated in any communication with France within the last six months?**

*Response No. 23*:     No.     Responding defendants (Boone and Boone Enterprises) have never communicated with France, at any time.  As a matter of fact, the first time responding defendants ever heard of France was after they learned of this lawsuit, and saw France's name referenced.

> **If so:**
>
> **a.  Identify the date of each communication;**

*Response No. 24*:     Not applicable.

> **b.  Identify the persons participating in each communication,**

*Response No. 25*:     Not applicable.

> > **i.  Identify each person who communicated in any way;**

*Response No. 26*:     Not applicable.

> > **ii.  Identify each person who was present for or witnessed such communication;**

*Response No. 27*:     Not applicable.

> > **iii.  Identify the intended recipient of each communication; and**

*Response No. 28*:     Not applicable.

> > **iv.  Identify each person who was a copied recipient, or a cc or bcc recipient, of each communication**

*Response No 29*:     Not applicable.

> **c.  State verbatim the content of each communication or, if in written form, attach such communication in lieu of stating its content verbatim; and**

*Response No. 30*:     Not applicable.

> **d.  Identify and describe in detail each and every document mentioning or related to each communication identified in this Interrogatory, including:**

       i.    **Identify each document summarizing each such communication, including any notes about, recapitulation, abstract, brief, compendium, restatement, digest, inventory, report, review, or synopsis;**

*Response No. 31*:    *Not applicable.*

       ii.    **State the verbatim content of each document or attach such document in lieu of stating its content verbatim.**

*Response No. 32*:    *Not applicable.*

8.    **Have you had any communications with any employee, agent, or representative of CAA, or any individual associated with CAA or negotiating on CAA's behalf?**

    **If so:**

    a.    **Identify the date of each communication;**

    b.    **Identify the persons participating in each communication, including:**

       i.    **Identify each person who communicated in any way;**

       ii.    **Identify each person who was present for or witnessed such communication;**

       iii.    **Identify the intended recipient of each communication; and**

       iv.    **Identify each person who was a copied recipient, or a cc or bcc recipient, of each communication**

    c.    **State verbatim the content of each communication or, if in written form, attach such communication in lieu of stating its content verbatim; and**

    d.    **Identify and describe in detail each and every document mentioning or related to each communication identified in this Interrogatory, including:**

PHIL1 8935815v.1

     i.    **Identify each document summarizing each such communication, including any notes about, recapitulation, abstract, brief, compendium, restatement, digest, inventory, report, review, or synopsis;**

     ii.    **State the verbatim content of each document or attach such document in lieu of stating its content verbatim.**

<u>*Response No 33*</u>:     *This supplemental response is set forth in answer to Interrogatory No. 8 and all subparts thereof. For football athlete signings, responding defendants (Boone and Boone Enterprises) deal with approximately 7-10 entities on a regular basis, of which CAA is one. Sometimes these entities reach out to us and ask us if we are interested in organizing marketing events, and sometimes we reach out to them and/or individual athletes to request if we can do such events. Moreover, this is a fairly standard practice in the industry. Jake Silver is the person we have historically dealt with at CAA. Near the Christmas holidays in late December 2018, I had a telephone conversation with Jake Silver regarding such marketing events (such calls between us and various other parties are not unusual, but occur frequently in our ordinary course of business). The telephone conversation was not specific to Mr. Golladay, nor was Mr. Golladay the reason for the telephone conversation. Rather, while discussing the possibility of various signing events, Jake Silver mentioned that Mr. Golladay, a player for the Detroit Lions, might be interested in doing an autograph signing event, and asked us if we were interested. At no point during this conversation did Mr. Silver insist that we participate in this signing, nor was there ever any mention of Todd France, Jason Bernstein or Clarity Sports during this call. Rather, Mr. Silver mentioned that any such autograph signing would need to take place in or near Mr. Golladay's hometown of Chicago, Illinois and, to the extent there was interest on our part, it would need to occur toward the end of January when Mr. Golladay would be visiting his mother in Chicago, Illinois. I provided Jake Silver potential dates in January 2019 that we would be available, and was told that January 21, 2019*

