**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| CLARITY SPORTS INTERNATIONAL, LLC | : | No. 2:20-MC-51484 |
| And JASON BERNSTEIN, | : | |
| | : | District Judge Steeh |
| Petitioners, | : | Magistrate Judge Patti |
| | : | |
| v. | : | Arising From Civil Action |
| | : | No. 1:19-cv-0305-YK pending |
| KENNY GOLLADAY, | : | in the United States Court for the |
| | : | Eastern District of Pennsylvania |
| Respondent. | : | |

## RESPONDENT KENNY GOLLADAY'S OPPOSITION
## TO MOTION FOR CONTEMPT AND SANCTIONS

Respondent Kenny Golladay ("Golladay") submits this response in opposition to the motion for contempt and sanctions (the "Motion") filed against him by Petitioners, his *former* NFL agent Jason Bernstein ("Bernstein"), and Bernstein's marketing company, Clarity Sports International, LLC ("Clarity"). Golladay also preliminarily responds to a new issue Bernstein and Clarity waited to raise until after he: (1) fully responded to the *duces tecum* portion of the January 22, 2021 third party subpoena that Bernstein and Clarity issued but never served on Golladay (the "Subpoena"); and (2) then sat for and completed his deposition as was requested in the Subpoena—specifically, their false accusation that he did not search for and/or produce whatever documents he may have possessed that were responsive to the Subpoena.

## I.    INTRODUCTION

Third party fact witness Golladay is now the victim of serial litigation and arbitration proceedings that his *former* agent, Bernstein, has been litigating over the past 2½ years in multiple federal courts and arbitration forums in connection with Bernstein's vendetta against Golladay's *new* NFL agent, Todd France ("France"). Why?  Because Golladay exercised his absolute right to terminate his "at-will" relationship with Bernstein and Clarity, as was his undisputed right under the regulations promulgated by the National Football League Player's Association ("NFLPA")—regulations to which Bernstein is bound, but is defiantly ignoring via Bernstein's collateral and hostile proceedings.

To be clear: Golladay is not a "party" to any of the five (5) separate litigations that Bernstein (and, derivatively through him, Clarity) have been litigating to the death against Golladay's *new* NFL agent, France, and Golladay's former marketing agency, CAA Sports, LLC ("CAA"), where France was previously employed. Despite this undeniable fact, Bernstein (and Clarity) now seek to ignore that Golladay is <u>not</u> a party to any of these "spite-suits" that Bernstein is fighting over with France and CAA and, instead, is acting as though Golladay, himself, was some kind of a wrongdoer or proper litigant.  He is neither and the undeniable record in

all of these proceedings—as difficult as this may be for Bernstein to accept—has made this fact abundantly clear.[1]

It is also evident that Bernstein (individually and in his capacity as the key decision maker for Clarity) has now resorted to misappropriating and/or distorting the legal process he issued out of the Pa. Federal Court Action—another action to which Golladay is <u>not</u> a party—to vilify and punish his former client for simply exercising his right to break-up with Bernstein (and Clarity) after he decided to

---

[1]     The five litigations Bernstein commenced are: (1) the federal court proceeding he and Clarity are litigating in the Middle District of Pennsylvania against France's former employer, CAA, and several other small memorabilia dealers and furniture movers (the "Pa. Federal Court Action") from which the Subpoena at issue emanates; (2) an NFLPA arbitration proceeding that Bernstein commenced and fully litigated through discovery and two days of arbitration hearings against Golladay's *new* agent, France, in which Bernstein made the same—***but failed to prove and ultimately lost***—the same claims he is now asserting against France's former employer (CAA) and the remaining defendants in the Pa. Federal Court Action ("Bernstein's Failed First Arbitration"); (3) the action Bernstein commenced under the Federal Arbitration Act to vacate the NFLPA arbitration award ***that was entered against Bernstein, and in France's favor***, at the conclusion of Bernstein's Failed First Arbitration ("Bernstein's Failed Vacatur Action"); (4) the appeal of Bernstein's Failed Vacatur Action that Bernstein has now taken to the U.S. Court of Appeals for the Third Circuit ("Bernstein's Second Appeal"); and (5) a specious follow-on arbitration that Bernstein initiated against France with the NFLPA resulting from Bernstein's Failed First Arbitration in an attempt to collaterally attack or ignore: (a) the NFLPA arbitrator's award, (b) two orders and written opinions issued by the federal district court judge presiding over the Pa. Federal Court Action confirming the arbitration award, and twice denying Bernstein's request that it be vacated, and (c) the NFLPA's unwillingness to take any action on Bernstein's new arbitration against France pending the outcome of Bernstein's Second Appeal. Why has Bernstein "lit the earth on fire" via all of these proceedings to this point? The answer is simple.  To enable him to keep such proceedings alive and ongoing *for as long as possible*—no matter the burden and expense they place on the tribunals in which they are being litigated, or the parties against whom they are directed—in the hopes that he will find something to contradict the sworn and case dispositive testimony that Golladay provided <u>more than 2 years ago</u>, and then <u>reaffirmed multiple times</u> under oath on August 30, 2021.  Having failed to find any such evidence—***because no such evidence exists***—Bernstein has now resorted to painting his former client, Golladay, the villain. Enough is enough.

engage a vastly more talented and experienced agent in France.  Such wrongful use of civil proceedings and abuse of process should not be countenanced.