PHIL1 8935815v.1

would be the best date for Mr. Golladay (it is my understanding that this date had something to do with Mr. Golladay's scheduled flight into Chicago that day). Ultimately, we and Mr. Golladay signed a contract and there was nothing unusual about this. The only unusual thing regarding this signing is that, prior to the event, I received a call or calls from Gerry Ochs where he told me that an "Emily Ries" and "Jason Bernstein" had contacted him. According to Gerry Ochs, Emily Ries had called him and initially posed as a memorabilia dealer who was interested in receiving some signed merchandise from the upcoming Kenny Golladay signing. After Gerry Ochs confirmed for Ms. Ries that the signing was scheduled to take place, and he inquired what items she was interested in, at which point she told him that she was not a memorabilia dealer but, instead, Mr. Golladay's exclusive marketing representative, and that he should not proceed forward with the signing. At no point in time did Ms. Ries provide any of us with a copy of any contracts to substantiate the assertions she made to Gerry Ochs after recanting her prior statements to him about being a bona-fide memorabilia dealer. Gerry Ochs also told me that he had received similar communications from Jason Bernstein. I myself have never communicated with either Emily Ries or Jason Bernstein and, until the calls from Gerry Ochs, had no idea who they were. At the time, we were skeptical of the calls, because Gerry Ochs told us that Emily Ries had lied to him in his initial communication with her, and also because neither Emily Ries nor Jason Bernstein sent us any documents showing that they had any relationship with Mr. Golladay. Upon learning of this, I called Jake Silver about it; he told me he would check into it and call me back; he called me back and said that we could go ahead with the autograph event in Chicago, Illinois. For the avoidance of any doubt, at no point during these conversations did Mr. Silver insist that we pursue this signing with Mr. Golladay at the direction of CAA, or in order to maintain CAA as contact in the industry, or to curry favor with CAA as it pertained to other business opportunities involving other players with whom we have done work. Moreover, and as noted above, there was never any mention of Todd France during these conversations,

*nor any request (as Mr. Bernstein falsely alleges in this lawsuit) that we participate in this signing for the direct, or indirect, purpose of encouraging, persuading or influencing Mr. Golladay to fire Bernstein or Clarity Sports (again, whose names I had never even heard of before) and, instead, hire Mr. France or CAA.  As such, and having heard nothing further from either Emily Ries or Jason Bernstein, we proceeded forward with the signing on January 21, 2019 in Chicago, Illinois.*

**9.      Describe how, and the circumstances under which, you first came into contact with Golladay, and all communications you had relating to your initial contact with Golladay, including communications with any persons other than Golladay.**

<u>*Response No 34*</u>*:      Responding defendants (Boone and Boone Enterprises) never came into contact with Mr. Golladay.  For the answer to the remainder of this Interrogatory, see Response No. 33, above.*

**10.      Describe all communications you had with France or any other employee, agent, or representative of CAA, about arranging, contracting for, setting up, or otherwise related to the January 21, 2019 autograph signing and appearance by Golladay in Lombard, Illinois that is referenced in the Second Amended Complaint.**

<u>*Response No. 35*</u>*:      Responding defendants (Boone and Boone Enterprises) never had any communications with France.  For the answer to the remainder of this Interrogatory, see Response No. 33, above.*

**11.      Describe all communications you had with France or any other employee, agent, or representative of CAA, about Golladay, including but not limited to communications about arranging for, contracting for, setting up, or otherwise related to any public appearance or autograph signing by Golladay.**

<u>Response No. 36:</u>    *Responding defendants (Boone and Boone Enterprises) never had any communications with France.  For the answer to the remainder of this Interrogatory, see Response No. 33, above.*

12.    **Describe all communications you had with France or any other employee, agent, or representative of CAA, about selling, marketing, advertising, or otherwise disposing of the items signed by Golladay at the January 21, 2019 autograph signing in Lombard, Illinois that is referenced in the Second Amended Complaint.**

<u>Response No. 37</u>:    *Responding defendants (Boone and  Boone Enterprises) never had any communications with France.  For the answer to the remainder of this Interrogatory, see Response No. 33, above.*

13.    **Describe all communications you had with France or any other employee, agent, or representative of CAA about Plaintiff Jason Bernstein and/or Clarity Sports International LLC.**

<u>Response No. 38</u>:    *Responding defendants (Boone and Boone enterprises) never had any communications with France.  For the answer to the remainder of this Interrogatory, see Response No. 33, above.*

14.    **Identify your business partners, partner agencies, and other sports memorabilia or related companies with whom you have worked on professional athlete player appearances or autograph signings within the last six months. For each person, entity, or company identified, state your business relationship with same.**