Finally, in terms of the Subpoena itself, and the related Motion Bernstein brought against Golladay in this Court to enforce it, it is undisputed that Golladay **<u>fully</u>** complied with the Subpoena: specifically, the *duces tecum* portion on August 13, 2021, and the *ad testificandum* portion when he sat for and completed his deposition on August 30, 2021.

For all of these reasons, and those set forth in greater detail below, Golladay respectfully submits that no sanctions or other costs should be imposed against him, and that this miscellaneous proceeding should now be dismissed, with prejudice.[2]

**A. <u>Golladay Sat For And Completed His Deposition On August 30, 2021</u>:**

As an initial matter, and after recently retaining counsel, Golladay sat for and completed his deposition on August 30, 2021, pursuant to the Subpoena.  All counsel involved—three different attorneys for three different sets of clients—had the full opportunity to question Golladay over the course of nearly five hours of questioning,

---

[2]   Although not the subject matter of the Motion, Bernstein recently advised via his portion of the Joint Status Report being filed of even date that he also intends to litigate with Golladay over Bernstein's erroneous claim about Golladay's alleged non-compliance with the *duces tecum* portion of the Subpoena.  Should the Court even entertain such improper arguments—and it is respectfully submitted that it should not—there should be no order directing Golladay to conduct any additional searches for documents because he has ***already*** done so in accordance with the requests set forth in the Subpoena itself.  Likewise, because Golladay has ***already*** sat for his deposition, and the parties agreed that his deposition is completed, there is no further action this Court need take in connection with the Motion or Subpoena, and this case should now be dismissed.

and then asked follow-up questions on each other's questions. At the end of the deposition, no attorney—including counsel for Bernstein and Clarity—requested that the deposition be left open, or placed any statement on the record indicating that counsel did not have enough time, or was prevented from asking any further questions of, or obtaining any answers from, Golladay. Rather, Bernstein and Clarity (through counsel) acknowledged, on the record, that Golladay completed all aspects of the *ad testificandum* portion of the Subpoena that requested him to appear for his deposition. At this point, Bernstein and Clarity have agreed that the testimony portion of the Subpoena is now closed.

### B. **Golladay Fulfilled The *Duces Tecum* Part Of The Subpoena Before Testifying:**

Golladay also testified that he looked for, but did not have, documents responsive to the enumerated requests set forth in the Subpoena. Unsatisfied with his former client's sworn testimony—which has been Bernstein's pattern and practice in all of the depositions he has taken in his numerous disputes with France and his former employer, CAA—Bernstein (through counsel) kept asking the same questions ***over and over again*** in the hope that the witness would provide a slightly different answer, no matter how slight or immaterial. Indeed, the deposition is replete with Bernstein's counsel repeatedly asking Golladay the same questions over and over again. Such redundant, argumentative, and cumulative questions not only

necessitated "asked and answered" objections, but also wasted a substantial amount of Golladay's time during the deposition itself.  Bernstein and Clarity will no doubt "cherry pick" certain portions of the testimony where Golladay—after being asked and answering the same question numerous times—indicated that he may not have searched for certain obscure documents that were: (1) not specifically requested in the Subpoena, or (2) outside of the relevant time frame identified therein (as he was neither requested, nor required, to do so by the very terms of the Subpoena itself). Hence, it is highly incongruent, if not absurd, for Bernstein (a former litigation attorney) to criticize his former client, Golladay (a non-lawyer), for adhering in all respects to the instructions contained in, and discovery order entered by the Court in the Pa. Federal Court Action that was attached to, the Subpoena that Bernstein himself drafted and issued to his former client.

It cannot be overemphasized that Bernstein's (and derivatively, Clarity's) tactics throughout all aspects of the discovery process with his arch-rivals France and CAA more closely resemble those of a "special counsel" or "FBI investigation," than those used in civil litigation.  Knowing they have no actual evidence to support their claim—which is and remains a straightforward claim for tortious interference with two "at-will" contracts that Golladay properly terminated with Bernstein and Clarity—and after having their claims completely gutted, most recently, by Golladay's own deposition testimony on August 30, 2021, Bernstein and Clarity

now rely on unfair questioning tactics to manufacture purported contradictions in Golladay's sworn testimony in the hopes that this will obscure the record and allow them to exact financial punishment on their former client (in the form of "monetary sanctions"), as well as reputational and related harm (in the form of a wildly inappropriate request for criminal contempt). Petitioners' tactics are as improper as they are transparent.