<u>Response No. 39</u>:    *There is no formal relationship between Boone Enterprises, MVP Authentics and Gerry Ochs of Redland Sports. We work with MVP Sports and Gerry Ochs of Redland Sports in connection with memorabilia signing events.  We also inform other memorabilia dealers about signing events to see whether they want to pre-order signed memorabilia.  The reason for this is simple.  Many athletes will not*

*show up at an event unless they are paid a certain amount of money. The athlete's compensation for showing up is typically based on how many items they will sign. The memorabilia dealer responsible for the signing must purchase the items to be signed and transport them (or have them shipped to) the signing event. This involves an initial upfront cost. Sometimes it is necessary to involve more than one, or even several, memorabilia dealers, to purchase enough items to support the compensation to be paid to the athlete. Also, this mitigates loss if the memorabilia items, once signed, cannot be sold, because we would not have incurred the entire cost of the items ourselves. With respect to Mr. Golladay, it is believed that he signed approximately 600 items that were so pre-purchased, which included full size helmets, mini-helmets, footballs, jerseys and cleats (I am not sure if there were any photographs signed). These expenses were shared between Boone Enterprises, MVP Authentics and Gerry Ochs of Redland Sports. On information and belief, Gerry Ochs physically traveled to the signing event with the unsigned items; handed Mr. Golladay a check after Mr. Golladay signed the memorabilia (which represented his compensation); told Mr. Golladay what and where to sign; and then returned with the signed items. To the extent the items were not already pre-sold to other memorabilia dealers, Boone Enterprises, MVP Authentics and Gerry Ochs of Redland Sports sold the items over the internet during the next several months. It is believed that all the items signed by Mr. Golladay at the event have been sold as of this time.*

**15. Describe your relationship with CAA, including but not limited to the number of professional athlete player appearances and autographs signing for which you have entered into a contract with a player represented by CAA, and identify the CAA employee(s), agent(s), or representative(s) with whom you negotiated each contract.**

<u>Response No. 40</u>: *See Response No. 33, above. By way of further answer, CAA is only one of 7-10 entities with whom we interact to arrange signings for football players, and these particular entities only represent a small fraction of the hundreds of market participants with whom we interact in the industry*

*to participate in memorabilia signings in general. Finally, we are not bound by any restrictions that would limit our ability to freely work with any such market participants. Responding defendants (Boone and Boone Enterprises) do not know the number of signing events they have done with players represented by CAA, nor do they keep track of such information for any particular agency.*

16.     **State the amount of your income, revenue, commission(s), payments or other earnings from the sale of items and/or memorabilia signed by Golladay.**

<u>*Response No. 41*</u>*:      See Response No. 39, above. By way of further answer, the exact amount is unknown. Again, the profits earned from any signing event are not large. Boone Enterprises' inventory of signed memorabilia typically turns over quite quickly, and we do not track sales by any individual athlete. Since our business is much broader than just football players (we also deal with signings for movie stars, recording artists, baseball players, basketball players, hockey players, etc.), we do not account for revenue, income, commissions or earnings and profits based on any one particular signing; instead, we focus on overall sales across all industries.*

17.     **Identify any payments you have received from CAA and/or CAA Sports LLC, or CAA and/or CAA Sports LLC employees, agents, or representatives within the last eighteen months.**

<u>*Response No. 42*</u>:  *None.  Further, this Interrogatory misunderstands how the memorabilia industry works. There would be no reason for CAA or any of its employees, agents or representatives to make any such payment to us in connection with any autograph signing event and, certainly, no such payments were received in connection with Mr. Golladay's January 21, 2019 autograph signing event.*

<div style="margin-left:40%">

KLEHR HARRISON
HARVEY BRANZBURG LLP

</div>

Dated:  June 1, 2020                    By:     */s/ Michael A. Iaconelli*
                                                Michael A. Iaconelli (Pa. I.D. No. 77340)
                                                William J. Clements (Pa. I.D. No. 86348)
                                                Monica Clarke Platt (Pa. I.D. No. 311445)
                                                1835 Market Street, 14th Floor
                                                Philadelphia, PA 19103
                                                ph  (215) 569-2700
                                                fax (215) 568-6603
                                                miaconelli@klehr.com
                                                wclements@klehr.com
                                                mplatt@klehr.com