As an initial matter, Golladay is merely a third-party fact witness, and not a party to this or any other dispute that Bernstein and Clarity are litigating with their sworn rivals, France and CAA. Indeed, both Bernstein and Clarity have already admitted in verified discovery responses and represented, numerous times, that: (1) they are not accusing Golladay of any wrongdoing; (2) they are not accusing Golladay of breaching any duty to them; and (3) that they have not brought any legal action against Golladay (other than this miscellaneous action in which they now seek to **have him fined $1,000/day**, and **held in criminal contempt during the current NFL season** in which he is already playing for his new employer, the New York Giants).

In addition, because Golladay's recent deposition testimony—as well as the sworn declaration that Golladay provided to all parties **over two years ago**—completely contradicts Bernstein's and Clarity's claims for alleged tortious interference in the Pa. Federal Court Action from which the Subpoena arises,

Bernstein and Clarity have now declared Golladay "Public Enemy Number 1," accuse him of lying and/or perjury, and otherwise paint him as a villain. Again, this should not be countenanced.

What should be of more concern to this Court is that Bernstein and Clarity are also using the discovery process in the Pa. Federal Court Action, and this ancillary proceeding, to harass and torment Golladay—a stranger to the underlying Pa. Federal Court Action from which the Subpoena was issued—for merely testifying *honestly* and *accurately* about the events to which he possesses firsthand knowledge related to that case. Fortunately for Golladay, the law on this issue is well settled, and provides protection to him as a non-party from the unreasonable and overbearing tactics that Bernstein and Clarity have used against him via the Motion.

Even more fundamentally—and ironically considering Bernstein's and Clarity's unreasonable attacks upon their former client—Golladay was never hand-served with the Subpoena in question. Nor was he ever hand-served with any original process with respect to this action to enforce the Subpoena. Rather, these important papers were supposedly sent to an email address that Golladay barely, if ever, used or monitored, or were otherwise sent to third-parties who were neither authorized nor obligated to accept service of process for Golladay. Yet, it is on this flimsy, if not non-existent, record indicating lack of service upon Golladay and no due process protections being afforded to Golladay that Bernstein and Clarity bring

their motion for contempt and seek monetary and criminal sanctions against Golladay, including trying to have him imprisoned for contempt of a Subpoena he was never hand-served with in the first place.

These issues aside, Golladay, a professional athlete at the beginning of his football season, with numerous professional and personal commitments, took time out of his schedule to search for documents and testify about a few sporadic events that took place over the course of a few months in the latter part of 2018 and the first month of 2019. Under the circumstance, there is no evidence that Golladay willfully evaded service or defied any obligation under the Subpoena, and thus no sanctions or other costs should be imposed against him. Indeed, if anything, it is respectfully submitted that this Court should exercise its discretion to protect Golladay—a mere non-party witness—from further harassment, embarrassment and attack by Bernstein and Clarity, and now dismiss this miscellaneous proceeding, with prejudice.

## II.    BACKGROUND

### A.    <u>The Underlying Litigation For Which The Subpoena Was Issued</u>

This Court has only heard the skewed and self-serving views of Bernstein and Clarity and has yet to have the benefit of Golladay's perspective. Contrary to the tenor of Bernstein's and Clarity's filings, the "sky is not falling." Nor was there ever any nefarious plot against Petitioners to prevent them from discovering what

Golladay would testify about. This is because they already had in their possession a sworn declaration that Golladay signed in mid-August 2019 (the "Golladay Declaration") that was submitted in connection with Bernstein's First Failed Arbitration that Bernstein (Golladay's *former* agent) brought against France (the agent whom Golladay chose to replace Bernstein). *See* Exhibit A. As already noted, **Petitioners lost** Bernstein's First Failed Arbitration; the award in France's favor was confirmed by the same District Court Judge in the United States District Court for the Middle District of Pennsylvania where the Pa. Federal Court Action is pending; and Bernstein is now appealing that decision to the Third Circuit Court of Appeals.

In Bernstein's First Failed Arbitration, Bernstein falsely accused France of violating NFLPA regulations governing agent conduct by "poaching" Golladay away from Bernstein, and by "bribing" Golladay with a small autograph signing event (the "Signing Event"). However, as set forth in the Golladay Declaration, Bernstein's recitation of how, when, and why Golladay fired him and hired France was pure fiction, at best. The Signing Event had **nothing** to do with Golladay's decision, which fact was again reaffirmed as true by Golladay himself at his deposition on August 30, 2021.

It should also be noted that Clarity is a marketing agency owned by Bernstein. Golladay fired Clarity as his marketing representative when he fired Bernstein. Moreover, Golladay's contractual relationships with Bernstein and Clarity were

purely "at will," both pursuant to the contracts themselves and NFLPA regulations, which allow an NFL player to terminate his agent at any time and for any reason (or no reason at all).  Indeed, that athletes change agents is not an uncommon occurrence in the sports and entertainment industry, and Bernstein himself grudgingly admitted during discovery in the Pa. Federal Court Action that he was also fired *by at least 10 other NFL player clients* during the relevant time period.