                                                *Attorneys for Defendants,*
                                                *MVP Authentics, LLC, Daryl Eisenhour,*
                                                *Jason Smith, Boone Enterprises, Inc. d/b/a*
                                                *Boone Enterprises Authentic Autographs*
                                                *and Craig Boone*

PHIL1 8935815v.1

## **VERIFICATION**

I, Craig Boone, state that I have read Plaintiffs' First Set of Interrogatories directed to Boone Enterprises, Inc. and Craig Boone dated January 31, 2020 and, on behalf of Boone Enterprises, Inc. and me, I hereby verify that the foregoing supplemental answers to those interrogatories are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Date: June 1, 2020

Craig Boone (Individually and as Authorized Representative of Boone Enterprises, Inc.)

-16-

## <u>CERTIFICATE OF SERVICE</u>

I, Monica Clarke Platt, hereby certify that on this 1st day of June , 2020, I served a true and correct copy of the foregoing Responses and Objections to First Set of Interrogatories addressed to Craig Boone and Boone Enterprises, Inc. dated January 31, 2020 by Electronic Mail to the following:

Scott L. Grenoble, Esquire
BUZGON DAVIS LAW OFFICES
525 South Eighth Street
P.O. Box 49
Lebanon, PA 17042-0049

and

John D. Comerford
James B. Martin
DOWD BENNETT LLP
7733 Forsyth Blvd., Suite 1900
St. Louis, MO 63105

*Attorneys for Plaintiffs,*
*Clarity Sports International LLC and Jason Bernstein*

and

Iles Cooper
J.T. Herber III
WILLIAMSON FRIEDBERG & JONES, LLC
10 Westwood Road
Pottsville, PA 17901

*Attorneys for Defendants,*
*Redland Sports and Gerry Ochs*

Dated:  June 1, 2020                    By:    */s/ Michael A. Iaconelli*
                                              Michael A. Iaconelli

PHIL1 8935815v.1

# Exhibit 2



Gerry - Signings
Mobile

1/6/19 5:11 PM

Phil walls is only common contact on Facebook

Who is phil walls

Baltimore guy.

You know if you see him

I will look him up...sounds like your guy does he have your numbee

Yes. But I don't think that's where it came from

She tried to call me again

He is LLC sports marketing...I

Type a message...

BOONE-007



**Gerry - Signings**
Mobile

Baltimore guy.

You know if you see him

I will look him up...sounds like your guy does he have your numbee

Yes. But I don't think that's where it came from

She tried to call me again

He is LLC sports marketing...I remember him from csa

Really in guess she is not going to let it go...maybe phil had the signing

LGC sports marketing....did you pick him off

Type a message...

BOONE-006



BOONE-005



**Gerry - Signings**
Mobile

We will see what we get from Jake tomorrow

Maybe nothing

Hope it is nothing...if she has called you again I think she is going to keep calling

I'm gonna call her tomorrow

What are you going to tell her

That I am buying from another company. And ask who they sold a signing to

That works she has no idea that we are running it

Correct

Type a message...

BOONE-004



← **Daryl, Gerry**
Group MMS

1/11/19 6:38 PM

He is trying to sign via phone and said he will sign and print at his moms this weekend worse case scenario but he's 100% confirmed
6:38 PM

Just got from Jake about kenny
6:38 PM

**Daryl - MVP Framing**
👍
6:39 PM

**Gerry - Signings**
Good deal
6:39 PM

**Daryl - MVP Framing**
Hes knows he cant sign from his phone on 21st right??

Type a Group Message...

BOONE-010



Kenny flight booked

1/17/19 11:30 AM

Kenny prefers to just go straight to signing but if there can be waters and snacks there that would be amazing

BOONE-003



**Daryl, Gerry**
Group MMS

1/18/19 8:41 AM

**Gerry - Signings**

Car service for Kenny/mom/Todd CAA $336

8:41 AM

Ok..can you send me the car service info so I can send to jake

8:43 AM

**Gerry - Signings**

???

8:43 AM

**Gerry - Signings**

They need the airline. Flight #. And need to call Simon when they land

8:44 AM

Ok ...did you give them the flight info and what is Simon number



 

BOONE-008



**Daryl, Gerry**
Group MMS

**Gerry - Signings**
Only flight #. What airline?
8:45 AM

**Gerry - Signings**
Simon
Limo Driver
8478461633
8:46 AM

1/18/19 9:42 AM

American airlines...he wants to know if he will be inside waiting for him
9:42 AM

1/18/19 2:32 PM

**Daryl - MVP Framing**
Updated list of CAA draft picks?
2:32 PM

I asked him for it yetserday
2:32 PM

Type a Group Message...