Undaunted by Petitioners' defeat in Bernstein's First Failed Arbitration against France, and for whatever reason unconvinced by the statements of fact set forth in the Golladay Declaration, Bernstein has continued to pursue his claims in the Pa. Federal Court Action pending in the United States District Court for the Middle District of Pennsylvania against certain other defendants whom he has accused of aiding and abetting France in poaching Golladay away from Bernstein and Clarity (referred to above as the "Pa. Federal Court Action").  Specifically, in the Pa. Federal Court Action, Bernstein and Clarity have accused defendants— France's former employer CAA and three small sports memorabilia dealers and furniture movers—of tortiously interfering with the Petitioners' contracts with Golladay by merely participating in any aspect of the Signing Event.

In short, the same events that gave rise to Bernstein's First Failed Arbitration *that Bernstein lost* also give rise to the Pa. Federal Court Action.  The same result should be reached—another Bernstein loss.  Because the Signing Event had no

bearing on Golladay's decision to terminate Bernstein and Clarity, there is no causation for the tort Petitioners complain of, and all of the claims Petitioners asserted in the Pa. Federal Court Action will fail as a matter of law.

Moreover, Bernstein has at all times known that the factual predicate of his and Clarity's claims are without merit, because they have had the Golladay Declaration for nearly two years, yet went to great lengths to persuade the District Court Judge in the Pa. Federal Court Action to not require them to take Golladay's deposition **two years ago** as one of the **first** witnesses in that action. (*See* Exhibit B, Plaintiffs' Opposition to Defendants' Motion to Bifurcate and Sequence Discovery.). Golladay's deposition testimony plainly highlights why Bernstein has been running away from this evidence for so long.

Finally, and with time running out because the discovery cut-off date in the Pa. Federal Court Action is September 30, 2021, Bernstein (through counsel) leveled numerous improper and unfounded attacks against Golladay, including accusations and/or implications and innuendo that Golladay was lying—even going so far as trying to pit Golladay against his own mother and a close family friend. Unmoved by such tactics, Golladay testified truthfully and consistently with the Golladay Declaration, namely: (i) that he made his decision to fire Bernstein and Clarity many months before the Signing Event took place on January 21, 2019, perhaps as early as September 2018, but in any event, by no later than the beginning of December

2018; (ii) the Signing Event had nothing to do with his decision to fire Bernstein and Clarity; and (iii) for his former agent, Bernstein, to argue—as he no doubt will—that Golladay decided to change agents merely for the chance of earning approximately $7,750.00 at the small Signing Event is "insulting" and "a slap in the face" to Golladay, who made the careful decision to "do what is best for him and his family" by changing agents and "considers hiring Todd France one of the best decisions he ever made" in his life because France was able to obtain for Golladay his current lucrative ($72 million) NFL playing contract with the New York Giants.

Again, and to be perfectly clear as to what the Pa. Federal Court Action is about, it is Bernstein's and Clarity's contention that the Signing Event was an act of tortious interference and, critically, that ***it was the Signing Event*** that caused Golladay to fire Bernstein and Clarity.  Through both the Golladay Declaration and his sworn deposition testimony, Golladay has repeatedly and consistently confirmed, under oath, that he made his decision to fire Bernstein and Clarity well prior to the Signing Event, and that the Signing Event had nothing to do with his decision to change agents—in other words, Petitioners' entire alleged act of tortious interference (*i.e.*, the Signing Event) was just a small and routine autograph signing that Golladay gave little thought to, not some monumental or career altering event like Bernstein and Clarity have self-servingly made it out be.  Critically, Bernstein and Clarity cannot contradict any material facts in the Golladay Declaration or in Golladay's

deposition testimony because they have admitted, on numerous occasions during discovery in the Pa. Federal Court Action, that they have no personal knowledge of when or why Golladay decided to fire them—they were not parties to any discussions he had with France, and were certainly not privy to Golladay's thoughts or decision-making process.

Indeed, Petitioners have already lost Bernstein's First Failed Arbitration regarding them being fired by Golladay.  Further, Petitioners' own former client, Golladay—the best source for first-hand information—has provided dispositive testimony via the Golladay Declaration and his recent deposition testimony that completely debunks Bernstein's and Clarity' claims in the Pa. Federal Court Action. Thus, the question in this proceeding is how far, under these circumstances, will this Court permit Bernstein and Clarity to go forward with harassing, punishing and victimizing Golladay via these discovery motion filings.  It is respectfully submitted that the answer is simple: ***no further***.