BOONE-009



← **Gerry - Signings**
Mobile

signing but if there can be waters and snacks there that would be amazing

Ok.

1/18/19 6:16 PM

How is the weather out there

1/18/19 7:29 PM

Good now

1/19/19 5:06 PM

Please remind the client to call once he lands and I will direct him to door 3D for the pickup and vehicle number.

From Simon limo guy

1/20/19 7:39 PM

+ Type a message...

BOONE-002



Kenny's flight right now say arriving at 930

Call you in a few

1/21/19 9:45 AM

Everything god with Jake?

Yeah he is upset about kenny..also wanted us to know Steiner hit him up for aaron

1/21/19 10:05 AM

Jake is waiting for kenny to send it to him

Can I call Jake?

Of course you can

 Type a message...  

**BOONE-001**

# Exhibit 3

**From:** Jason Bernstein
**Sent:** Monday, January 7, 2019 9:54 AM
**To:** 'gman52770@yahoo.com' <gman52770@yahoo.com>
**Subject:** Kenny Golladay

Gary:

This is Jason Bernstein – Kenny Golladay's NFLPA-licensed agent.  Emily Ries (our marketing director) mentioned she spoke with you yesterday regarding Kenny, and passed along your contact.  Please give me a call at your earliest convenience.  We came across your social media post regarding a private signing with Kenny, which Kenny mentioned (yesterday) he is unaware of.  As Emily mentioned to you yesterday, we have an exclusive marketing agreement in place with Kenny, which includes handling all signings.  Thus, we would request that you remove the post immediately, and please give me a call at 301-257-0126 when you get a chance.   I will send you a text message as well to ensure you receive this message.

Thank you,

Jason Bernstein

------



Jason Bernstein | Member
M: 301.257.0126 | F: 240.238.9444
jason@clarityfootball.com | www.clarityfootball.com

**CONFIDENTIAL**

# Exhibit 4





**CONFIDENTIAL**

# Exhibit 5

**In the Matter of:**

**Bernstein**
**v.**
**France**

**Arbitrator Hearing, Day 1**
**CONFIDENTIAL**

November 19, 2019



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1              BEFORE ROGER P. KAPLAN, ARBITRATOR

 2

 3   ----------------------------------:

 4   In the Matter of Arbitration      :

 5   Between:                          :

 6   JASON BERNSTEIN,                  :

 7            Grievant,                : Case No.

 8   vs.                               : NFLPA 19-CA-4

 9   TODD FRANCE,                      :

10            Respondent.             :

11   ----------------------------------:

12                          Alexandria, Virginia

13                          Tuesday, November 19, 2019

14

15           The above-entitled matter came on to be

16   heard before ARBITRATOR ROGER P. KAPLAN, located at 211

17   North Union Street, Suite 100, Alexandria, Virginia,

18   commencing at 9:30 a.m., when were present on behalf of

19   the respective parties:

20

21

22
```

Case 2:20-cv-51481-GCS-RSW ECF No. 1-2 PageID.107 Filed 12/08/20 Page 87 of 93
Case 1:19-cv-00305-YK Document 120-5 Filed 07/17/20 Page 4 of 6

2
Arbitrator Hearing, Day 1 - CONFIDENTIAL                    11/19/2019

```
 1                  A P P E A R A N C E S

 2

 3     On behalf of Grievant:

 4         JOHN D. COMERFORD, ESQUIRE

 5         JAMES B. MARTIN, ESQUIRE

 6         Dowd Bennett, LLP

 7         7733 Forsyth Boulevard, Suite 1900

 8         St. Louis, Missouri 63105

 9

10     On behalf of Respondent:

11         MICHAEL IACONELLI, ESQUIRE

12         WILLIAM CLEMENTS, ESQUIRE

13         Klehr, Harrison, Harvey, Branzburg, LLP

14         1835 Market Street, Suite 1400

15         Philadelphia, Pennsylvania 19103

16

17

18

19                      *   *   *   *   *

20

21

22
```

1          C O N T E N T S

2

3    WITNESS:              DIRECT   CROSS   REDIRECT   RECROSS

4    Kenneth Saffold, Jr.   55      118      164       169

5    Todd France           183      --       --        --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Case 2:20-cr-51484-GCS-RSW ECF No. 1-2 PageID.109 Filed 12/08/20 Page 89 of 93
Case 1:19-cv-00305-YK Document 120-5 Filed 07/17/20 Page 6 of 8

166
11/19/2019

Arbitrator Hearing, Day 1 - CONFIDENTIAL