This proceeding is part and parcel of Bernstein's quest to pin the blame for the loss of a client on anyone and everything other than himself.  The reality is that Bernstein's claims are nothing more than the "sour grapes" of an agent who was fired by a client and replaced by someone the client felt was better able to obtain the

results the client wanted—which Golladay's new agent France did, procuring for his client a lucrative veteran contract with the New York Giants.[3]

Ironically, when Golladay parted ways with Bernstein and Clarity, he had no ill-will toward them.  Yet Golladay (along with the defendants in the Pa. Federal Court Action) has become collateral damage in Bernstein's crusade against his industry competitor, France.  However, neither Bernstein nor Clarity have accused Golladay of breaching any duties to them, of owing them any money, or engaging in any wrongful conduct whatsoever to their detriment.  From Golladay's perspective, he merely exercised his right—guaranteed to him by his union, the NFLPA—to terminate one agent and hire another.  Despite exercising this right, Golladay has been hounded by his former agent, Bernstein, who now apparently wants him to pay thousands of dollars in sanctions, or risk being thrown in jail in the middle of his NFL playing season.  If anything, this is a cautionary tale for NFL players to think twice about whom they decide to affiliate themselves with, as it may ultimately result in a messy and public divorce.

---

[3]     In perhaps one of the most bizarre exchanges in the Golladay deposition, after Golladay stated that he made his decision, in part, because he had a "gut feeling" that France would obtain better results for him than Bernstein in negotiating his veteran contract, Bernstein unleashed (through counsel) a series of follow up demands on Golladay that he articulate "what facts" supported his "gut feeling."  The reality—as Bernstein (a lawyer) is acutely aware of—is that the player's union, the NFLPA, has secured for its players the right to terminate their contract with an agent at any time, for whatever reason, or for no reason at all.  The relationship is purely "at will."  Under these circumstances, it was in bad faith for Bernstein to badger Golladay (through counsel) about "why" he fired Bernstein, and attempt to portray him in a negative light as an unappreciative or impulsive and reckless former client.

In summary, three things are apparent:

First, the relief requested by Bernstein and Clarity is unduly punitive (not to mention completely disproportionate).

Second, the relief is additionally inappropriate considering the due process concerns at stake since Golladay was not properly served with the Subpoena by Petitioners in the first place (Bernstein could easily have located Golladay but chose instead to pull the wool over this Court's eyes with *ipse dixit* arguments and insinuations about how there was some sort of conspiracy to allow Golladay to evade service).

Third, the requested relief is unwarranted considering that Golladay remains a non-party in this litigation, is merely a former client who exercised his right to terminate Bernstein as is guaranteed and allowed by NFLPA regulations and has fully responded to all aspects of the Subpoena.

## B.   **Golladay Retained Counsel And Sought To Cooperate With Petitioners**

Also militating against any sanctions is that Golladay, through counsel, reached out to counsel for Petitioners Bernstein and Clarity and offered to enter into an appropriate stipulation to fully resolve the issue of Golladay's third-party deposition and related document production.  (*See* Exhibit C, Correspondence among counsel for Petitioners and Respondent.)  At this point, Golladay has sat for

his deposition and otherwise complied with the Subpoena, making anything that happened beforehand "water under the bridge."  Golladay therefore objects to Bernstein's and Clarity's attempts to seek sanctions and costs for any matters that were already resolved.

### C.   Golladay Was Not Properly Served And Jurisdiction Is Doubtful

There is no doubt that Golladay was not hand-served with the Subpoena or any order of this Court in Michigan (or anywhere else for that matter).  Papers were "served"—using that term in its loosest sense—upon an email address that Golladay did not regularly use or monitor, and/or to third parties who had no authority or obligation to accept service of process for him.  Considering the magnitude of the punitive relief Petitioners Bernstein and Clarity seek to level against Golladay— including, astoundingly, potential imprisonment—strict adherence to service, notice and due process standards should be required.  Finally, other than Petitioner's apparent inability to properly locate and hand-serve process upon a third party, there is no indication that Golladay was actually or intentionally evading service.

## III.   ARGUMENT

### A.   <u>No Sanctions Should Be Imposed</u>

No sanctions or other costs should be imposed on Golladay.  Fed. R. Civ. P.

45(b)(1) states that:

> Any person who is at least 18 years old and not a party may serve a subpoena. Serving a subpoena requires delivering a copy to the named person and, if the subpoena requires that person's attendance, tendering the fees for 1 day's attendance and the mileage allowed by law. Fees and mileage need not be tendered when the subpoena issues on behalf of the United States or any of its officers or agencies.

Fed. R. Civ. P. 45(b)(1).  It is beyond dispute that Golladay was not hand-served

with either the Subpoena or any order of this Court.  Nor was Golladay tendered any

fee for attendance.  With respect to the commencement of this action against him,

Golladay is not aware of being served with original process via any of the

mechanisms outlined in Fed. R. Civ. P. 4(e)(2)(A)-(C).  He is also not aware of being

asked, nor did he, waive service of process.  Nor does he, as an individual, have any

agent that he has authorized to accept service of process for him.

Going strictly by the applicable Rules, service has not properly been

effectuated on Golladay.  In the absence of proper service of process, consent, waiver

or forfeiture, a court may not exercise personal jurisdiction over a named defendant.

*Boulger v. Woods*, 917 F.3d 471, 476 (6th Cir. 2019).  Without personal jurisdiction,

a federal court is "powerless to proceed to an adjudication."  *Id.*; *see also Whitaker*

*v. Stamping*, 302 F.R.D. 138, 142 (E.D. Mich. 2014).

Turning to the issue of service via email, some federal courts have held that original service via email is improper and does not comport with due process requirements. *See*, *e.g.*, *Columbia Ins. Co. v. SeeCandy.com*, 185 F.R.D. 573, (N.D. Cal. 1999) (generally, service of process by electronic mailing to email addresses associated with a defendant is not sufficient to comply with the Federal Rules of Civil Procedure). Most federal court decisions appear to struggle with the issue of whether email service is proper in the context of attempting to serve elusive foreign parties outside of the United States. Even so, courts engage in extensive fact-finding as to whether email service comports with due process under the circumstances.

This Court has addressed the issue of alternate service in the case of *Mosely v. Regency Transportation, LLC*, 2021 WL 972880 (E.D. Mich. March 15, 2021). *See* Exhibit D. In *Mosely*, this Court held that it may allow service by publication, by posting a copy of the summons and complaint on the door of the defendant's address or by email. However, such substituted service is not an automatic right. As stated by this Court in *Mosely*, "[a] truly diligent search for an absentee defendant is absolutely necessary to supply a fair foundation for and legitimacy to the ordering of substituted service." Here, there does not appear to be any record of a "diligent search" for Golladay on the part of Petitioners. As both sophisticated and highly experienced litigants, Petitioners cannot be excused from discharging their obligation to follow the rules, and comply with all aspects of the procedural

19

requirements associated with the legal process that they, themselves initiate and seek to pursue against mere third parties.

Moreover, per <u>Mosely</u>, before alternate service is allowed, Petitioners must have established that: (i) service could not have been made by the prescribed means; and (ii) the proposed alternate method—here, this is apparently email or delivery to third parties who have no authorization or obligation to accept service of process for Golladay—is likely to give actual notice to the party being served. As held by the *Mosely* court, the first element must be established by sufficient facts. The second element—that the method of service is likely to give actual notice to the party being served—is critical because it "embodies the constitutional requirements of due process." The record is devoid of support for either of these two elements.

This Court specifically addressed alternate service by email in *BBK Tobacco & Foods, LLP v. Gooshelly*, 2020 WL 2315879 (E.D. Mich. May 11, 2020). *See* Exhibit E. In allowing email service upon Golladay, it is respectfully asserted that this Court did not follow the guidelines it set for itself in *BBK*. For example:

- In *BBK*, plaintiff was attempting to serve foreign defendants who, this Court noted, were operating "in such a way as to stymie any effort to determine their true addresses," making service by email proper. Here, there is no evidence that Golladay was trying to prevent anyone—let alone Petitioners—from learning or obtaining his physical address or whereabouts.

- This Court also found it significant that the *BBK* defendants did business online and noted that courts typically found email service proper in situations involving online businesses. Here, Golladay is a mere

individual.  He does not operate any online business that would make it more likely for email service to comport with due process requirements, as discussed at length in *BBK*.  To the contrary, Golladay testified that he does not regularly utilize or even check email in this current day age of utilizing social media modalities to communicate with third parties.

- Also, prior to allowing email service in *BBK*, this Court verified the plaintiff had thoroughly investigated that all physical addresses they had for the defendants "were false, incomplete and invalid for service of process."   No such evidence or report of any comparable thorough investigation is present here with respect to Golladay.

- In *BBK*, this Court also noted that the plaintiff had not merely obtained email addresses for defendants.  Rather, the plaintiff assured this Court that the defendants were actually and continuously conducting business via the email addresses through which service would be made.   Indeed, this appeared to be the reason that the *BBK* court found that "service through those email addresses is reasonably calculated to give effective notice." There is no such evidence in the record with respect to Golladay's use of the email account served—in fact, the record shows the opposite to be the case.

- Finally, and critically, the *BBK* court did not merely allow a bare email to constitute service.  Rather, this Court required that "the service emails be sent with a read-receipt or third-party confirmation of receipt."  There is no indication this was done with respect to the supposed service by email upon Golladay.

Again, and in conclusion, there is substantial doubt that Golladay was properly served, or that Petitioners were sufficiently diligent to even be able to request an order for alternate service.   In conjunction with the fact that Golladay has *already* voluntarily complied with all aspects of the Subpoena, this certainly bespeaks caution in imposing the draconian sanctions requested by Petitioners, who have not met their burden to demonstrate that alternate service was proper, or that

Golladay was served at all by any means that comports with due process requirements.

## B.   Golladay Should Not Be Punished For Not Buying Into Bernstein's False Narrative

As set forth above, Golladay's testimony under oath via the Golladay Declaration and at his deposition has eviscerated Bernstein's and Clarity's tortious interference claim.  In Petitioners' filing of Bernstein's First Failed Arbitration against France, and in commencing the Pa. Federal Court Action against various defendants with whom Petitioners never communicated or interacted with prior to filing suit, Bernstein guessed and speculated as to when and why Golladay decided to fire him.  Golladay has now explained "why" in his words twice, under oath, and in any rational world this would end the dispute.  Indeed, when these disputes were in their infancy, Golladay agreed to provide the Golladay Declaration which, taken at face value, should have demonstrated to Bernstein and Clarity that their guesses and speculations about what happened were completely wrong. But rather than accept these facts, Bernstein and Clarity doubled and tripled down on litigation.  As far as the public record demonstrates in the Pa. Federal Court Action, Petitioners have no evidence, and little rational argument beyond merely accusing the party defendants and third parties of "lying" and being involved in some nebulous conspiracy, the result of which was (purportedly) Golladay firing Bernstein.

Having realized that they improvidently wasted a rather large quantity of time and resources pursuing their meritless claims, and unreasonably disregarded the Golladay Declaration for more than two years, Bernstein and Clarity now seek to recoup some of their costs by trying to sanction anyone and everyone they can. At this point, Bernstein and Clarity are not arguing about the merits of their actual tortious interference claims. But third parties such as Golladay should not be held hostage or vilified—let alone be forced to pay—for Bernstein's and Clarity's ill-conceived litigation tactics and strategies. From Golladay's perspective, Bernstein's recitations as to when and why Golladay made the decision to fire him are completely fabricated, and are damaging to Golladay's reputation as a professional. Regardless, Golladay should not be punished for not wanting to be drug into Bernstein's and Clarity's vendetta against Golladay's new agent France, and Golladay's former marketing agency CAA, in advancing what—in Golladay's view—is a completely false narrative about what actually happened.

### C.   The Document Issue Is A "Red Herring"

Bernstein and Comerford already have documents that were produced by parties and third parties reflecting communications among Golladay and others (including themselves) relating to the matter in dispute in the Pa. Federal Court Action. Other than through some slippery mischaracterizations of Golladay's sworn testimony and their *ipse dixit* assertions, Bernstein and Clarity provide no evidence

to support their apparent contention that additional documents exist. In other words, Golladay's texts and emails purportedly sent to Golladay's email address have already been produced via other document productions in Bernstein's First Failed Arbitration and the Pa. Federal Court Action. It would serve no purpose to force Golladay to conduct another (and unnecessary) search for any such identical documents. Indeed, "Judges are trusted to prevent 'fishing expeditions' or an undirected rummaging through . . . records for evidence of some unknown wrongdoing." *Cuomo v. Clearing House Ass'n, L.L.C.,* 557 U.S. 519, 531 (2009).

In fact, it is widely held that courts are reluctant to require a non-party to provide discovery that can be produced by a party or obtained from another source. Because Bernstein and Clarity apparently seek to obtain documents that (i) Golladay searched for and confirmed he does not have in his possession; and (ii) were already produced by other parties (and non-parties) in the Pa. Federal Court Action, the Court should not entertain any further "fishing expedition" by Bernstein and Clarity via their non-party Subpoena. *See*, *e.g.*, *Rocky Mountain Medical Management*, 2013 WL 6446704, at *4 (D. Idaho Dec. 5, 2013) ("A court may prohibit a party from obtaining discovery from a non-party if that same information is available from another party to the litigation."); *see also Precourt v. Fairbank Reconstruction Corp.*, 280 F.R.D. 462, 467 (D.S.D. 2011) ("If the party seeking information can easily obtain the same information without burdening the non-party, the court will

quash the subpoena."); *Brown v. City of Syracuse*, 648 F.Supp.2d 461, 466 (N.D.N.Y. 2009) (when balancing hardships between requesting party and non-party, court should consider whether there are other sources for obtaining the material); *Arthrex, Inc. v. Parcus Medical, LLC*, 2011 WL 6415540, at *6 (S.D. Ind. Dec. 21, 2011) ("A party's ability to obtain documents from a source with which it is litigating is a good reason to forbid it from burdening a non-party with production of those same requests.").

Moreover, Golladay testified that he rarely (if ever) uses email or even checks it. As far as text messages, he also testified that he has gone through numerous phones over the last several years since the events at issue and that he does not back his data up to the "cloud." He also testified that he talks on the phone and uses "Facetime," "Direct Messaging," and other forms of social media-based platforms to communicate, and that certainly there will be no documents pertaining to any such internet-based communications in his physical possession. Finally, and most importantly, Golladay testified that he searched for and could not find any emails responsive to each of the enumerated requests for documents in the Subpoena; if there was any confusion over his testimony it was because Bernstein's and Clarity's lawyers—as noted above—attempted to misconstrue the record by asking the same question numerous times. Such tactics are deliberately designed to trick witnesses

into inadvertently changing answers, which is why such questions are immediately objected to and quashed during trial in actual courtrooms.

Lastly, it must also be remembered that Golladay is a non-party with no stake in the outcome of Petitioners' disputes with his current agent (France) and former marketing company (CAA). *See*, *e.g.*, *Hansen Beverage Co. v. Innovation Ventures, LLC*, 2009 WL 2351769, at *1 (E.D. Mich. July 28, 2009) ("Courts [] consider one's status as a nonparty to be a significant factor in the undue-burden analysis."). If anything, Bernstein, France, and any other agent Golladay may hire in his career to work for Golladay, are service providers to Golladay, not the other way around—hence, Golladay is not beholden to any agent. As such, Golladay has zero motive or inclination to hide anything or not tell the truth. He is not a party and has no real interest in the outcome of the Pa. Federal Court Action (except to protect his own reputation from the false narratives being supplied by Bernstein and Clarity).

Consequently, it is respectfully submitted that this Court should be loath to subject Golladay to some sort of additional (and significant) burden to conduct yet another search for documents, when he has already confirmed, under oath, that he made a good faith effort to search for and produce any responsive documents, and that no such documents are in his possession (*see also* Exhibit F, Golladay's August 13, 2021 written responses to Subpoena), and has also provided direct deposition testimony to that effect on the relevant subject matter. This is even more pronounced

where, as here, the only relevant documents would have already been provided by numerous other parties (and non-parties) during the lengthy discovery process in the Pa. Federal Court Action.   Put simply, Golladay complied in all aspects with the Subpoena and there is no justification for placing any additional burden on him, when he is and remains a non-party in the case.   *See Cash Today of Texas, Inc v. Greenberg,* 2002 WL 31414138, * 4 (D. Del. Oct. 23, 2002) (quoting *Exxon Shipping Co. v. United States Dept, of Interior,* 34 F.3d 774, 779 (9th Cir. 1994) ("[I]n the undue burden inquiry, nonparties are afforded "special protection")); *American Standard Inc. v. Pfizer Inc.,* 828 F.2d 734, 738 (Fed. Cir. 1987) (affirming district court's restriction of discovery where non-party status "weigh[ed] against disclosure"); *Solarex Corp. v. Arco Solar, Inc.,* 121 F.R.D. 163, 179 (E.D.N.Y. 1988) (non-party status is a significant factor in determining whether discovery is unduly burdensome).

One final point is also in order.   Golladay is a very busy and elite professional athlete who has year-round commitments to his sport, not the least of which is maintaining his body in peak physical condition.   Whatever Golladay's "duties" were in connection with the Subpoena or the Pa. Federal Court Action under the circumstances as outlined herein, he has performed them.   Again, the question is why—and how far any court should go—to force a non-party like Golladay who has already testified *ad nauseum* as to his personal knowledge (remembering, again, that

via the Golladay Declaration provided at the outset of these disputes, Golladay informed  Bernstein and Clarity of his recollection, and that their choice not to believe their former client was what prolonged the caused this unnecessary action to be commenced by Petitioners in the first place).  It is respectfully submitted that some protection must be afforded to Golladay from further harassment.  Bernstein (a former litigation attorney himself) and Clarity should not be rewarded with sanctions merely because of their obstinate refusal to believe what their former client told them under oath from the outset.  Not only does Golladay have no new responsive documents to produce, but he should also not be further harassed into going on a wild goose chase based on Bernstein's and Clarity's mere speculation that he may have more documents beyond what was requested in the Subpoena in the first place.[4]

## IV.   CONCLUSION

It is respectfully submitted that no sanctions or other costs should be imposed upon Golladay.  Nor should there be any order directing Golladay to search for or produce any documents.  Instead, because Golladay has sat for his deposition, and his deposition is completed, there is no further action this Court need take, and this case should be dismissed, with prejudice.  Finally, to the extent the Court is inclined

---

[4]      While discovery in the hands of a non-party is subject to discovery, that does not mean non-parties must yield discovery that causes undue burdens, as evidenced by the protections in the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(b), (c); Fed. R. Civ. P. 45(d)

to provide any form of relief to Petitioners, Golladay respectfully requests an opportunity to be fully heard on the issues via briefing and a hearing on the merits, and with the benefit of the official deposition transcript.

Respectfully submitted,

BODMAN PLC

Dated:  September 2, 2021

By: //s//  Joseph J. Shannon
1901 St. Antoine Street
6th Floor at Ford Field
Detroit, MI 48226
(313) 393--7549
jshannon@bodmanlaw.com

*Attorneys for Respondent,*
*Kenny Golladay*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2021, the foregoing document was filed with the Clerk of the Court using the Court's e-filing system which will give notice of such filing to all parties of record.

/s/Joseph J. Shannon
Joseph J. Shannon (P38041)
jshannon@bodmanlaw.com