```
1        Q    Right.  And before -- as I understood what
2   you said earlier, before that Golden Tate event on
3   September 24, 2018, Mr. Golladay hadn't told you
4   that he was interested in talking to other agents or
5   looking at other agents; do I have that right?
6        A    You are kind of stuck on the words, and
7   what I'm saying is that the entirety of the time
8   from January -- excuse me, from July, summer of 2018
9   until his decision to change, we constantly and
10  continually, we do it now, look for other
11  opportunities.  And so an agent wasn't the specific
12  interest at this time before the September 24th
13  meeting.  It was just more opportunities to, like,
14  get out and brand himself.
15        So before he met Todd, it was Racquel in
16  the marketing.  We had looked at a number of other
17  marketing agencies to help represent him.  And then
18  following the dinner, it kind of shifted from
19  marketing to, hey, let's look into this new agent.
20        Q    Okay.  And now let's fast-forward through
21  December 2018.  As I understand your testimony, you
22  told Mr. Golladay to wait and see what opportunities
```

Arbitrator Hearing, Day 1 - CONFIDENTIAL

1   might be presented to him by Jason Bernstein and his

2   company Clarity in the run-up to the Super Bowl in

3   early 2019; do I have that right?

4        A    Correct.

5        Q    And the Super Bowl happened on February 3,

6   2019, right?

7        A    Correct.

8        Q    And so this memorabilia signing that we're

9   talking about on January 21, 2019, that would be

10  somewhere in the NFL playoffs; is that fair?

11       A    Yes, from my recollection.

12       Q    Okay.  And so you advised Mr. Golladay

13  wait and see what opportunities you have during that

14  time period, correct?

15       A    Yes.

16       Q    And then make your decision, right?

17       A    Correct.

18       Q    Okay.  Now, you said to Mr. Clements that

19  it would be a red flag if you were to learn that

20  Todd France or CAA Sports had offered something of

21  value to Mr. Golladay to encourage him to switch.

22  Do you remember that?

Arbitrator Hearing, Day 1 - CONFIDENTIAL

```
 1        A     Yes.

 2        Q     And you also told us that you don't know

 3     whether Todd France or CAA Sports had anything to do

 4     with setting up that memorabilia signing on January

 5     21st, correct?

 6        A     Yes.

 7        Q     And so if you were to learn that there was

 8     a connection between Mr. France or CAA Sports and

 9     that memorabilia signing on January 21st, then that

10     would be a red flag to you, correct?

11        A     If I had learned after the fact, if I

12     learned now that there is a connection and that

13     connection was utilized as a pawn to help sway

14     Kenny's decision, then I would have reservations

15     about our entire relationship.

16        Q     Right.  You agree with me that it would be

17     improper if we were to discover that Todd France or

18     his company, CAA Sports, were involved in that

19     memorabilia signing on January 21st, correct?

20        A     Yes.

21        Q     Okay.  And you understand that under the

22     Regulations that are at issue in this case, the
```

# Exhibit C

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CLARITY SPORTS        :    **1:19-CV-00305**
INTERNATIONAL LLC and    :
JASON BERNSTEIN,        :
                    :
       Plaintiffs      :    (Judge Kane)
                    :
     v.              :    (Magistrate Judge Schwab)
                    :
REDLAND SPORTS, *et al.*,      :
                    :
       Defendants     :

## <u>ORDER</u>
March 31, 2020

Following a telephone conference with counsel, **IT IS ORDERED** that the applicable time period for discovery is January 21, 2018, through January 21, 2020. If discovery reveals that the time period should go back further than January 21, 2018, Plaintiffs shall inform the Court by letter. **IT IS FURTHER ORDERED** that Defendants shall respond to Plaintiffs' discovery requests on or before sixty days from March 31, 2020. Within sixty days of receipt of the discovery, Plaintiffs shall inform the Court of any deficiencies by letter.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge