# *EXHIBIT A*



**Pohlman**USA®
Court Reporting and
Litigation Services

Kenneth Golladay - CONFIDENTIAL
ATTORNEY'S EYES ONLY

August 30, 2021

Clarity Sports International, LLC, et al.

vs.

CAA Sports, LLC, et al.

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA


CLARITY SPORTS INTERNATIONAL,
LLC, and JASON BERNSTEIN,

       Plaintiffs,

   vs.              Case No. 1:19-cv-00305-YK

CAA SPORTS, LLC, et al.,

       Defendants.




Remote Videotaped Deposition of
KENNETH GOLLADAY

CONFIDENTIAL - ATTORNEYS' EYES ONLY




Monday, August 30, 2021
10:05 a.m.




Reporter:  Stephanie R. Dean, RPR

```
 1    REMOTE APPEARANCES:

 2
         On behalf of the Plaintiffs:
 3             JOHN D. COMERFORD, ESQ.
               Dowd Bennett LLP
 4             7733 Forsyth Boulevard, Suite 1900
               St. Louis, MO  63105
 5             314.889.7300
               jcomerford@dowdbennett.com
 6

 7       On behalf of Defendants MVP Authentics, LLC,
         Daryl Eisenhour, Jason Smith, Boone Enterprises,
 8       Inc., d/b/a Boone Enterprises Authentic
         Autographs and Craig Boone:
 9             WILLIAM J. CLEMENTS, ESQ.
               MICHAEL A. IACONELLI, ESQ.
10             Klehr Harrison Harvey Branzburg, LLP
               1835 Market Street, 14th Floor
11             Philadelphia, PA  19103
               215.569.2700
12             wclements@klehr.com
               miaconelli@klehr.com
13

14       On behalf of Defendants Redland Sports and Gerry
         Ochs:
15             ILES COOPER, ESQ.
               J.T. HERBER, ESQ.
16             Williamson, Friedberg & Jones, LLC
               10 Westwood Road
17             Pottsville, PA  17901
               570.622.5933
18

19                       - - - - -

20    ALSO PRESENT:
               Matt Schnorf, Videographer
21             Jason Bernstein
               Susan Wasilewski
22             Lauren Marsh

23                       - - - - -

24

25
```

```
 1                    I N D E X

 2           EXAMINATION OF KENNETH GOLLADAY
```

```
 3   BY MR. COMERFORD                       5
     BY MR. CLEMENTS                      166
 4   BY MR. HERBER                        180
     BY MR. COMERFORD                     184
 5   BY MR. CLEMENTS                      189

 6
                       EXHIBITS
 7   Plaintiff's Exhibit 1                 13
     Plaintiff's Exhibit 2                 13
 8   Plaintiff's Exhibit 3                 35
     Plaintiff's Exhibits 4 and 5         37
 9   Plaintiff's Exhibit 6                 55
     Plaintiff's Exhibit 7                 56
10   Plaintiff's Exhibit 8                 69
     Plaintiff's Exhibit 9                 74
11   Plaintiff's Exhibit 10                86
     Plaintiff's Exhibit 11                88
12   Plaintiff's Exhibit 12                91
     Plaintiff's Exhibit 13                94
13   Plaintiff's Exhibit 14               103
     Plaintiff's Exhibit 15               105
14   Plaintiff's Exhibit 16               112
     Plaintiff's Exhibits 17 and 18       118
15   Plaintiff's Exhibit 19               123
     Plaintiff's Exhibit 20               155
16   Plaintiff's Exhibit 21               164
     Plaintiff's Exhibit 22               164
17   Defendant's Exhibit 23               165
     Plaintiff's Exhibit 24               165
18   Plaintiff's Exhibit 25               179
     Plaintiff's Exhibit 26               184!
```

```
19
                     - - - - -
20

21

22

23

24

25
```

1           MR. COMERFORD:  So we're on the record.

2    Today is August 30th 2021.  It's 10:05 a.m. Eastern

3    time.  This is John Comerford, counsel for

4    Plaintiffs.  Mr. Golladay, the witness, has not

5    appeared on the Zoom videoconferencing.  His

6    attorneys are not here and the attorneys for the

7    Defendants are not here.  On Friday I received an

8    email from Mr. Golladay's attorneys saying that

9    they were refusing to produce him at the noticed

10   time of 10:00 a.m. Eastern and instead will produce

11   him at 2:00 p.m. Eastern.  Plaintiffs made clear

12   that we object to that and because we have a full

13   day of questioning, we want to start at 10:00 a.m.

14   Eastern.  We're here and neither Mr. Golladay, nor

15   his attorneys nor the attorneys for the Defendants

16   are here, so at this time we will adjourn the

17   deposition and reconvene it at 2:00 p.m. Eastern as

18   per Mr. Iaconelli's email on Friday.  Plaintiffs

19   reserve all of our rights with this issue.

20               (Off the record.)

21               *  *  *  *  *  *  *

22

23

24

25

```
 1            THE VIDEOGRAPHER:  We are on the record.

 2   This is the videotaped deposition of Kenneth

 3   Golladay.  Today's date is August 30, 2021, and the

 4   time is 2:12 p.m. Eastern time.  This is in the

 5   case of Clarity Sports International, LLC and Jason

 6   Bernstein versus Redland Sports, et al.  Case

 7   Number 1:19-cv-00305-YK pending in the United

 8   States District Court for the Middle District of

 9   Pennsylvania.  All counsel will be reflected on the

10   stenographic record.  Will the court reporter

11   please swear in the witness?

12       KENNETH GOLLADAY, of lawful age, called for

13   examination, being by me first duly sworn, as

14   hereinafter certified, deposed and said as follows:

15            EXAMINATION OF KENNETH GOLLADAY

16   BY MR. COMERFORD:

17       Q.   Good afternoon.

18       A.   How are you doing?

19       Q.   Will you please state your full name for

20   the record?

21       A.   Kenneth Kasey Golladay.

22       Q.   Mr. Golladay, my name John Comerford.  I

23   represent Jason Bernstein and Clarity Sports

24   International, LLC.  We've never spoken with each

25   other, right?
```

1        **A.    No.**

2        Q.    Have you ever had your deposition taken

3    before?

4        **A.    No.**

5        Q.    Have you ever testified in court before?

6        **A.    No.**

7        Q.    Do you understand that you're under oath

8    today in this proceeding as I ask you questions

9    just like you would be in a court of law?

10       **A.    Yes.**

11       Q.    If you don't understand any of the

12   questions that I've asked, can you please let me

13   know and I'll try to ask it a different way or do a

14   better job, okay?

15       **A.    Okay.**

16       Q.    Try to answer questions yes or no whenever

17   you can or feel free to explain your answer.  We

18   can take a break whenever you need to to use the

19   restroom or something like that.  Generally I like

20   to go for about an hour or hour and a half or

21   however long you want to go, but...

22       **A.    I'll just state this right now.  This**

23   **whole thing won't be that long.  I still have**

24   **obligations and everything.  I'm in camp right now,**

25   **I still have stuff going on as well, so I have,**

1    like, two or three hours, that's max.

2        Q.   And so are you saying that you've got two

3    or three hours today and then we can finish the

4    questioning on another day?

5        A.   I'm just going to be done with it.

6        Q.   Okay.  We might have to take that up with

7    the court then because we're entitled to ask you

8    questions until we're finished, up to a maximum of

9    seven hours.  Are you aware of that?

10       A.   No.

11       Q.   All right.  The one thing I would ask is

12   that if you ask to take a break, that you answer

13   whatever question I've asked before we take a

14   break, okay?  Is that okay?

15       A.   All right.

16       Q.   Where are you now, sir?

17       A.   I'm in New Jersey.

18       Q.   Are you in a house or in an office?

19       A.   House.

20       Q.   Whose home is it?

21       A.   Mine.

22       Q.   Okay.  And who is there in the room with

23   you?

24       A.   I have my lawyers.

25       Q.   What are their names?

1      **A.   Mike and Bill.**

2      Q.   Is there anyone else in the room there

3  with you?

4      **A.   No.  I have other people as well working**

5  **on my house.  I just signed a new deal here to the**

6  **New York Giants.  I just bought a house and I have**

7  **construction going on right now.**

8      Q.   But as far as sitting there listening to

9  the deposition, it's you and Michael Iaconelli and

10  William Clements?

11      **A.   Yes.**

12      Q.   Do you have any papers there in front of

13  you?

14      **A.   No.**

15      Q.   What did you do to prepare for the

16  deposition?

17      **A.   Not much.**

18      Q.   What did you do?

19      **A.   I didn't do much.**

20      Q.   Did you meet with Mr. Iaconelli and

21  Mr. Clements?

22      **A.   Not really.**

23      Q.   Did you meet with them, yes or no?

24      **A.   They got here today, so I met with them**

25  **before we got on this.**

1     Q.   What time did you begin meeting with them

2   today?

3     **A.   I don't know.  What time is it?  Two**

4   **something.  An hour ago maybe.**

5     Q.   Did you have any appointments this morning

6   or obligations that made you unable to do this

7   deposition this morning?

8     **A.   Yes.**

9     Q.   What was that?

10    **A.   I'm in training camp right now.  I did a**

11   **little injury.  I'm getting ready for week one,**

12   **just trying to get my body right, take care of my**

13   **body.**

14    Q.   How long did you meet with Mr. Iaconelli

15   and Mr. Clements today?

16    **A.   I already answered that.**

17    Q.   How long was your meeting?

18    **A.   I already answered that.**

19    Q.   I don't remember the answer.

20    **A.   I answered it.  It started at two.**

21   **They've been here for like an hour.**

22    Q.   One hour.  Understood.

23         Have you ever met Mr. Iaconelli and

24   Mr. Clements in person before?

25    **A.   No.**

1       Q.   Have you spoken to them on the phone

2   before today?

3       **A.   Yeah.**

4       Q.   When was the first time you spoke with

5   Mr. Iaconelli and Mr. Clements?

6       **A.   I don't remember.**

7       Q.   Can you tell me what year it was?

8       **A.   2021.**

9       Q.   Do you remember being served with a

10  subpoena in January of 2021?

11      **A.   I don't.**

12      Q.   We can show that to you if you want.  Do

13  you remember the Lions' general counsel accepted

14  service of a subpoena for you?

15      **A.   I don't.**

16      Q.   Were you aware of that happening?

17      **A.   I don't remember.  I was with the Lions**

18  **last year.  I was actually dealing with an injury.**

19  **I have better things to focus on, to be honest.**

20      Q.   Are you taking any medications that might

21  affect your ability to recall events in the past,

22  your memory?

23      **A.   No, sir.**

24      Q.   Other than Mr. Iaconelli and Mr. Clements,

25  did you speak with anybody else about your

1    deposition?

2         **A.    I don't remember.**

3         Q.    Did you speak with Todd France about your

4    deposition?

5         **A.    We spoke about it.**

6         Q.    Tell me about that conversation.

7         **A.    Pretty much -- he pretty much just told me**

8    **to tell the truth, and that's why I'm on this Zoom**

9    **right now.**

10        Q.    And when did you have that conversation

11   with Mr. France?

12        **A.    I don't remember.**

13        Q.    Was it this week or before this week?

14        **A.    I don't remember.**

15        Q.    Was it this year, 2021?

16        **A.    I'm pretty sure we've spoke about it.**

17        Q.    Have you spoken with Mr. France more than

18   once about your deposition?

19        **A.    I don't remember.**

20        Q.    Did you look at any documents to prepare

21   for your deposition today?

22        **A.    No.**

23        Q.    Other than Mr. France and the two lawyers,

24   have you spoken with anyone else about the fact

25   that you were being deposed in this case?

1      **A.    My mom maybe.**

2      Q.   Anybody else?

3      **A.    No.**

4      Q.   Let's bring up the deposition notice for

5      today, August 30th.  I've got a colleague who is

6      working with me and he's going to share his screen

7      and show you some documents.

8           Mr. Golladay, are you able to see that

9      document on the computer screen?

10     **A.    Yes.**

11     Q.   This is an amended notice of videotaped

12     deposition for you to start at 10:00 a.m. Eastern.

13     Do you see that?

14     **A.    Yes, I see that.**

15     Q.   Why were you not able to start 10:00 a.m.?

16          MR. CLEMENTS:  Objection, asked and

17     answered.

18          You can answer again.

19     Q.   Go ahead, Mr. Golladay.

20     **A.    I'm a pro athlete and I had obligations to**

21     **attend to my body.**

22     Q.   What did you have going on this morning

23     that made you unable to start at 10:00 a.m.?

24     **A.    I just answered that.**

25     Q.   You had to attend to your body?  Is that

1  your answer?

2      **A.  Massage, yes.  Body maintenance, yes.**

3      Q.  Other than a massage, did you have any

4  other things that involved other people that dealt

5  with your body --

6      **A.  Massage was an example.  I was taking care**

7  **of my body.  That varies.  Massage, active**

8  **recovery, anything.  I had obligations to attend to**

9  **my job.  My body is part of my job, yes.**

10     Q.  That will be marked as Exhibit 1.

11  (Thereupon, Plaintiff's Exhibit 1 was marked for

12  purposes of identification.)

13     Q.  Let's bring up the deposition notice for

14  August 23rd, which will be Exhibit 2.

15  (Thereupon, Plaintiff's Exhibit 2 was marked for

16  purposes of identification.)

17     Q.  Sir, do you see that?  We noticed your

18  deposition for a week ago Monday, August 23rd.  Are

19  you aware of that?

20     **A.  Yes, I see that.**

21     Q.  Why were you unable to do the deposition

22  on that day?

23     **A.  This was in the heart of the NFL training**

24  **camp and that's what my main focus is.  I'm new to**

25  **a brand new team, New York Giants and that's my**

1   **main focus right now.  They're paying me a lot of**

2   **money, and I want to make sure I'm available at all**

3   **times.**

4       Q.   So my understanding is you have Mondays

5   kind of off from team activities during the

6   preseason; is that right?

7       **A.   No, I'm actually dealing with an injury.**

8   **I'm actually dealing with an injury right now and I**

9   **have treatment outside them by myself, so -- and**

10  **there's training camp on top of that.**

11      Q.   Sir, were you aware that I was sending

12  emails to your email address with the subpoena and

13  deposition notices over the past year?

14      **A.   I don't even check my email.**

15      Q.   Did you become aware of any of those

16  emails?

17      **A.   I have no clue.**

18      Q.   What do you do for a living?

19      **A.   I'm an NFL wide receiver.**

20      Q.   When did you meet Jason Bernstein?

21      **A.   I don't remember.  Maybe my junior year,**

22  **start of my senior year of college with Northern**

23  **Illinois.**

24      Q.   Did Mr. Bernstein negotiate your rookie

25  contract in the NFL?

 1        A.    Yes.

 2        Q.    Did you think that the contract that he

 3   negotiated for you was fair for you?

 4        A.    Well, I got drafted in the third round

 5   and, I mean, I'm pretty sure all that is already

 6   slated.  I'm not sure as far as what negotiations

 7   is really going on.

 8        Q.    Did you ever have any problems with the

 9   contract that Mr. Bernstein negotiated for you in

10   the NFL?

11        A.    No.

12        Q.    In the 2019 NFL season you had the most

13   touchdowns of any player in the league; is that

14   right?

15        A.    I think so.

16        Q.    And you made the Pro Bowl in the 2019

17   season?

18        A.    Yes.

19        Q.    I looked up your career stats.  I think

20   you've got 21 touchdowns in the NFL.  Is that still

21   about right?

22        A.    To be honest, I don't even know.  I don't

23   know.

24        Q.    In 2019 you had 11 receiving touchdowns,

25   which led all the NFL receivers, right?

1      A.   Yep.

2      Q.   Who is your agent now?

3      A.   Todd France.

4      Q.   Let's pull up the arbitration hearing day

5  one and go to page 272.  Mr. Martin will show it on

6  the screen.

7           Mr. Golladay, did Todd France ever tell

8  you that he felt you were a star player in the NFL?

9      A.   I don't remember.

10     Q.   I'm showing a transcript of the

11  arbitration hearing that was held in late 2019

12  during the 2019 season, and that's me talking there

13  where it says "By Mr. Comerford," and I'm asking

14  Todd France questions, and I said:  "Do you agree

15  that Kenny Golladay is a star?"

16          And Todd France said "No."

17          And I said, "Okay.  Why not?"

18          And Todd France said, "Because he's not a

19  star.  It's not a word I would use to describe

20  Kenny Golladay."

21          Have you ever had conversations with Todd

22  France about whether you're a star player in the

23  NFL?

24     A.   No.

25     Q.   In your view are you a star?

1    A.    My contract might speak it.

2    Q.   Yes.

3    A.    My contract might speak that I'm a star.

4 What do you think?

5    Q.   I think you are.

6    A.   Okay.  So I guess I am.

7    Q.   A lot of stuff I read about you says that

8 you are.

9    A.   Thank you.

10    Q.   Have you ever heard Todd France tell you

11 you're not a star?

12         MR. CLEMENTS:  Objection, asked and

13 answered.  He said he didn't have any discussions

14 with him about it.

15    Q.   You can answer, Mr. Golladay.

16    A.   I already answered it.

17    Q.   We served you with a subpoena, sir, and we

18 asked you for any documents that you had about, you

19 know, leaving Mr. Bernstein and going with

20 Mr. France, text messages, emails.  Are you aware

21 of that?

22    A.   I don't know.

23    Q.   Did you look at the subpoena?

24    A.   Yeah.

25    Q.   Do you have any emails from the 2018 or

1    2019 time period about Mr. Bernstein or Mr. France?

2        **A.    I don't know.  I don't check my emails.**

3        Q.    Did you or did anybody else look at your

4    email to see if there were emails there in response

5    to the subpoena?

6        **A.    No.**

7        Q.    No one checked?

8        **A.    No, I don't have anyone check my email for**

9    **me.**

10        Q.    I just want to make sure that I understand

11    what you're saying.  After you were served with the

12    subpoena in January of 2021 you didn't check your

13    email accounts to see if there any were any emails

14    there and nobody else checked your email accounts

15    as far as you know.  Do I have that right?

16        **A.    Yes.**

17        Q.    How about text messages?  We understand

18    that you have exchanged text messages with

19    Mr. Bernstein in the past and with Todd France in

20    the past.  Did you look for any text messages in

21    response to that subpoena?

22        **A.    I don't have any text messages about it.**

23        Q.    Do you know what happened to your text

24    messages with Jason Bernstein and Todd France from

25    2018 and 2019?

```
 1      A.   I don't know.  I done went through so many
 2  phones, I have no clue.
 3      Q.   Did you look to see if you had any after
 4  you got served with the subpoena?
 5      A.   I didn't have any.
 6      Q.   Did you check, though?
 7      A.   Yeah.  I didn't have any.
 8      Q.   Did you speak with anyone about emails or
 9  text messages that might be responsive to the
10  subpoena?
11      A.   No.
12      Q.   Have you ever talked to Todd France about
13  the emails and text messages that you exchanged
14  with him back in 2018 and 2019?
15      A.   No.
16      Q.   As I understand it, you've got two email
17  addresses, one is ████████████████████; is
18  that right?
19      A.   Yep.
20      Q.   And then you've got one
21  ████████████████; is that right?
22      A.   Yes.
23      Q.   Tell me what the difference is between
24  those.  Do you use one for some things and one for
25  another or how does it work?
```

1     **A.    To be honest, one of them was made in**

2  **maybe high school, freshman year.  I mean, I don't**

3  **even know who use Yahoo anymore.  One is a gmail.**

4  **That's the answer to that pretty much.**

5     Q.   Do you still control those email accounts

6  and use them from time to time?

7     **A.    I have them.**

8     Q.   Did you delete any emails that you might

9  have received from Todd France or anybody else at

10  CAA in January of 2019?

11    **A.    I don't even check emails.  I actually**

12  **hate emails.**

13    Q.   Let me ask you about phone numbers.  What

14  is the phone number that you're currently using for

15  your personal stuff or to talk to Mr. France?

16          MR. CLEMENTS:  We'll mark this

17  confidential, just the number itself.  It shouldn't

18  be out there, but you can answer.

19    **A.    I'm going to keep that confidential.**

20    Q.   That's fine, and your attorney is saying

21  that that's going to be marked confidential.

22          MR. CLEMENTS:  We have an agreement in

23  place.

24          THE WITNESS:  So I can say it?  I don't

25  have to, right?

```
 1          MR. CLEMENTS:  We request it be attorneys'
 2   eyes only.  Mr. Bernstein could drop off for a
 3   second.  I mean, they subpoenaed phone records of
 4   everybody so they have all the numbers.
 5       A.   █████████████
 6          MR. CLEMENTS:  And as long as the number
 7   isn't mentioned again, we're back into the
 8   non-confidential portion.
 9       Q.   So that number you just mentioned, that's
10   a number that you used for your personal affairs?
11       A.   I have two numbers, and to be totally
12   honest, I don't even know my second number by
13   heart.  That's the crazy part.  I use whatever
14   phone I feel like at the time.
15       Q.   So is it okay with you if I refer to the
16   number that you just gave me by the last two
17   digits?
18       A.   Okay.
19       Q.   So if that's okay with you, I'm going to
20   call that the 86 number.
21       A.   Yes.
22       Q.   That 86 number, is that your primary
23   phone?
24       A.   Yes.
25       Q.   Does your mom use that phone or is that
```

1    your phone?

2        **A.    I just gave you my phone number.**

3        Q.    Okay.  So am I right that your mother has

4    not used that phone, it's yours?

5        **A.    My mom don't live with me.**

6        Q.    And then I've got another phone number for

7    you.  Do you mind if I say it and --

8            MR. CLEMENTS:  Let's mark it confidential,

9    attorneys' eyes only.

10           MR. COMERFORD:  That's agreed.

11

22           MR. CLEMENTS:  As long as the numbers

23   aren't mentioned we can go back on no

24   confidentiality.

25       Q.    And then the 86 number, is that the number

1    that you used to communicate with Todd France?

2        **A.    Whichever number I feel like using, that's**

3    **the number I am going to use that day or at that**

4    **time.**

5        Q.   Did your mom pay the bills for those

6    numbers or did you pay the bills?

7        **A.    I'm a grown man, John.**

8        Q.   So you paid the bills, correct?

9        **A.    Yes.**

10       Q.   Dating back probably the whole time you're

11   in the NFL at least?

12       **A.    Yes.**

13       Q.   Any other phone numbers other than those

14   two that we've mentioned that you used?

15       **A.    No, sir.**

16       Q.   And have you deleted any text messages

17   relating to Todd France or Jason Bernstein from the

18   86 phone number?

19       **A.    No.**

20       Q.   How about social media, have you used any

21   social media platforms to communicate with either

22   Jason Bernstein or Todd France?

23       **A.    No.**

24       Q.   Like Facebook messenger or Instagram, any

25   messages on those platforms?

1      A.   No.

2      Q.   How about Jake Silver, do you know a man

3   by the name of Jake Silver?

4      A.   I know Jake.

5      Q.   In 2018 and 2019, how would you

6   communicate with Jake Silver?  Would it be by text

7   message or phone call or both?

8      A.   FaceTime, FaceTime audio, DM maybe.

9      Q.   And DM is direct message?

10      A.   Yes.

11      Q.   So what would the platform be for a DM?

12      A.   I mean, you would have direct message, all

13   the social medias.

14      Q.   So did you use any social media accounts

15   to ever direct message with Jake Silver?

16      A.   I think he direct messaged me.

17      Q.   What platform would that have been on?

18      A.   I have no clue.  I don't remember.

19      Q.   Have you deleted any of the direct

20   messages on social media platforms?

21      A.   No.

22      Q.   Which social media platforms do you use

23   for direct messaging?

24      A.   To be honest, I don't even direct message,

25   but I have -- I mean, I'm in the NFL.  I have a lot

1    **of direct messages coming at me.**

2        Q.    You think Jake Silver might have direct

3    messaged you or do you know that he did or did

4    somebody tell you that he did?

5        **A.    I don't remember.**

6        Q.    So as we sit here, is it fair to say that

7    you have no memory of Jake Silver sending you a

8    direct message on social media platforms, correct?

9        **A.    Yes.**

10       Q.    Let's talk about 2018.  You had a contract

11   in place with Jason Bernstein called a standard

12   representation agreement, right?

13       **A.    Right.**

14       Q.    And that dated back to when you were a

15   rookie, right?

16       **A.    Yes.**

17       Q.    And then you also had a contract in place

18   with Clarity Sports for the endorsement marketing

19   work, correct?

20       **A.    Right.**

21       Q.    So let's start around the time frame of

22   July 2018.  Did you have any major concerns with

23   Mr. Bernstein and the work he was doing for you?

24       **A.    I mean, to be honest, I just felt like I**

25   **needed better.  I wanted better.**

1     Q.   Let's bring up the Document 2018712.

2   We're going to show you some emails.  It's going to

3   be page 8, and there's an email here that I want to

4   ask you to look at involving Kenneth Saffold.

5   First of all, who is Kenneth Saffold?

6     **A.   Friend of the family, kind of like a**

7   **mentor to me, big brother.**

8     Q.   How long have you known him?

9     **A.   For a while.**

10    Q.   Since you were young?

11    **A.   Yeah, since I was probably in high school**

12  **maybe.**

13    Q.   And as you understand he's, what, four or

14  five years older than you are?

15    **A.   I don't know.  I don't know how old Ken**

16  **is.**

17    Q.   So you can see there that on July 12,

18  2018, Kenneth Saffold is writing an email to Emily

19  Ries from Clarity; do you see that?

20    **A.   I see that.**

21    Q.   Picking up in the email, he writes:  "I

22  appreciate your thorough response to the inquiry.

23  I also very much appreciate having both Jason and

24  Kenny included in our correspondence.  Kenny and I

25  want to ensure he is receiving maximum exposure and

```
 1   support required to take his brand to the next
 2   level.  There are no major concerns.  However,
 3   Kenny is strategizing and considering what methods
 4   and resources he'd like to take advantage of to
 5   help meet his goals."
 6           Is that an accurate depiction of how you
 7   felt in July of 2018?
 8       A.   Ken had his own opinion.  I'm my own man.
 9       Q.   In July of 2018, did you have the view
10   that there were no major concerns with Jason
11   Bernstein and Clarity Sports?
12       A.   Well, I clearly decided to change agents,
13   so clearly something was going on that I wasn't
14   happy about.
15       Q.   So what were you unhappy about in July of
16   2018?
17       A.   I knew I wanted the total package, and
18   that comes with everything and I wanted a monster
19   deal.  I felt like I was worthy for a monster deal,
20   and to be honest, no hard feelings to Jason, I
21   didn't feel like he would be able to do that for
22   me, and I found an agent that was able to do that
23   and I thought would be able to do it, and Todd
24   France was the guy, and, I mean, $72 million later,
25   here we are.
```

```
 1        Q.   What caused you to feel that Jason
 2   Bernstein was not able to get you that kind of a
 3   deal?
 4        A.   That's personal.  It was a gut feeling and
 5   I'm glad I went with my gut.
 6        Q.   Okay.  Anything else that you had in terms
 7   of concerns in July of 2018?
 8        A.   I knew -- at the end of the day I knew
 9   what I wanted and I wanted what was best for me and
10   my family and that's what I got with Todd France, a
11   big deal, super agent and that's what I received
12   with him.
13        Q.   Did you know why Kenneth Saffold felt that
14   there were no major concerns in July of 2018?
15             MR. CLEMENTS:  Objection, speculation.
16             You can answer.
17        A.   I don't.  You can ask him, though.
18        Q.   Right.  We did ask him about this, and
19   he -- as I recall he said, "I felt like there were
20   no major concerns."
21             Any idea why he felt that way?
22             MR. CLEMENTS:  Objection, asked and
23   answered.  He's answered it.  Speculation.
24        A.   I mean, that's pretty much how he felt.
25   That's not what Kenny Golladay felt.
```

1      Q.   Does Mr. Saffold give you advice from time

2   to time?

3      **A.   And I take it into consideration.**

4      Q.   Do you typically follow his advice?

5      **A.   I take it into consideration.**

6      Q.   Who is Raquel Douglas?

7      **A.   A friend of mine.  I actually met her, I**

8   **want to say, my rookie year at the NFL PA with the**

9   **rookies in LA somewhere, yeah, and I want to say**

10  **she started -- she was with a friend of mine and I**

11  **looked into it.**

12     Q.   And that was in the summer of 2018?

13     **A.   I don't remember.**

14     Q.   Did you ever do any work with her?

15     **A.   I'm sure when I was at the NFL PA event I**

16  **did some work with her.**

17     Q.   So in the summer of 2018 you were talking

18  with Raquel Douglas, and I think Mr. Saffold was in

19  touch with her as well.  Can you tell me what you

20  remember about those discussions, like what she was

21  trying to do?

22     **A.   I don't remember.**

23     Q.   2018, do you remember you and Mr. Saffold

24  making a decision to sort of table your discussions

25  with Raquel Douglas?

1    **A.    I can't remember.**

2    Q.   Do you remember having any discussions

3    with Jason Bernstein about using Raquel Douglas for

4    some work for you?

5    **A.   Yes.  And I also remember Jason saying, "I**

6    **can go through third party, you know, without them**

7    **and everything will be all right and they will look**

8    **over it if need be.  No harm, no foul."**

9         MR. CLEMENTS:  And --

10        THE REPORTER:  I didn't hear you,

11   Mr. Iaconelli.

12        MR. CLEMENTS:  I just asked by "they," do

13   you mean Clarity Sports?

14   Q.   Do you remember your mom telling you to

15   not use Raquel Douglas with Jason Bernstein

16   standing there in Detroit?

17        MR. CLEMENTS:  Objection, hearsay.

18        You can answer.

19   **A.   That all goes into me being a grown man**

20   **and that's their advice and I take it into**

21   **consideration.**

22   Q.   Did your mom tell you that in her view you

23   should not use Raquel in the summer of 2018?  Do

24   you remember that?

25   **A.   I don't remember, to be honest.  You said**

1    that was 2018.  It's 2021.  I don't remember.

2         Q.   Are you doing any work with Raquel Douglas

3    now?

4         A.   No.

5         Q.   Why not?

6         A.   My choice.

7         Q.   And so from the summer of 2018 forward,

8    when you were having those discussions about using

9    Raquel, did you ever use her for anything?

10        A.   Don't remember.

11        Q.   After the summer of 2018 you worked with

12   Clarity Sports to do a bunch of marketing for you,

13   right?  Do you remember that?

14             MR. CLEMENTS:  Objection, vague.

15        A.   Can you repeat the question?

16        Q.   Sure.  Do you remember that Jason

17   Bernstein and Clarity Sports did work with you and

18   for you in 2018 for marketing?

19             MR. CLEMENTS:  Same objection.

20             Go ahead.

21        A.   I wouldn't put it past them.  I don't

22   remember.

23        Q.   Do you remember that they formed an LLC

24   for you to handle your off-the-field income?

25        A.   Yeah, I don't remember.

1      Q.   Do you remember that they did a logo

2  redesign for you?

3      **A.   A logo I didn't even pick.   They showed me**

4  **logos.   I do remember that.   A logo I don't have to**

5  **this day.**

6      Q.   Did you approve a logo with Jason

7  Bernstein and Clarity Sports?

8      **A.   I don't have a logo to this day.   I just**

9  **answered that.**

10     Q.   Did they launch your Twitter account and

11 get it verified?   Do you remember that?

12     **A.   A lot of agents do that with a rookie**

13 **coming in.**

14     Q.   Did Mr. Bernstein and Clarity do that for

15 you?

16     **A.   Yes.**

17     Q.   Did they set up events for you?

18     **A.   What event?**

19     Q.   There was like a pro camps event.   Do you

20 remember that?

21     **A.   I haven't attended a pro camp event.**

22     Q.   Do you remember Clarity setting that up

23 for you, though?

24     **A.   I don't remember.**

25     Q.   Do you remember a Vizio promotion?   I

 1    think they make TVs.

 2        **A.    I don't remember.**

 3        Q.    Let's pull up the arbitration hearing day

 4    one transcript.  I want to show you some things

 5    Mr. Saffold told us.  Let's pull up that

 6    arbitration hearing day one, page 71.

 7            Now, this is Mr. Saffold testifying, and

 8    you see there on page 71, line 8, the question is:

 9    "I've looked through all your text messages with

10    Mr. Bernstein that we've collected from

11    Mr. Bernstein's phone.  I've also looked at emails

12    that Mr. Bernstein and Ms. Emily Ries had that they

13    exchanged with you, and we produced all those in

14    this arbitration.  I've not seen any text messages

15    from you or any emails from you where you are

16    expressing displeasure with Mr. Bernstein or

17    telling him that you're not happy with the job he's

18    doing.  Does that sound right to you?"

19            And Mr. Saffold said, "Yes."

20            Do you see that?

21        **A.    Okay.**

22        Q.    Did you send any emails or text messages

23    to Mr. Bernstein telling him that you were not

24    happy with the job he was doing for you?

25        **A.    No.**

1      Q.   Did you send any emails or text messages

2  to Emily Ries telling her that you were not happy

3  with the job Clarity Sports was doing for you?

4      **A.   No.**

5      Q.   Let me ask you about the next question

6  that I asked Mr. Saffold.  I said, "Did you ever

7  tell Mr. Bernstein that you wanted him to do

8  anything differently and he didn't do it?"  And

9  then the response was, "No" there at the top of

10  page 72.

11          So let me ask you that question,

12  Mr. Golladay:  Did you ever tell Mr. Bernstein that

13  you wanted something done differently and he didn't

14  do it the way you wanted?

15      **A.   No.**

16      Q.   Did you ever tell Emily Ries of Clarity

17  Sports that you wanted her to do something

18  differently and she didn't do it right?

19      **A.   No.**

20      Q.   Do you remember referring some football

21  players to Jason Bernstein so he could talk to them

22  about maybe being an agent for them?

23      **A.   I don't know.**

24      Q.   Do you remember that you did that at least

25  for some people?

1      **A.    No.**

2      Q.   Were you aware that --

3           MR. HERBER:  This is J.T. Herber here.

4      You're using a whole bunch of exhibits here and I

5      don't think any of them have been marked.  So for

6      clarity, could we have these marked before we

7      proceed on?  I'd rather clean that up now before we

8      get into doing more exhibits.

9           MR. COMERFORD:  Sure.  We can mark the

10     arbitration hearing transcript as Exhibit 3.

11     (Thereupon, Plaintiff's Exhibit 3 was marked for

12     purposes of identification.)

13          MR. HERBER:  Can you also identify the

14     Bates number for the record as we go?

15     Q.   Mr. Golladay, were you aware of the fact

16     Mr. Saffold was referring football players to Jason

17     Bernstein so he could talk to them about being an

18     agent for them?

19          MR. CLEMENTS:  Objection, not reasonably

20     calculated to lead to discoverable admissible

21     evidence, but you can answer.

22     **A.    That's their business.**

23     Q.   Were you aware that that was going on?

24     **A.    No, I'm not aware of that.  I wasn't aware**

25     **of that.  That's their business.**

1    Q.   Do you know a person named Albert Smalls?

2    **A.   Yes.**

3    Q.   Did you refer Albert Smalls to Jason

4    Bernstein in October of 2018?

5    **A.   No.**

6    Q.   Did you ever refer Albert Smalls to Jason

7    Bernstein?

8    **A.   No.**

9    Q.   Do you know whether or not Kenneth Saffold

10   referred Albert Smalls to Jason Bernstein?

11   **A.   I have no clue.  Ask him.**

12   Q.   When did you first meet Todd France?

13   **A.   I met him at one of my old teammate's --**

14   **Golden Tate's foundation event my rookie year or my**

15   **second year, one of those years.  I don't remember.**

16   MR. COMERFORD:  Let's bring up the 2018

17   924 document, Mr. Martin.

18   Q.   As I understand it you met with Mr. France

19   at a bowling event; is that right?

20   **A.   It maybe was a bowling event.  I was just**

21   **there for support.  There we go.**

22   Q.   Was that the event where you met

23   Mr. France?

24   **A.   Yes.**

25   Q.   Had you ever heard of Mr. France before

1    this night?

2        **A.    No.**

3            MR. CLEMENTS:  Are you marking this as an

4    exhibit?

5            MR. COMERFORD:  Yeah.  This will be

6    Exhibit 4.

7            MR. HERBER:  I think the 2018 summer email

8    should be Exhibit 4 and this will be Exhibit 5.

9    (Thereupon, Plaintiff's Exhibits 4 and 5 were

10   marked for purposes of identification.)

11       Q.   And so this was at the Lucky Strike in

12   Novi, Michigan; do you see that?

13       **A.    Yep.**

14       Q.   Do you remember the evening?

15       **A.    That was -- I don't remember.  I mean,**

16   **that was a few years ago.**

17       Q.   Did you drive out there with anybody?

18       **A.    I don't remember.**

19       Q.   Did you drive home with anybody?

20       **A.    I don't remember.**

21       Q.   Do you remember talking with Mr. Saffold

22   before this event about the fact that you were

23   going to go?

24       **A.    I don't remember.**

25       Q.   Do you remember talking with Mr. Saffold

1    after the event about what happened there?

2        A.    I don't remember.

3        Q.    Why did you go to this event?

4        A.    To help support one of the older vets over

5    me at that time.

6        Q.    And what's that gentleman's name?

7        A.    Golden Tate.

8        Q.    And he was a wide receiver for the Lions

9    at the time?

10       A.    Yes.

11            MR. COMERFORD:  Let's bring up the

12   arbitration hearing transcript, Exhibit 3.  I want

13   to go to page 166.

14       Q.    I'm going to show you a little bit more of

15   what we talked about with Mr. Saffold.  This is me

16   asking questions of Mr. Saffold, and I said,

17   "Right, and before -- as I understood what you said

18   earlier, before that Golden Tate event on

19   September 24th 2018, Mr. Golladay hadn't told you

20   that he was interested in talking to other agents

21   or looking at other agents, do I have that right?"

22            And Mr. Saffold's answer was:  "You were

23   kind of stuck on the words and what I'm saying is

24   that the entirety of the time, from January --

25   excuse me, from July summer of 2018 until his

1   decision to change, we constantly and

2   continually -- we do it now -- look for other

3   opportunities, and so an agent wasn't a specific

4   interest at this time before the September 24th

5   meeting, it was just more opportunities to, like,

6   get out and brand himself.  So before he met Todd,

7   it was Raquel in the marketing.  We've looked at a

8   number of other marketing agencies to help

9   represent him.  And then following the dinner it

10  kind of shifted from marketing to, hey, let's look

11  into the new agent."

12          Do you see all that?

13    **A.   Yes.**

14    Q.   So let me ask you a few questions about

15  that.  Before the bowling event on September 24,

16  2018, you had not told Mr. Saffold that you were

17  interested in talking to other agents besides

18  Mr. Bernstein, correct?

19    **A.   Well, first, I don't talk to Mr. Saffold**

20  **about everything, so sometimes I might want to talk**

21  **to him about something, sometimes I might not.**

22    Q.   Understood.  Is the way I said it correct,

23  though?

24          MR. CLEMENTS:  Objection, it's

25  argumentative.

1          You can answer.

2          Do you need the question read back?

3          THE WITNESS:  Yeah.

4     Q.   Sure.  I'll just ask the question again,

5    Mr. Golladay.  I think that will be easier.

6          Before the bowling event that took place

7    on September 24, 2018, you had not told Mr. Saffold

8    that you were interested in talking with other

9    agents besides Mr. Bernstein, correct?

10    **A.   Right, because I don't talk to him about**

11   **everything.**

12    Q.   Before the bowling event on September 24,

13   2018, had you told anybody that you were interested

14   in maybe talking with other agents besides

15   Mr. Bernstein?

16    **A.   I'm not an open book.  I mean, I don't**

17   **have to go telling everybody everything.  I keep it**

18   **to myself.**

19    Q.   So would I be correct if I said that

20   before September 24, 2018 you had not told anybody

21   that you were interested in talking with other

22   agents?  Is that right?

23    **A.   Right.**

24    Q.   Now, when Mr. Saffold testified, he talked

25   about a dinner.  He says, "following the dinner, it

1    kind of shifted from marketing to, hey, let's look

2    into this new agent."

3            What's your understanding of the dinner

4    that he was talking about there?

5        A.    Okay, John, so this is how it went.  I

6    went to the bowling event, Golden, you know thanked

7    everybody for coming, he shouted out his agent,

8    Todd France, I went over there, introduced myself,

9    asked for his number, I texted him, we linked up in

10   Detroit, not sure where we went, what we ate.  The

11   meeting went really good.  To be honest, I loved

12   the meeting, loved everything about it or I

13   wouldn't be with him.  The season went on and in

14   the beginning of December, he went out to visit my

15   mom.  I mean, my mom has a big influence on my

16   life, she's a big part of it, this whole thing, she

17   helps everything go, and the meeting went great

18   with her.  I had feedback from her and me and her

19   had the same feeling and that was pretty much the

20   cherry on top and I pretty much had made up my mind

21   back when I first met him.  And when my mom pretty

22   much said what she had to say, like I said, it was

23   the cherry on top and I knew in December, "this is

24   going to be my agent," so I knew Jason was no

25   longer going to be my agent, with or without Todd,

1    **but once me and my mom got to the same page, Todd**

2    **was the guy, period.**

3        Q.   Let's go back to the bowling event then.

4    I had an understanding from Mr. Saffold that you

5    were kind of walking around introducing yourself to

6    people and you had another gentleman there with you

7    as your guest.

8        MR. CLEMENTS:  Objection, foundation.

9    Everybody knows that Saffold was not at the bowling

10   event.  Can't you just ask him the question about

11   what he was doing without constantly saying

12   Mr. Saffold this and Mr. Saffold that?

13       **A.   Ken was not at the bowling event.  And at**

14   **the same time I'm around teammates, so, of course,**

15   **we're all laughing, throwing the ball down the**

16   **lane.  Yeah, it was years ago.  I don't remember.**

17   **We were having a good time.**

18       Q.   Were you there with Mr. Saffold's brother

19   or somebody like that?

20       **A.   I don't remember.**

21       Q.   So at some point you -- did you approach

22   Todd France or did he approach you?

23       MR. CLEMENTS:  Objection.  It was asked

24   and answered.  He just told you.

25       **A.   I approached him.**

```
 1      Q.   And --

 2      A.   I asked for his number.

 3      Q.   What did you say to him when you

 4  approached him?

 5      A.   I don't remember.  I had a conversation, I

 6  asked for his number, he gave it to me, I texted

 7  him.

 8      Q.   And why did you approach him?

 9      A.   Because I was thinking about an agent

10  change.

11      Q.   And so, I mean, do I understand right that

12  you approached him because --

13      A.   I approached him because I knew he was an

14  agent and I was thinking about an agent change.

15      Q.   How did you know he was an agent?

16      A.   I answered that already.  Golden pretty

17  much addressed everyone at the bowling event, he

18  thanked everybody for coming out, and he also

19  shouted his agent out, Todd France, for coming.  I

20  walked over there and I introduced myself, I asked

21  for his number and texted him.

22      Q.   And do you remember anything that he said

23  to you?

24      A.   I don't.

25      Q.   Do you remember anything you said to him
```

1    other than asking him for his number?

2        **A.   I don't remember.  I know I got his job.**

3    **Happy I got his number.  Look how life is now.**

4        Q.   Did anybody suggest to you that you should

5    speak with Todd France?

6        **A.   I went under my own will.  Wanted to.**

7    **Glad I did.**

8        Q.   But did -- what I'm getting at is did

9    Golden Tate say, "Ken, you ought to talk to my

10   agent, Todd France"?

11       **A.   I went under my own will.**

12           MR. CLEMENTS:  It's been asked and

13   answered.

14       Q.   So the specific question is did Golden

15   Tate --

16       **A.   I went under my own will.  That's the**

17   **third time.  I went under my own will.  Sorry,**

18   **John.**

19       Q.   That's okay.  Am I right that Golden Tate

20   did not suggest to you that you talk to Mr. France?

21           MR. CLEMENTS:  Objection.  It's been asked

22   and answered three times.

23           THE WITNESS:  Let's give him a fourth

24   time.

25       **A.   I went under my own will.  No one had to**

1    ask me.  I'm my own man.  I went under my own will.

2         Q.   I just wanted to make sure you're not

3    making a distinction between doing 1something under

4    your own will and somebody suggesting that maybe

5    you should do something and then you decide to do

6    it under your own will.

7              MR. CLEMENTS:  That question,

8    Mr. Comerford, is not reasonably calculated to lead

9    to discovery of admissible evidence because it

10   doesn't matter who suggested it or not so long as

11   it wasn't Todd France under the NFL regulations.

12        A.   For the fifth time, I went under my own

13   will.

14        Q.   Right.  Did you have any conversations

15   with Golden Tate that evening about Todd France?

16        A.   No.

17        Q.   Had you had any conversations with Golden

18   Tate prior to that evening about Todd France?

19        A.   No.

20        Q.   Had you had any conversations with anybody

21   either prior to that meeting or at that event about

22   Todd France before you first spoke with him?

23        A.   No.

24        Q.   Did you ask any of the other players at

25   the event about Todd France?

1      **A.    No.**

2      Q.    Were you talking with any other agents at

3      this time period, September 2018?

4      **A.    I don't remember.**

5      Q.    Did Mr. France tell you what agency he was

6      with?

7      **A.    I already knew, to be honest.**

8      Q.    And how did you know?

9      **A.    Golden's locker was right next to me.  He**

10     **gets CAA packages of everything, and then Matthew**

11     **Stafford, I would say, in my opinion, is one of the**

12     **best quarterbacks in the league is with CAA.**

13     **Glover Quin, another, is with CAA, and Golden is**

14     **CAA and that's his agent, so I wanted to go over**

15     **there and introduce myself to a CAA rep and that's**

16     **what I did.  Just so you know, the vets who had**

17     **long careers and great careers and who they were**

18     **with, who were representing them, and I felt like**

19     **me just needing to be the player that I am, I take**

20     **great pride in what I put out there in the field**

21     **and I wanted to be represented by somebody like**

22     **that, period.**

23     Q.    From the time you met Todd France until

24     you signed with him in January of 2019, were there

25     any other potential agents that you spoke with?

1      **A.    I answered that.  I don't remember.**

2      Q.    What happened next after this bowling

3   alley event in terms of you talking with Todd

4   France?

5      **A.    I texted him, he came to Detroit, we went**

6   **out to eat, yeah.**

7      Q.    Was there anybody else there when you had

8   dinner with Mr. France the first time?

9      **A.    I don't remember it was so long ago.**

10      Q.    How long did you wait to contact Todd

11   France?

12      **A.    Not long.  I don't remember.**

13      Q.    How did you communicate with him about all

14   the details of that first meeting, like where are

15   we going to meet, what time are we going to meet?

16   Was that text messages?

17      **A.    It could have been text, call, FaceTime,**

18   **FaceTime audio.  I don't remember.**

19      Q.    So how did Mr. France recruit you?  How

20   did he talk about becoming your agent?

21          MR. CLEMENTS:  Objection.  It's not

22   reasonably calculated to lead to the discovery of

23   admissible evidence because once -- under the NFL

24   regs once Mr. Golladay approaches Todd France, Todd

25   France can say whatever he wants about

1    Mr. Golladay's football career, but you can answer.

2        A.   As far as recruiting me, I mean, first

3    off, it was my decision.  I don't remember what we

4    talked about.  I mean, it was, what, two,

5    three years ago.  Clearly the conversation went

6    really well.  I was pleased with the conversation.

7    Yeah, I don't remember.

8        Q.   Did Mr. France talk about contracts that

9    he had done for other players?

10       A.   No.

11       Q.   Were you curious about contracts he had

12   done with other players?

13       A.   No.

14       Q.   I mean, I understood the reasoning for

15   going with Mr. France was that you wanted a monster

16   deal, right?

17       A.   Right.

18       Q.   And so what did you do to satisfy yourself

19   that Todd France could do a monster deal for you?

20       A.   Look at the track record.  I know the

21   players who are under him.  Of course, I did my own

22   research, so I know who he had represented.  I

23   don't need to ask him about, "So what deals have

24   you done?  I know the players who he has and now

25   I'm one of them.

1      Q.   What did you guys talk about at that first
2  dinner?

3      **A.   I don't remember.  It was so long ago.**

4      Q.   Do you remember anything you talked about
5  at that dinner?

6      **A.   I don't remember not one single thing at**
7  **that dinner.**

8      Q.   Did Mr. France bring you any papers for
9  you to look at, anything to put in front of you?

10     **A.   No.**

11     Q.   Did Mr. France talk about marketing that
12  he and his agency would be able to do for you?

13     **A.   No.**

14     Q.   So tell me why you thought Mr. France
15  would do a better job marketing than Mr. Bernstein
16  and his agency were able to do.

17         MR. CLEMENTS:  That is not reasonably
18  calculated to lead to the discovery of admissible
19  evidence, but you can answer.

20     **A.   I never even talked about marketing.**

21     Q.   Were you worried about marketing?

22     **A.   I never once talked about marketing.  What**
23  **I was worried about is making sure me and my family**
24  **and rest of my generation would be good, and that's**
25  **what happened when I signed with Todd France.**

```
 1      Q.   Why didn't you talk with Mr. France about

 2   marketing if that was something that you were

 3   concerned about in the summer of 2018?

 4      A.   I never said that.

 5      Q.   So do I -- help me understand.  I think I

 6   have it wrong then.

 7      A.   What did you have --

 8      Q.   Were you concerned about your marketing

 9   when you were with Jason Bernstein and Clarity?

10      A.   No, I was more concerned about everything.

11      Q.   What do you mean by that?

12      A.   The total package.  What I wanted -- this

13   whole thing is about me and my family and that's

14   the contract, that's what I was worried about.  I

15   wanted a big deal, I felt like I deserved a big

16   deal in the future and the future is now.  I didn't

17   feel like Jason Bernstein would be able to get that

18   for me, no hard feelings to him.  To be honest, I

19   didn't even have to give him a call, I could have

20   just shot him an email, but just out of respect for

21   him I called him and told him, and I wanted a big

22   agent, and that's what I feel like I got in Todd.

23   That's what I got in Todd, and, like I said, this

24   is where I'm at now.  I'm a New York Giant, I'm

25   happy with what I got with Todd, and that was the
```

1    **best decision I've made in my life to this day.**

2        Q.    Why do you feel that Mr. Bernstein would

3    not have been able to get you a $72 million deal

4    with the Giants or with any other team?

5        **A.    That's just my feeling and clearly I made**

6    **the right decision.**

7        Q.    Did Mr. France talk to you at all before

8    you signed with him about the resources that he and

9    his agency could offer you?

10       **A.    No.**

11       Q.    Do you remember having any conversation

12   with Jason Bernstein where you told him that the

13   reason you were switching was resources?

14       **A.    To be honest, I didn't even have to tell**

15   **him anything, I could have just sent him an email.**

16   **Out of respect, I gave him a phone call.**

17       Q.    And so on that phone call, do you remember

18   saying to him that you were switching because of

19   resources?

20       **A.    On that phone call I do remember that I**

21   **said I would no longer be working with him or he**

22   **doesn't have to work for me.   That's what I**

23   **remember.**

24       Q.    Do you remember saying anything about

25   resources in that conversation?

1    **A.   On the phone call, I remember me telling**
2    **him that I would no longer need his assistance.**
3    Q.   When you called him -- when you called
4    Mr. Bernstein to let him know, my understanding is
5    the date you did that was January 22, 2019; is that
6    right?
7    **A.   I don't remember the date.**
8    Q.   When you called Mr. Bernstein, was anybody
9    there with you?
10   **A.   I was at my mom's house.  I don't remember**
11   **if she was there or not.**
12   Q.   Was Mr. France there with you when you
13   called Mr. Bernstein to terminate him?
14   **A.   No.**
15   Q.   But you were at your mother's house in
16   Chicago?
17   **A.   Yes.**
18   Q.   Did Mr. France come to Chicago to meet
19   with you around that same time either that day or
20   right around there?
21        MR. CLEMENTS:  Objection, vague.  You said
22   that day, January 22, 2019, when he called
23   Mr. Bernstein or --
24   **A.   I don't remember the date.**
25   Q.   We can look at some stuff that might help.

 1    All right.  You said that you spoke with your

 2    mother about possibly changing agents.  Her name is

 3    Stacy Wright Whitaker, correct?

 4        **A.    Yes.**

 5        Q.    Do you know if Mr. France provided

 6    references to your mother?

 7        **A.    About what?**

 8        Q.    About other players that he had worked

 9    with?

10        **A.    Ask them.  I don't know.**

11        Q.    That's my question, did --

12        **A.    I don't know.  I don't know.  Ask them.**

13        Q.    Do you know whether Mr. France provided

14    any references to Kenneth Saffold?

15        **A.    Ask him.  I don't know.**

16        Q.    Did Mr. France provide any references to

17    you?

18        **A.    No.**

19        Q.    You know what I mean, like, did he say

20    "talk to so and so about" --

21        **A.    No to me.  For them, I don't know.  You**

22    **can ask those people.**

23        Q.    Who would those people be that I should

24    ask?

25        **A.    The people that you just asked about.**

```
 1      Q.   So your mom and Ken Saffold?
 2      A.   I think those are the people you just
 3   asked about, right?
 4      Q.   Yeah.  Now I'm asking about whether there
 5   were any references like Golden Tate or anybody
 6   else who is a --
 7      A.   Yeah, ask them, John.  You can ask all
 8   these other ways, but ask them.  I don't know.
 9          MR. CLEMENTS:  He's asked and answered as
10   far as his facts and knowledge.
11      A.   He can ask them.
12      Q.   What did your mother say to you about
13   potentially switching agents in that
14   December 2018/January 2019 time frame?
15          MR. CLEMENTS:  Objection, hearsay.  It's
16   not reasonably calculated to lead to discovery of
17   admissible evidence, but you can answer it.
18      A.   Can you ask the question again, please?
19      Q.   What did your mother say to you in
20   December 2018 or January 2019 about the idea that
21   you were potentially going to switch from Jason
22   Bernstein to Todd France?
23          MR. CLEMENTS:  Same objection.
24      A.   Like I said, I'm my own man.  I don't
25   remember what she said to me, but I know when her
```

1    **and Todd met, the conversation went very well, it**

2    **went very well when me and him met, and that's why**

3    **I signed to him.  If I'm signed with him right now,**

4    **it went great.**

5            MR. COMERFORD:  Let's pull up the

6    2018-12-06 text between Mr. Saffold and Mr. France.

7        Q.    We're going to show you a text message.

8    This was produced by Mr. France, and this is a text

9    message dated December 6, 2018 between Mr. France

10   and Kenneth Saffold.  Can we go down a little bit?

11   This is Kenneth Saffold talking to Mr. France.  It

12   says, "Also I failed to ask, would you be able to

13   provide Kenny and I with a referral?  Looking to

14   talk to a current or former client of yours to get

15   their perspective on working with you and your

16   team."

17           Do you see where I read all that?

18           MR. HERBER:  Could we mark this as an

19   exhibit?

20           MR. COMERFORD:  Sure.  I think this will

21   be Exhibit 6.

22   (Thereupon, Plaintiff's Exhibit 6 was marked for

23   purposes of identification.)

24       Q.    And, Mr. Golladay, did you have any

25   conversations with Mr. Saffold about any referrals

1    or references that he got from Todd France?

2         A.   I don't remember.

3         Q.   I want to bring up another text.  This is

4    going to be dated the same date, December 6, 2018,

5    and this is going to be a text message between

6    Mr. Bernstein and Mr. Saffold, and I want to go to

7    the page marked Clarity 667 at the bottom.

8         A.   I'm sorry, I can't really read that.

9         Q.   We'll zoom in on it.  So this will be

10   Exhibit 7.

11   (Thereupon, Plaintiff's Exhibit 7 was marked for

12   purposes of identification.)

13        Q.   I want to ask you about this.  These are

14   texts between Kenneth Saffold and Jason Bernstein

15   on that same day, December 6, 2018, and

16   Mr. Bernstein writes and says:  "Spoke with Kenny

17   for a while tonight.  All good.  There are no

18   issues.  It looks like the GM is just starting his

19   posturing a year early."

20             Do you see where I read that?

21        A.   Yes.

22        Q.   And then Mr. Saffold responds and says,

23   "Sounds good.  I'll let you know if any new news

24   comes up my way."

25             Do you see that?

1    **A.    Right.**

2    Q.    So Mr. Bernstein had gotten a message from

3    the GM of the Lions around this time saying, "Hey,

4    Mr. Golladay might be talking to another agent or

5    another agent might be talking to Mr. Golladay," or

6    something along those lines.  Did you become aware

7    of that?

8    **A.    I don't remember.**

9    Q.    Did you have any conversations with the

10   general manager of the Lions around that time, late

11   2018 about maybe another agent?

12   **A.    No.**

13   Q.    And so Mr. Bernstein was reaching out to

14   Mr. Saffold and he's basically saying to

15   Mr. Saffold that Mr. Bernstein talked with you and

16   you said everything is good, there are no issues.

17        Do you remember having a conversation like

18   that with Mr. Bernstein around December 6, 2018?

19        MR. CLEMENTS:  Objection.  It's hearsay

20   within hearsay and it's also you editorializing

21   what a document says, but you can answer.

22   **A.    I don't know.  December 6th of what year?**

23   Q.    2018.

24   **A.    Yeah, I don't know.**

25   Q.    Do you remember Mr. Bernstein being on the

1   phone with you in early December 2018 saying, "Hey,

2   Kenny, I'm hearing that another agent might be

3   talking with you or you might be talking with

4   another agent," and you told Mr. Bernstein, "It's

5   all good, there are no issues."  Do you remember

6   that conversation?

7       **A.   I don't.**

8       Q.   Did you have any conversations around this

9   time with Mr. Saffold about whether you should let

10  Mr. Bernstein know that you were talking with Todd

11  France?

12      **A.   I don't remember.**

13      Q.   So let's just focus on this period of

14  time, December 6, 2018.  By this time you've met

15  Todd France and you had dinner with him in Detroit,

16  and then Mr. France had come to Chicago and met

17  with your mom, right?

18      **A.   Right.**

19      Q.   And then from these text messages, it

20  looks to me like you had a conversation with

21  Mr. Bernstein that led Mr. Bernstein to write this

22  text message and say, "Hey, I spoke with Kenny for

23  a while tonight.  All good, there are no issues.

24  It looks like the general manager is just starting

25  his posturing a little early."

1          What was your thinking at this point in

2    time about letting Mr. Bernstein know that maybe

3    you were going to switch?

4         **A.   Well, like I said already, in September I**

5    **had already made my mind up, and then in December,**

6    **that's when I let Todd know I would be going with**

7    **him.**

8         Q.   So why didn't you let Mr. Bernstein know?

9         **A.   Was it any of his business?  And then on**

10   **top of that I didn't want it to become a**

11   **distraction to me or the team at the time so I**

12   **played the rest of the year out.**

13        Q.   Do you feel it was okay to just tell

14   Mr. Bernstein something that wasn't true?

15          MR. CLEMENTS:  Objection, argumentative.

16   I'm not sure there was any -- you're saying

17   somebody -- an email that people wrote that aren't

18   Kenny Golladay.  Are you accusing Mr. Golladay of

19   lying about what was in that email?  I don't

20   understand.  It's an improper question, but if you

21   want to rephrase it.

22        Q.   You can answer, Mr. Golladay.

23        **A.   What was the question?**

24        Q.   So the way it looks to me is that you're

25   in touch with Todd France by this point in time and

1    then you have a conversation with Mr. Bernstein and

2    you tell him, "Hey, it's all good, there are no

3    issues," and it looks to me like you're just trying

4    to keep both of these guys, Jason Bernstein and

5    Todd France on track; is that fair?

6            MR. CLEMENTS:  Objection, it's

7    speculation, it's based on hearsay given these

8    texts that he didn't write or wasn't a party to.

9    It's an incomplete hypothetical, so I don't even

10   know how he could opine on whether it's true or

11   not.  That was wasn't your original question.  I

12   don't know if you can answer.

13       **A.   I don't know if I can answer that.**

14       Q.   Do you want me to ask it again,

15   Mr. Golladay?

16           MR. CLEMENTS:  We would like you to ask it

17   without all the editorializing and the references

18   to the email.  That's what's getting confusing.

19   You're looking at these text messages,

20   Mr. Comerford, but there's no foundation that

21   Mr. Golladay ever saw them and he's certainly not

22   party to them, so he has no factual knowledge about

23   the text messages.  I'm not sure what you're

24   getting at.  It's just an argumentative question

25   with you trying to characterize something in your

1    client's favor and trying to trick the witness into

2    agreeing with you when he has no factual knowledge.

3    Now if you want to ask him about his factual

4    knowledge or his state of mind, irrespective of

5    this, at this time period, that's a fair question.

6    I think that's what's confusing him is these aren't

7    his texts, right?

8              Are these your text messages,

9    Mr. Golladay?

10             THE WITNESS:  No.

11             MR. COMERFORD:  Mr. Clements --

12             MR. CLEMENTS:  Mr. Comerford, there's no

13   foundation.

14             Have you ever seen these text messages

15   before?

16             THE WITNESS:  No.

17             MR. CLEMENTS:  So that's our objection.  I

18   don't want to instruct him not to answer the

19   question, but I believe it's an unfair,

20   argumentative question.

21             MR. COMERFORD:  Mr. Clements, you've

22   already been sanctioned by the court for making

23   long speaking objections --

24             MR. CLEMENTS:  I got sanctioned by the

25   court for being a little obnoxious.  But if you

1   want to ask your questions, ask your questions.  I

2   don't see this as being any different than your

3   obstructionist objections during Mr. Bernstein's

4   where you said it's an incomplete hypothetical,

5   et cetera, et cetera, and you wouldn't let him

6   answer.  Can you just ask the question?  We're not

7   stopping you from asking the question.  You can

8   even ask it with references to the texts, but we're

9   all confused about what you meant.

10          MR. COMERFORD:  Mr. Clements, I'm going to

11   ask you to please stop making long speaking

12   objections and long commentary and let me ask the

13   questions in the deposition.

14          MR. CLEMENTS:  Go ahead.

15      Q.   Now, Mr. Golladay, is it true that in

16   early December 2018 you were not being completely

17   forthcoming with Mr. Bernstein about the fact that

18   you were in contact with Todd France?  Is that fair

19   to say?

20      **A.   I didn't have to tell Jason anything.**

21      Q.   Am I correct --

22      **A.   He worked for me.  I don't have to tell**

23   **him anything.**

24      Q.   Am I correct that you were not sharing all

25   the information with Mr. Bernstein in

1    December 2018?  Is that fair?

2        A.    I didn't have to.

3        Q.    So what I said is correct, though, right?

4        A.    I told you what I said.  I didn't have to

5    tell him anything.  He works for me, I don't work

6    for him.

7        Q.    And so one of the reasons that you were

8    not telling Mr. Bernstein that you were in touch

9    with Mr. France is because there was a chance that

10   you might stick with Mr. Bernstein and you didn't

11   want to mess up your relationship with

12   Mr. Bernstein; is that fair?

13           MR. CLEMENTS:  Objection, argumentative.

14           You can answer.

15       A.    The reason I didn't tell him is because I

16   don't have to tell him anything.

17       Q.    Is another reason you didn't tell

18   Mr. Bernstein because you didn't want to mess up

19   your relationship with him?

20           MR. CLEMENTS:  Objection, argumentative.

21           You can answer.

22       A.    I didn't have to tell him anything.

23       Q.    Let's bring up Exhibit 3, the arbitration

24   hearing transcript, and let's go to page 99,

25   starting at line 19.  This is Mr. Saffold answering

1    questions, and the question was, "Okay, so as of

2    January 3, 2019, I think we agree that you did not

3    know that Mr. Golladay was going to change his

4    representation from Mr. Bernstein to Mr. France; is

5    that fair?

6        **A.   And Mr. Golladay responded, "Yeah, I had**

7    **an idea, but" --**

8            MR. CLEMENTS:  You misquoted.

9    Mr. Golladay did not testify at the hearing.

10           MR. COMERFORD:  Let's go back to page 99

11   and I'll start again because of Mr. Clements'

12   interruption.

13           MR. CLEMENTS:  No, it's because you said

14   Mr. Golladay instead of Mr. Saffold.  Mr. Golladay

15   didn't testify at this hearing so you're

16   mischaracterizing this as being his testimony.

17           MR. COMERFORD:  All right.

18       Q.   Mr. Golladay, I'm going to read from this

19   transcript where Mr. Saffold was answering

20   questions, and the question Mr. Saffold was:

21   "Okay, so as of January 3rd I think we agree that

22   you did not know that Mr. Golladay was going to

23   change his representation from Mr. Bernstein to

24   Mr. France; is that fair?"

25           And Mr. Saffold's answer was:  "Yeah, I

 1    had an idea, but he hadn't made a decision yet."

 2          And then the question was:  "Okay.  And

 3    you're certainly still keeping up a good

 4    relationship with Mr. Bernstein because it's not

 5    clear which way this is going to go; is that fair?"

 6          And Mr. Saffold said "Correct."

 7          Do you see all that?

 8    **A.   Yes.**

 9    Q.   So what I'm asking you, do you sort of

10    agree with that general idea from Mr. Saffold?

11    **A.   He is his own man.  He can think whatever**

12    **he want to think.  I don't know if they have a**

13    **relationship to this day.  Who cares?  At the end**

14    **of the day I'm my own man and I made the decision**

15    **that I made.  I didn't have to tell Ken anything.**

16    Q.   I understand.  Was Mr. Saffold correct

17    when he said that as of January 3, 2019, you hadn't

18    made a final decision yet?

19    **A.   Like I said already, in my mind, back in**

20    **September, I knew the route I wanted to go.  In**

21    **December, that's when I told Todd, "I want to be**

22    **with you," and I decided to wait until the end of**

23    **the season.  I didn't want to be distracted, or the**

24    **team.**

25    Q.   So Mr. --

 1     **A.   So I don't really know about what Ken had**

 2  **to say or anything.  Ask him.  Ask Ken.**

 3     Q.   Yeah.  And that's what I'm trying to do is

 4  ask you about --

 5     **A.   But ask him, though.  I already told you.**

 6     Q.   Right.  I get it.  And we asked

 7  Mr. Saffold in this transcript that you're looking

 8  at on the screen there.

 9     **A.   Back in September, I had already made my**

10  **mind up that I was going with an agent change, and**

11  **in December I told Todd that I wanted him to be my**

12  **agent, so that's the answer right there.  So I see**

13  **the dates, but I don't know anything about those**

14  **dates.  I know in my mind back in September I**

15  **wanted to make an agent change.  In December,**

16  **that's when I told Todd I want him to be my agent,**

17  **point blank, period.**

18        MR. CLEMENTS:  And you're speaking of

19  September and December 2018.

20        THE WITNESS:  Yes.

21     Q.   Here is my question, Mr. Golladay:  You

22  can see that Mr. Saffold said that in --

23     **A.   Who cares what Kenny said?  It doesn't**

24  **matter.  That's what he said, that's not what I**

25  **said.**

```
 1        Q.   Right.  I'm just trying --

 2        A.   Yeah, yeah, yeah.  I see these highlighted

 3   yellow -- yeah, I see what he said.  I don't care

 4   what he said.

 5        Q.   Right.

 6             MR. CLEMENTS:  Also, object that

 7   everything that Mr. Saffold said is hearsay in

 8   connection with this proceeding.

 9        Q.   So, Mr. Golladay, we can say that

10   Mr. Saffold felt as of January 3, 2019 that you and

11   he were keeping up a good relationship with

12   Mr. Bernstein because it's not clear which way this

13   is going to go.

14        A.   That's what Kenny feel like.  I don't care

15   what he feels like.  That's how he felt at the

16   time.  That's not what I felt like, period.

17        Q.   That's what I'm trying to lead up to.

18        A.   I didn't feel the same way he felt.

19        Q.   Let me ask the question, though.

20             MR. CLEMENTS:  It's been asked and

21   answered.

22        Q.   Do you have any understanding as to why

23   Mr. Saffold felt that?

24        A.   You will have to ask Mr. Saffold again why

25   he felt that way because I didn't feel that way.
```

1      Q.   Let me get the whole question out and then
2  you can answer it.
3           Do you have any idea why Mr. Saffold felt
4  that --
5      **A.   I have no idea.**
6           MR. CLEMENTS:  Let him ask his question.
7  Let him finish his question and then you can
8  answer.  Don't anticipate.  It's going to take
9  longer.
10     **A.   I've got stuff to do.  I won't be on this**
11  **call too much longer.**
12     Q.   So I appreciate that, Mr. Golladay.  I
13  just need to get the whole question out before you
14  start answering so that the written transcript that
15  results from what we're doing here today makes
16  sense, so let me get the whole question out and
17  then you can answer.
18          Do you have any idea why Mr. Saffold felt
19  that you and he should keep up a good relationship
20  with Mr. Bernstein because it wasn't clear which
21  way this was going to go as of January 3, 2019?
22     **A.   I have no idea, John.  Ask Mr. Saffold.**
23     Q.   Okay.  Let's bring up another document.
24     **A.   I need a break.  I've got to use the**
25  **bathroom.**

```
1              MR. COMERFORD:  We'll make it as short as

2    we can so we can get this done as soon as possible.

3              THE VIDEOGRAPHER:  Off the record at 3:31.

4              (Thereupon, a recess was taken.)

5              THE VIDEOGRAPHER:  We're back on the

6    record at 3:48 p.m.

7    BY MR. COMERFORD:

8         Q.   Mr. Golladay, I want to show you some text

9    messages from -- they're going to be dated around

10   December 17, 2018.

11             MR. COMERFORD:  Mr. Martin, it will be a

12   document called 2018-12-17, and the page 049 --

13   this is a text message from Todd France to you

14   December 17, 2018.  He says, "Had great convo with

15   Mom."  It goes on from there.  And can we scroll

16   down?

17             MR. HERBER:  John, can you please mark

18   this as an exhibit?

19             MR. COMERFORD:  This will be exhibit -- is

20   it Exhibit 8?

21             MR. HERBER:  Yeah, it will be Exhibit 8.

22   (Thereupon, Plaintiff's Exhibit 8 was marked for

23   purposes of identification.)

24             MR. HERBER:  And Exhibit 7 will be the

25   December 6, 2018 Bernstein text with Saffold.
```

1      Q.   And, Mr. Saffold -- it looks like you

2    didn't respond to the text from Todd France on

3    December 17, 2018.  Do you see that?

4      **A.   Yeah, I did see that.**

5      Q.   Do you remember why you didn't respond to

6    Mr. France?

7      **A.   Yeah, I mean, I have no clue.  Maybe we**

8    **talked on the phone.  I don't know.**

9      Q.   So on December 18, 2018, the following

10   evening, Mr. France texted you again and says,

11   "What up?  Making sure you saw my late text last

12   night.  Great convo with Mom last night."

13            And then you respond and say, "What's up,

14   Todd?"

15            He says, "What up, KG."  And then you say,

16   "Yeah, I saw your message."

17            Do you remember this exchange?

18      **A.   I don't.  I mean, I guess, I see it.**

19      Q.   Do you remember why you weren't responding

20   more positively to Mr. France at this point?

21            MR. CLEMENTS:  Objection, argumentative.

22      **A.   I mean, I guess it's just me.  I have no**

23   **clue.  I'm a pretty nonchalant guy, pretty dry.  I**

24   **don't know.**

25      Q.   I looked at all the text messages that

1   Todd France has produced and I have not seen any

2   text messages from you to Todd France where you

3   say, "Todd, I've decided to hire you."

4          Do you know if you sent any text messages

5   like that?

6       **A.   I don't remember.**

7       Q.   And I haven't seen any emails either from

8   you to Todd France where you say, "Todd, I've

9   decided to hire you."

10          Do you remember sending any emails about

11  that?

12      **A.   I don't.  But at the end of the day, I**

13  **mean, he's my agent now, so the conversation must**

14  **have happened some way somehow.  It just can't**

15  **appear that he's my agent without some type of**

16  **communication.**

17      Q.   Right.  Do you remember when that

18  communication took place?

19      **A.   No.**

20      Q.   Let's go back to Exhibit 3, the

21  arbitration hearing transcript, page 139.  This is

22  Mr. Saffold again, and he's answering a question,

23  and then I highlighted the part I want to ask you

24  about.  Mr. Saffold testified, "and I just kept

25  saying, all right, let's take our time.  There's no

1    rush.  Let's you get through, let's see what

2    opportunities that Jason and his team may bring,

3    because we were still talking about some

4    opportunities around the Superbowl time.  I was,

5    like, let's see what may come to see if it helps

6    shape your decision, and then that was enough for

7    him to say 'All right, I'll wait until after

8    Christmas.'"

9            Do you see all that?

10   **A.    Yeah.**

11       Q.   Do you remember Mr. Saffold telling you in

12   December 2018 to -- on the issue of changing

13   agents, take your time, there's no rush?

14   **A.    I don't remember that.**

15       Q.   Do you remember Mr. Saffold saying in

16   December of 2018 or January of 2019, let's see what

17   opportunities that Jason Bernstein and his team at

18   Clarity may bring because you guys were still

19   talking about some opportunity around the Superbowl

20   time?

21   **A.    I don't remember.**

22       Q.   Do you remember that the Superbowl took

23   place in late January 2019?

24   **A.    Isn't the Superbowl in February.**

25       Q.   Or maybe February 3rd 2019.  I think

1    you're probably right.

2            Do you remember any discussions with Jason

3    Bernstein and the folks at Clarity about some

4    marketing opportunities around the Superbowl

5    February 2019?

6        A.    I mean, I don't remember.  That's so long

7    ago.

8        Q.    Do you remember -- so going back to

9    Mr. Saffold's testimony here, at the very end he

10   says, "and then that was enough for him to say,

11   'All right, I'll at least wait until after

12   Christmas.'"

13           Do you remember having conversation with

14   Ken Saffold where you said, "I'll wait on this

15   decision about whether I'm going to change agents

16   at least until after Christmas"?

17       A.    I don't remember having a conversation

18   with him.

19       Q.    Do you know whether that is something that

20   you would have said, or you just don't remember

21   either way?

22       A.    I don't remember either way.  I don't

23   remember if we even had the conversation.

24       Q.    So Mr. Saffold may be right about all

25   these things that he testified to, and what you're

1    telling me is you don't remember one way or the

2    other; is that fair?

3            MR. CLEMENTS:   Objection, argumentative.

4    Also calls for speculation, but you can answer.

5        **A.    Yeah, I mean, I'm not agreeing to that.   I**

6    **don't remember having that conversation with Ken**

7    **about that.**

8        Q.    Let's pull up a document dated 2019-01 --

9    let's see, it's going to be -- 2019-01-24 is the

10   Stacy Wright Whitaker text with Mr. Bernstein.

11   This will be Exhibit 9.

12   (Thereupon, Plaintiff's Exhibit 9 was marked for

13   purposes of identification.)

14       Q.    I want to ask you about -- these are some

15   texts between Jason Bernstein and your mom, Stacy

16   Wright Whitaker.   The first one -- we can zoom in a

17   little bit, the first one is January 4, 2019.

18   Jason Bernstein writes and says:   "Hey, Stacey, I'm

19   going to plan to come in for Kenny's surgery to

20   make sure everything goes smoothly.   Will plan to

21   fly in Tuesday morning for the eval."

22           Do you remember Mr. Bernstein going to be

23   with you when you had surgery in January 2019?

24       **A.    Can you ask the question again?**

25       Q.    Do you remember that Jason Bernstein went

1    to you and spent time with you when you had surgery

2    in January of 2019?

3        A.   Yes.

4        Q.   And where was that surgery?

5        A.   **Ann Arbor, Michigan.**

6        Q.   And was Mr. Bernstein helpful to you when

7    you were having surgery in January of 2019?

8        A.   **He took me to the surgery and dropped me**

9    **back off at home.**

10       Q.   Do you remember anything else that he did

11   for you during that surgery?

12       A.   **No.**

13       Q.   Did you ask Mr. Bernstein for advice about

14   which doctor you should use for your surgery?

15       A.   **I don't remember.**

16       Q.   If Mr. Bernstein says that you did ask him

17   for advice, would you have any reason to disagree

18   with that?

19       A.   **No, I wouldn't.  I was paying him, so I've**

20   **got the right to ask him for advice.**

21       Q.   Why were you still asking Mr. Bernstein

22   for advice in December 2018 and January 2019?

23       A.   **Because I was paying him.**

24       Q.   Why weren't you just asking Mr. France for

25   advice instead?

1       **A.   I don't think it really matter who I ask**

2   **for advice.**

3       Q.   Is it possible that you were asking

4   Mr. Bernstein for advice and you were also asking

5   Mr. France for advice on the same topics because

6   you wanted to see what both of them had to say?

7           MR. CLEMENTS:  Objection, argumentative.

8           You can answer.

9       **A.   I mean, I really don't think it matters**

10  **who I ask for advice.  I went to the right surgeon,**

11  **the surgery went well, I went on to have a Pro Bowl**

12  **season after that.  It don't matter.**

13      Q.   Right.  What I'm getting at is, one way to

14  look at this is you were asking Jason Bernstein for

15  advice in December 2018 and January 2019 because

16  you didn't know if you were going to terminate him

17  for sure.  You hadn't fully and finally made up

18  your mind, and you were also asking Todd France for

19  advice on the same topics.  Do you see what I'm

20  saying?

21      **A.   Well, like I already said, I had pretty**

22  **much made my mind up in September, and then I told**

23  **Todd that he will be my agent, that I will hire**

24  **him, but at the time I was still paying Jason, so**

25  **why not ask him for advice.  I mean, I could ask**

1    **you for advice.  That doesn't mean I'm going to go**

2    **and do it.  I want to feel out your opinion on it.**

3       Q.   As I understand it you signed an SRA with

4    Todd France around January, I think it's dated 24th

5    2019.  Does that sound right?

6       **A.   Yeah, I don't remember the date.**

7       Q.   Do you agree with me that up until the

8    moment you signed the SRA with Todd France you can

9    change your mind and decide to not do it at any

10   time.

11      **A.   Say it again, please.**

12      Q.   Do you agree with me that up until the

13   moment you signed the SRA with Todd France in late

14   January 2019, you could have changed your mind and

15   you could have decided to not switch agents, right?

16          MR. CLEMENTS:  Objection, calls for a

17   legal conclusion.

18          You can answer.

19      **A.   I guess you could say I could have changed**

20   **my mind, but I wasn't going to change my mind.**

21      Q.   Right.  But up until you signed that SRA,

22   you've got no obligation to go through with it if

23   you decided you don't want to, agree?

24          MR. CLEMENTS:  Objection, calls for a

25   legal conclusion.

1          You can answer.

2     **A.   Either way it goes, I mean, that never**

3  **happened, and to be honest, I don't really think it**

4  **matters.   I did sign with Todd and that's all that**

5  **matters.**

6     Q.   Right.  And let me ask you about these

7  texts with your mom and Mr. Bernstein.  If we go to

8  the second page, your mother and Mr. Bernstein are

9  talking about your surgery, and then you see

10 January 8, 2019, she starts saying, "I haven't

11 talked to him.  He's been acting funny.  Not sure

12 if he really wants me to come.  He came by

13 yesterday, mentioned my flight, still never got an

14 itinerary, so I never checked in."

15         Do you remember that happening?

16    **A.   I don't.  Who were these conversations**

17 **between?**

18    Q.   Your mom, Stacy Wright Whitaker, is in the

19 gray box and Mr. Bernstein is in the blue box.

20    **A.   Okay.  Okay.**

21    Q.   Do you remember whether you wanted your

22 mom to come to your surgery in Ann Arbor or not?

23         MR. CLEMENTS:  Objection.  Not reasonably

24 calculated to lead to discovery of admissible

25 evidence, but you can answer.

```
 1       A.    I don't remember.

 2       Q.    You were dating someone at the time that

 3  this was going on December 2018, January 2019.  Do

 4  you remember that person's name?

 5       A.    Yes.

 6       Q.    Who was that?

 7            MR. CLEMENTS:  We'd like to mark this

 8  confidential as well.

 9       A.    Is that necessary?

10            MR. CLEMENTS:  We'll be out of here

11  quicker if you answer his questions.

12       A.    ███████████████████████

13       Q.    ██████████████████████████████?

14       A.    Yeah.

15            MR. CLEMENTS:  If you just refer to her as

16  the girlfriend, then we can go back on no

17  confidentiality.

18            MR. COMERFORD:  Sure.

19       Q.    So I'm going to refer to her as your

20  girlfriend at the time and we'll understand that

21  we're talking about ███████████, okay?

22       A.    Give me one second, John.  I'm actually

23  having some construction going on.

24            Okay, we can go.  There was a lot of noise

25  in my background.  I'm sorry.
```

1       Q.   It's okay.

2            Did you ever talk with the woman you were

3    dating at the time about Todd France or Jason

4    Bernstein or whether you should switch?

5       A.   **I don't remember.**

6       Q.   Did the woman that you were dating at the

7    time have any input into your decision?

8       A.   **I'm no longer with her.**

9       Q.   Did she attend a memorabilia signing that

10   you went to in Chicago on January 21st 2019?

11      A.   **Yeah.**

12      Q.   Did she attend the dinner that you had

13   with Todd France in Detroit back in I think it was

14   September or October 2019?

15      A.   **I don't remember.**

16      Q.   Let's talk about this autograph signing

17   that took place in the Chicago area, Lombard,

18   Illinois?

19      A.   **I don't know.**

20      Q.   It took place on January 21, 2019.  How

21   did you first hear about this possibility of doing

22   a signing on that day in Chicago?

23      A.   **Jake hit me up from maybe -- I don't**

24   **remember how I even received it.  Maybe DM maybe.**

25      Q.   And what do you remember him saying?

1      A.    No clue.  I don't remember.

2      Q.    And why did you talk with him?

3      A.    To be honest, I have no clue, but I'm glad

4   I did.  Yeah, make some quick little cash.

5      Q.    Did you have any idea how he got your

6   contact information?

7      A.    Like I said, I think he hit me up on DM or

8   something.

9      Q.    And so what do you remember him saying?

10     A.    Go ahead, finish.

11     Q.    How did he identify himself?

12     A.    I don't remember.  I mean, that was, what,

13  how many years ago?  I don't know.

14     Q.    Did you understand that Jake Silver was

15  reaching out to you from CAA Sports?

16     A.    No harm, no foul there.  I was able to go

17  through a third party for marketing on my own

18  without Clarity and Jason knowing about it.  That

19  was what was agreed.

20     Q.    What did Todd France tell you about that

21  issue, about being able to do the same?

22     A.    I've never talked to Todd about that.

23     Q.    What did Todd France tell you about Jake

24  reaching out to you, Jake Silver?

25     A.    Yeah, I never talked to Todd about any of

1    that.  I never talked to Todd about Jake reaching

2    out or anything.

3        Q.   Did you talk to Todd about the idea that

4    somebody from CAA might be reaching out to you with

5    marketing opportunities?

6        A.   I don't even talk to Todd now, to this

7    day, now that he's my agent, about marketing, so,

8    no.

9        Q.   Did you believe that Todd France knew

10   about this memorabilia signing on January 21, 2019?

11       A.   I didn't care if he did or didn't.

12       Q.   Did you think that he knew about it?

13       A.   It never even crossed my mind.  I didn't

14   care if he knew.  It had nothing to do with him.

15       Q.   Did you think that Mr. France was involved

16   in setting this up for you?

17       A.   No, I didn't think about that.  It didn't

18   matter to me.

19       Q.   Did you ever have any communications with

20   Mr. France about that January 21, 2019 memorabilia

21   signing?

22       A.   Yeah, I pretty much answered that me and

23   Todd, still to this day, now that he is my agent,

24   don't talk about marketing, period, so, no, I

25   didn't talk to him about that.

1    Q.   Did you ever get any text messages or

2    emails from Todd France about the January 21, 2019

3    memorabilia signing?

4    **A.   I don't know.**

5    Q.   Were you aware that Todd France was trying

6    to communicate with you about that or that you were

7    receiving emails from him about that?

8         MR. CLEMENTS:   Objection, foundation.

9         You can answer.

10   **A.   I don't know if Todd hit me up about a**

11   **marketing deal or a signing at all.   Like I said,**

12   **me and Todd don't talk about marketing.**

13   Q.   Other than Jake Silver, did you have any

14   conversations with anybody else at CAA about that

15   January 21, 2019 signing?

16   **A.   No.**

17   Q.   Did Jake Silver ever say, "Hey,

18   Mr. Golladay, I'm having trouble hearing back from

19   you or getting your attention about this

20   January 21, 2019 signing"?

21   **A.   I don't remember.**

22   Q.   Do you know that Mr. France has told us

23   that he had nothing to do with arranging that

24   signing for you.  Do you know that?

25   **A.   Yes.   I mean, that's the conversation you**

1   **guys had.**

2       Q.   Right.  So do you know, did Mr. France

3   know about the signing before it took place?

4       MR. CLEMENTS:  Objection.  It's been asked

5   and answered, but you can answer.

6       A.   **I have no clue.  You can ask Todd.  I**

7   **don't know.**

8       Q.   Before you went to that signing, did you

9   think that Mr. France knew about it?

10      A.   **I could care less if he knew about it or**

11  **not.**

12      Q.   But understanding that you could care

13  less, what was your understanding, he did or he

14  didn't know about it?

15      A.   **It didn't matter if he knew about it or**

16  **not.**

17      Q.   Right.  But did you think that he knew

18  about it or did you think he did not know about it?

19      A.   **I didn't care if he knew about it or not.**

20      Q.   I'm asking a different question, and I

21  understand that you don't care and I understand it

22  doesn't matter to you, but my question is:  Did you

23  think that Todd France knew that CAA was arranging

24  an autograph signing for you to take place on

25  January 21, 2019?

1      **A.    I went to the signing to knock out the**
2  **signing.  It didn't matter who arranged the signing**
3  **or not.  It's something -- it was a signing for me**
4  **to sign jerseys or autographs, whatever it was,**
5  **footballs.  You could have signed -- you know, you**
6  **could have gave me the opportunity to go do it and**
7  **I would have did it.  It doesn't matter if Todd did**
8  **it or not.  I don't know whether or not CAA did it,**
9  **I would have done it.  I'm glad I did it.  I have**
10 **people come to me to do signings all the time.**
11 **Either I'm going to go or not.  It don't matter who**
12 **sets it up.**
13     Q.   I'm going to ask the court reporter to
14 read my question back and I want you to listen to
15 it closely and then try to answer it because I feel
16 like you're not answering exactly, so can the court
17 reporter go ahead and read it back?
18                 (Question read.)
19     **A.    I never once thought about it.**
20     Q.   Okay.
21          MR. CLEMENTS:  I think the record readback
22 was a little incorrect because you said October 21,
23 2019.  I think it's January 21, 2019.
24     Q.   Let's bring up the 2019 January 3rd
25 Facebook post for this signing.

1    (Thereupon, Plaintiff's Exhibit 10 was marked for

2    purposes of identification.)

3        Q.   Mr. Golladay, this says that Redland

4    Sports is putting on a signing for you in

5    conjunction with Boone Enterprises and MVP

6    Authentics.  Do you see that?

7        **A.   Yes.**

8        Q.   And it's our understanding that this

9    Facebook post came out January 3, 2019.  Did you

10   have any discussions with anybody at Redland Sports

11   about this?

12       **A.   No.**

13       Q.   Did you have any discussions with anybody

14   at Boone Enterprises about this?

15       **A.   No.**

16       Q.   And did you have any discussions with

17   anybody at MVP Authentics about this?

18       **A.   No.**

19       Q.   When did you first talk to Jake Silver

20   about doing the signing on January 21st?

21       **A.   I don't remember.**

22       Q.   Do you remember if it was December 2018 or

23   after New Year's, January of 2019?

24       **A.   I don't remember a date at all.**

25       Q.   Do you remember how you agreed to the date

1   of January 21st for the signing?

2       A.   No.

3       Q.   Who did you talk with about setting that

4   date?

5       A.   I don't remember.  I mean, Jake proposed

6   it to me.  I don't remember.

7       Q.   How did you communicate with Jake Silver

8   about setting that date?  Was it over text or

9   emails?

10      A.   It could have been DM, FaceTime, FaceTime

11  audio.  I don't remember.  It was so long ago.

12      Q.   Would it have been, like, on the phone?

13      A.   FaceTime is on the phone, so, yeah, that's

14  the only way I could FaceTime.

15      Q.   And how did you arrive at the location

16  where this was going to take place?

17      A.   Uber.

18      Q.   No, I mean, how did you decide on it?  Did

19  Mr. Silver propose the location or did you or what?

20      A.   I don't remember.  I'm from Chicago --

21  well, I'm from Illinois.  Where did you say this

22  spot was at?  I don't even remember what spot we

23  were at to do it.

24      Q.   Do you know if it was in the Chicago area

25  or was it in another city or you just don't

1    remember?

2        A.   You said Illinois.  It was in Illinois.

3    I'm from there.

4            MR. CLEMENTS:  He said Lombard, Illinois.

5            THE WITNESS:  Yes.

6        A.   What was the question?

7        Q.   Was it your idea to do it in Illinois

8    instead of Detroit or some other place?  Whose idea

9    was that?

10       A.   I don't remember.

11       Q.   You don't remember if you suggested what

12   state or if CAA suggested?

13       A.   I don't remember how we came up on the

14   location.

15   (Thereupon, Plaintiff's Exhibit 11 was marked for

16   purposes of identification.)

17       Q.   Let's look at another document.  This will

18   be Exhibit 11.  This will be dated January 6, 2019.

19   Can we zoom in on that a little bit?  This is a

20   text between you and Emily Ries.  It looks like you

21   wrote, "Hey, Emily!"

22           She writes, "Checking in, how's it going?"

23           And then Sunday, January 6, 2019,

24   4:03 p.m., she sends you a screenshot of that

25   Facebook post we just looked at.  Do you see that?

1     **A.    Yes.**

2     Q.    Do you remember this text message exchange

3     between you and Emily Ries?

4     **A.    I don't remember the exchange.**

5     Q.    She writes, "This is the post."  And then

6     she says, "I'll hit them up."  She testified that

7     says, "I'll hit them up."

8          Do you see that?

9     **A.    I see "7P."**

10    Q.    She said it says "7P," but it should say

11    "UP."

12    **A.    Okay.**

13    Q.    And then you responded and said, "Yeah I

14    don't know about that."

15         Do you see that?

16    **A.    Yes.**

17    Q.    Now, was that true when you wrote it to

18    Emily Ries?

19    **A.    Yes.**

20    Q.    Did you know that these memorabilia

21    dealers were planning for you to do a signing on

22    January 21, 2019?

23    **A.    I don't remember the day or whatever.**

24    **Yeah, I knew about the signing, okay.**

25    Q.    Why did you say to Emily Ries, "Yeah, I

1    don't know about that"?

2        A.   It kind of goes back to the contract, you

3    know, they don't have to be involved with any third

4    parties, deals that come across my way and it

5    wasn't any of her business.

6        Q.   So do you and I agree that you said

7    something here to Emily Ries that was not

8    100 percent accurate?

9            MR. CLEMENTS:   Objection, argumentative,

10   asked and answered.

11           You can answer.

12       A.   Like I said, it wasn't any of her

13   business.  Who cares if I have a signing to do?  If

14   they didn't set the signing up, I could do whatever

15   I like.

16       Q.   Why didn't you just tell her that?

17       A.   I didn't have to.

18       Q.   Right, but why not be truthful to Emily

19   Ries at this point in time?

20           MR. CLEMENTS:   Objection, argumentative.

21   You are harassing the witness.

22           You can answer one more time.

23       A.   I didn't have to.

24       Q.   Do you remember any phone conversations

25   you had with Emily Ries about whether this signing

1    was authorized by you?

2         **A.    No.**

3         Q.   Do you remember having a phone

4    conversation with Jason Bernstein about whether the

5    signing had been authorized by you?

6         **A.    I don't.**

7         Q.   Did Mr. Bernstein reach out to you about

8    this signing before it happened?

9         **A.    I don't remember.**

10        Q.   Did Emily Ries reach out to you before

11   this signing happened?

12        **A.    I guess text messages shows it, right?**

13        Q.   Yes.  Anything else like phone calls with

14   Emily Ries that you recall?

15        **A.    Yeah, I don't remember.**

16   **(Thereupon, Plaintiff's Exhibit 12 was marked for**

17   **purposes of identification.)**

18        Q.   Let's bring up another document.  It will

19   Exhibit 12, and this is going to be dated

20   January 8, 2019, it's an email from Jake Silver to

21   Todd France, and this shows that Jake Silver of CAA

22   is writing an email to ToddFrance@CAA.com, dated

23   January 8, 2019 and it attaches a

24   Golladay_KennyBoone Enterprises private contract

25   PDF document, Jake Silver writes, "Contract

1    attached, already signed by Boone Enterprises."

2           Did you know that these communications

3    were going on between Jake Silver's email account

4    and Todd France's email account?

5           MR. CLEMENTS:  Objection, foundation.

6      **A.   I mean, that's between those two guys.**

7    **I'm not cc'd in there anywhere.  I wouldn't know**

8    **about that.**

9      Q.   Did Jake Silver tell you that Todd was on

10   board with this?

11          MR. CLEMENTS:  Objection, foundation,

12   hearsay.

13          You can answer.

14     **A.   Jake never brought Todd up about it.**

15     Q.   Did you know that Todd France was getting

16   emails sent to his account about this signing that

17   you were going to do?

18          MR. CLEMENTS:  Objection, foundation.

19     **A.   How would I know what Todd gets to his**

20   **email?**

21     Q.   Yeah, that's what I'm asking.  Did you

22   have any conversations with Jake Silver or with

23   Todd France or with anybody else about the idea

24   that Todd France had this signing contract sent to

25   his email account?

1          MR. CLEMENTS:  I think it's been asked and

2     answered.

3      A.   Yeah, I don't know what gets sent to

4     Todd's email.  I don't know how.

5      Q.   Yeah, and I'm asking you a different

6     question, which is, did you have any conversations

7     with either Jake Silver or Todd France about the

8     idea that Todd France had this signing contract

9     sent to his email account?

10     A.   Me and Jake never once talked about Todd,

11     and I don't know what gets sent to Todd's email.  I

12     don't know what emails Todd receives.

13     Q.   Did you and Mr. France talk about the

14     contract for the signing?

15          MR. CLEMENTS:  Objection, this has been

16     asked and answered numerous times, but you can

17     answer again.

18     A.   Todd is my agent now and still, to this

19     day, we do not talk about marketing.

20     Q.   I understand.  Did you talk about this

21     marketing event, this January 21, 2019 marketing

22     event?

23     A.   We've never talked about marketing.

24     Q.   Does that include this event?

25     A.   Ever.

1      Q.   Is that a yes or a no, Mr. Golladay?

2      **A.   We've never talked about marketing, no.**

3  **We haven't talked about this event, no event.**

4  **(Thereupon, Plaintiff's Exhibit 13 was marked for**

5  **purposes of identification.)**

6      Q.   Let's bring up the next email from this

7  date.  It's going to be an email from Mr. France to

8  you dated January 8, 2019.  So this was produced by

9  CAA Sports and they redacted off your confidential

10  email address, but it says that this message is

11  from Todd France at CAA.com.  Do you see that?

12     **A.   Yes.**

13     Q.   And it's dated January 8, 2019.  It says

14  that there's an attachment Golladay_Kenny Boone

15  Enterprises private contract PDF.

16          Did you receive this email from Todd

17  France?

18          MR. CLEMENTS:  Objection, foundation, but

19  you can answer.

20     **A.   I see what you've got right here on the**

21  **share screen.  I don't remember receiving that**

22  **email.**

23     Q.   Did you receive the contract for the

24  signing that took place on January 21st 2019 from

25  any source?

1      **A.    I did the signing so I had to sign some**

2  **type of contract, so I guess so.**

3      Q.   And this email from Todd France's email

4  account, is this how you received the contract for

5  the signing?

6      **A.    I don't even know if that's his email.  I**

7  **don't know.  I don't remember receiving the email.**

8          MR. CLEMENTS:  Late objection, foundation.

9      Q.   So what's written here says, "Please sign

10  this and send back.  If easier, I can text to you

11  also."

12          Did Mr. France send you any texts about

13  this signing event?

14      **A.    No.  Me and Todd did not talk about**

15  **marketing.**

16      Q.   Other than this email that we're looking

17  at here from Todd France's email account to your

18  personal email address, are there any other emails

19  from Todd France to you about the January 21, 2019

20  signing?

21          MR. CLEMENTS:  Objection, foundation.

22          You can answer.

23      **A.    Me and Todd never talked about the signing**

24  **event.**

25      Q.   Is this email still on your personal email

1   account?

2      **A.   I have no clue.**

3      Q.   When you received the subpoena in this

4   case, did you go look to see if you had any emails

5   like this one on your email account?

6      **A.   I didn't see an email on the account.  I**

7   **don't remember getting this email.**

8      Q.   And then what's written here is, "If you

9   want Mom to get a copy, let me know.  I can send to

10  her also."  Can you see that?

11     **A.   Yeah.**

12     MR. CLEMENTS:  Objection, foundation.

13     Q.   Did you respond to Mr. France about this?

14     **A.   I don't remember even seeing this email.**

15     Q.   Did you ever tell your mom about the

16  signing before it happened?

17     **A.   No.**

18     Q.   Do you know if anybody talked to your mom

19  about the signing before it topped?

20     MR. CLEMENTS:  Objection, speculation.

21     You can answer if you know.

22     **A.   You will have to ask her.**

23     Q.   Did your mom have any role in the signing?

24     **A.   No.**

25     Q.   Was she listed as somebody where notice

1    about the signing should be sent?

2        **A.   No.**

3        Q.   If she is listed in the contract as the

4    person who should receive notices about the

5    contract on your behalf, do you have any

6    explanation for how that would happen?

7        **A.   Can you repeat the question?**

8        Q.   Sure.  If your mother, Stacy Wright

9    Whitaker, is listed in the contract as being the

10   person who should receive notices on your behalf,

11   do you have any explanation for how that happened?

12       MR. CLEMENTS:  Objection.  Not reasonably

13   calculated to lead to discovery of admissible

14   evidence, but you can answer if you have any

15   knowledge.

16       **A.   Can you repeat the question again?  I**

17   **really don't know what you're trying to ask me**

18   **right now.**

19       Q.   Yeah.

20       **A.   Or rephrase the question.**

21       Q.   Sure.

22       MR. COMERFORD:  Let's just have the court

23   reporter read it back, please.

24                  (Question read.)

25       **A.   I don't.**

1           MR. CLEMENTS:   Same objection, calls for

2     speculation.

3       Q.    Before the signing took place, did anybody

4     reach out to you and tell you that someone had

5     contacted one of these memorabilia dealers and

6     objected to the signing?

7       **A.    No.**

8       Q.    Did Jake Silver ever reach out to you and

9     tell you, "Hey, someone reached out to the

10    memorabilia dealers and they're saying they're your

11    exclusive marketing agent"?

12      **A.    No.**

13      Q.    Did you ever have any conversations with

14    Jake Silver before the signing took place about the

15    idea of whether or not it was okay for you to do

16    this signing under the marketing contract that you

17    had with Clarity?

18      **A.    No, because in the contract I was able to**

19    **do any marketing from a third party.  That's in the**

20    **contract.  And I actually came from Jason and Emily**

21    **saying that I can do any marketing outside of them**

22    **and they will look it over, if I want them to, to**

23    **see if everything is accurate.  So I was able to do**

24    **anything I wanted to outside of them as far as**

25    **marketing.**

1       Q.   I'm sorry, could you say that again?

2       **A.   I don't know what's the big issue about**

3   **the signing if I was able to do another signing**

4   **outside of Clarity.**

5       Q.   Right.

6            Did you know from any source that Jason

7   Bernstein and Emily Ries had reached out to a

8   memorabilia dealer and objected?

9       **A.   I don't.  I mean --**

10      Q.   Did you say you just don't know or you

11  don't remember?

12      **A.   I don't know if they reached out to the**

13  **memorabilia people at all.  How about you ask them**

14  **to see if they reached out to them?**

15      Q.   What asking is, did you know that they

16  reached out to the memorabilia dealers?

17      **A.   I just said I don't.**

18      Q.   So I just want to make sure I understand,

19  you didn't have any conversations with Jake Silver

20  about whether it was okay for you to do this

21  signing or not, correct?

22      **A.   Right.**

23      Q.   Did you have any conversations with Todd

24  France about whether it was okay for you to do this

25  signing before it took place?

```
 1              MR. CLEMENTS:  Asked and answered.
 2         A.   Me and Todd never talked about marketing
 3    and still, to this day, we don't talk about
 4    marketing.
 5         Q.   Did you have any conversations with
 6    anybody at CAA Sports --
 7         A.   No.
 8         Q.   -- about whether it was okay for you to do
 9    the signing or not.
10         A.   No.
11         Q.   Did CAA Sports ask you to promise them
12    that it was okay for you to do the signing under
13    your contract with Clarity?
14         A.   No.
15         Q.   When you first were starting to think
16    about doing this signing and up until the point in
17    time it happened, who was going to attend in your
18    mind other than you?
19         A.   Say it again.
20         Q.   When you first started thinking about
21    doing this signing event that took place on
22    January 21st 2019, who did you think was going to
23    go to it with you?
24         A.   I didn't think anyone was going to go with
25    me.  The person that was doing the signing and
```

1   **that's it.**

2      Q.   Did you think that your mom was going to

3   go with you?

4      **A.   No.**

5      Q.   Was there ever a plan for your mom to go

6   with you?

7      **A.   No.**

8      Q.   Did you think that the person you were

9   dating at the time was going to go with you?

10     **A.   No.**

11     Q.   Did you think that Todd France was going

12  to go with you?

13     **A.   No, I didn't think anyone was going to go**

14  **with me.**

15     Q.   So you didn't think Jake Silver was going

16  to go with you, right?

17     **A.   I didn't think anyone was going to go with**

18  **me.**

19     Q.   Did you communicate with Jake Silver about

20  how you were going to get from the airport to the

21  signing event?

22     **A.   I don't remember.**

23     Q.   Are you going to take an Uber, are you

24  going to get a car service?  Do you remember any

25  conversation about that?

1      **A.    Yeah, I don't remember.**

2      Q.    Do you remember how you got from the

3   airport to the signing?

4      **A.    I don't remember.**

5      Q.    How often do you typically go home to

6   Chicago during the season?

7      **A.    During the season?**

8      Q.    Or the off season.  Let's do that.  Like a

9   typical January, if you guys don't make the

10  playoffs, how often would you go home?

11     **A.    I have a spot in Chicago outside of my**

12  **mom's house now.  I don't know.  Whenever I want**

13  **to.**

14     Q.    That Facebook post that we looked at a

15  minute ago, were you aware -- until Emily Ries sent

16  it to you, were you aware that that had been

17  posted?

18     **A.    No, I don't use Facebook.**

19     Q.    Were you unhappy that the memorabilia

20  dealers had been posted that on Facebook?

21     **A.    I could care less.**

22     Q.    Were you surprised that they posted it on

23  Facebook and advertised it?

24     MR. CLEMENTS:  Objection, asked and

25  answered.  Answer again.

1    **A.    I could care less if they posted it or**
2    **didn't post it.  Who cares?**
3        Q.    Did you have any conversations with Jake
4    Silver about the idea that this signing should be
5    kept private and should not be advertised?
6        **A.    I didn't care.**
7        Q.    Let's pull up the document dated
8    January 8, 2019, which is the signing contract.  So
9    this is the contract between you and Boone
10   Enterprises for this January 21, 2019 signing.
11   Let's go down to the end of it.  We'll mark this as
12   Exhibit 13.
13   (Thereupon, Plaintiff's Exhibit 14 was marked for
14   purposes of identification.)
15           MR. HERBER:  It should be Exhibit 14.
16           MR. CLEMENTS:  What is Exhibit 13?
17           MR. HERBER:  Mr. France's email to
18   Mr. Golladay on January 8, 2019.
19       Q.    So, Mr. Golladay, we're looking at this
20   contract.  Did you sign this contract?
21       **A.    Yeah.**
22       Q.    How did you sign it?
23       **A.    It looks like it was signed**
24   **electronically.**
25       Q.    So how did you do that?

 1      **A.    I don't know.  It was three years ago.**

 2      Q.   Did you use the email that you received

 3   from Todd France's email account to pull up the PDF

 4   document that he sent you?

 5      **A.    I don't remember how I signed it, but I**

 6   **signed it, clearly.**

 7           MR. CLEMENTS:  Belated objection,

 8   foundation.

 9      Q.   How did you return the contract to CAA

10   Sports after you signed it?

11      **A.    I don't remember.**

12      Q.   Do you remember who you emailed it to or

13   did you email it to anybody or did you put it in

14   the U.S. postage mail, or what?

15      **A.    I don't remember how I returned it.**

16      Q.   So you don't remember who you sent it to

17   or how you sent it; is that right?

18           MR. CLEMENTS:  It's been asked and

19   answered three times.

20           Go ahead.

21      **A.    I don't remember how I returned it.**

22      Q.   Let's go up a page or two to the Notices

23   section.  It says there -- in Section 13 it says,

24   "Notices.  All notices need to be delivered to the

25   address listed below," and then your mother's

1   address is listed there, right?

2       **A.   Right.**

3       Q.   Do you know how your mother's address made

4   it into this contract?

5       **A.   I don't.**

6   **(Thereupon, Plaintiff's Exhibit 15 was marked for**

7   **purposes of identification.)**

8       Q.   Let's pull up another document.  This will

9   be Exhibit 15.  It's going to be dated January 16,

10  2019, some text messages from Mr. Boone that you

11  entered into this contract with, and I want to go

12  to page 7.  So these are text messages between

13  Craig Boone and Boone Enterprises and the other

14  gentlemen listed at the top are Daryl Eisenhour and

15  Gerry Ochs, just to orient you, okay?  Do you see

16  that?

17      **A.   Yes.**

18      Q.   One of these text messages says, "Car

19  service for Kenny, mom, Todd CAA $336."  Do you see

20  that?

21      **A.   Yes.**

22      Q.   Do you have any idea why the memorabilia

23  dealers thought that your mom was going to attend?

24      **A.   I have no clue.**

25      Q.   I mean, do you have any explanation for

1    why your mom is listed there as being included in

2    the car service?

3        A.    I said I have no clue.

4        Q.    And then it says, "Todd, CAA" there in

5    that sentence about the car service.  Do you have

6    any explanation for why Todd's name is there?

7        A.    No, but you can ask those people.

8        Q.    Yeah.  This is why I asked you earlier if

9    you thought that Todd France was going to attend

10   the signing with you.

11       A.    Right.

12       Q.    Because his name was in these text message

13   about riding in the car service with you.

14       A.    I never saw these text messages until

15   right now, so that's why I said no, not that I know

16   of.  He wasn't supposed to be there.  He wasn't

17   there.

18       Q.    Did you have an understanding that Todd

19   France might attend this signing?

20            MR. CLEMENTS:  Objection, asked and

21   answered.

22       A.    I never once thought that he would be

23   there.

24       Q.    And these are dated January 18, 2019,

25   these text messages?

1      A.    So.

2      Q.    I'm just noting that for the record.

3            Did Mr. Saffold know that this signing was

4      going to take place?

5            MR. CLEMENTS:  Objection, not reasonably

6      calculated to lead to the discovery of admissible

7      evidence, but you can answer.

8      A.    I don't know.  Ask him.

9      Q.    Did you have any discussions with

10     Mr. Saffold about the idea that you were going to

11     do a memorabilia signing on January 21, 2019?

12           MR. CLEMENTS:  Same objection.

13           You can answer.

14     A.    I don't know.

15     Q.    Other than this signing that took place on

16     January 21, 2019, did you do any other memorabilia

17     signings that Jason Bernstein and Clarity Sports

18     didn't know about?

19     A.    Yes.

20     Q.    Tell me about those.

21     A.    When I did a signing they didn't know

22     about and it was never an issue.  Like I said, in

23     the contract I can do a third-party signing without

24     them being involved; no harm, no foul.

25     Q.    So what was the other signing that you did

```
 1    that was not coordinated with Clarity Sports

 2    besides this one on January 21, 2019?

 3        A.    It was a private signing.  I don't

 4    remember which one, but I've done a private signing

 5    without them knowing before, yes.

 6        Q.    And when did that take place?

 7        A.    I don't remember.

 8        Q.    What year did it take place?

 9        A.    I don't remember when it took place.

10        Q.    Who were the memorabilia dealers that you

11    worked with on that signing?

12        A.    I don't remember.

13        Q.    Do you remember the name of any person who

14    was involved in that signing besides you?

15        A.    I don't remember.

16        Q.    Do you remember what city the signing that

17    you're talking about took place in?

18        A.    No.

19        Q.    Do you remember what state the signing

20    that you're referring to took place in?

21        A.    I don't.

22        Q.    Do you remember how many items you signed

23    at this other private signing that you did without

24    Clarity knowing about it?

25        A.    No.
```

1    Q.   What kind of facility did this other

2    signing take place in, a hotel, warehouse?

3    **A.   I don't remember.**

4    Q.   Was it daytime or nighttime when you did

5    this other signing that Clarity didn't know about?

6    **A.   I don't remember.**

7    Q.   Can you tell me anything about this other

8    private signing that you did that you didn't

9    coordinate with Clarity, any person who was

10   involved, what state it took place in, what year it

11   was, anything like that?

12   **A.   I can't tell you anything.**

13   Q.   Do you remember if the items that you

14   signed at this other private signing that Clarity

15   didn't know about were sold on the market?

16   **A.   I don't remember.**

17   Q.   You know that there's a market for

18   memorabilia items signed by NFL stars like you,

19   right?

20   **A.   Yes, I know that items get sold, but**

21   **that's none of my concern.   I go there to sign and**

22   **get paid for it and I'm out.**

23   Q.   We have not been able to find any items

24   that have been offered for sale on any websites

25   that are items that you signed at a private signing

1   that Clarity didn't know about.  Can you help me

2   understand that?

3       A.   **What difference does it make?**

4       Q.   Well, I just want to know any details you

5   can give me about this other private signing you

6   say happened that Clarity didn't know about it.

7       A.   **They didn't need to know about any of**

8   **them.  It's in the contract that I can do**

9   **third-party signings without them knowing and**

10  **without them getting any part of it and it wouldn't**

11  **be an issue so they don't need to know about any of**

12  **it.  Who cares?**

13      Q.   How many private signings did you do that

14  Clarity didn't know about at all?

15      A.   **Enough.**

16      Q.   I mean, was it one or more than one?

17      A.   **It was enough.**

18      Q.   I understand you're saying it was enough,

19  but can you give me a number?

20      A.   **It was as many as I wanted to do.**

21      Q.   So how many was that, Mr. Golladay?

22      A.   **Enough to satisfy me.**

23      Q.   I mean, was it one, two, three?  How many?

24      A.   **As many as I wanted to do.**

25      Q.   Can you tell me the state in the United

1    States of America where any of these private

2    signings took place?

3        A.   I can't.  I don't remember.

4        Q.   Did you ever talk with Mr. France after

5    the January 21st 2019, signing took place about

6    whether you had done other signings on your own?

7            MR. CLEMENTS:  Objection.  It's been asked

8    and answered.

9        A.   Me and Todd never talked about marketing

10   and still don't to this day.

11       Q.   So you never told Mr. France that you had

12   done memorabilia signings on your own in the past?

13       A.   Right.

14           MR. CLEMENTS:  Objection, it's been asked

15   and answered.  You are badgering.  You keep asking

16   the same question over and over.

17           You can answer again.

18       A.   Me and Todd never talked about marketing

19   and still don't to this day.

20       Q.   Let's pull up Mr. France's flight records,

21   January 17, 2019.  These are flight records from

22   Mr. France.

23           MR. CLEMENTS:  Objection, foundation.

24       Q.   They are flight records relating to

25   Mr. France that we obtained from Delta Airlines.

1   The way I read these flight reservation records --

2         MR. HERBER:  Before you read them, can you

3   mark this as an exhibit?

4         MR. COMERFORD:  This will be Exhibit 16.

5   (Thereupon, Plaintiff's Exhibit 16 was marked for

6   purposes of identification.)

7     Q.  Mr. Golladay, according to the Todd France

8   flight records that we obtained from Delta

9   Airlines, there was a reservation created on

10  January 17, 2019, which is four days prior to the

11  signing that took place on January 21, 2019, and

12  the reservation called for Mr. France to depart

13  Atlanta on January 20th and arrive at O'Hare

14  Airport in Chicago, Illinois, and then on

15  January 21st 2019, which is the day of the signing,

16  Mr. France had a reservation to depart O'Hare

17  International Airport in Chicago, Illinois and

18  return to Atlanta.  Do you see that?

19    **A.   Yes.**

20    Q.  Now, you were going to be in Chicago on

21  January 21, 2019 to do this memorabilia signing,

22  right?

23    **A.   I don't remember the date.  Was that the**

24  **date?**

25    Q.  Yes, it was.

1      **A.    Okay.**

2      Q.    Did you know that Mr. France had made a

3  flight reservation to travel from Atlanta to

4  Chicago on January 20th 2019 and return on

5  January 21st 2019?

6      **A.    No.**

7      Q.    And then these records say that Mr. France

8  flew from Atlanta to Chicago on January 23rd 2019,

9  and returned from Chicago to Atlanta on

10  January 23rd 2019; do you see that?

11      **A.    Yes.**

12          MR. CLEMENTS:   Objection, authentication

13  and foundation.

14      Q.    Did you meet in person with Mr. France in

15  Chicago on January 23, 2019?

16      **A.    No.**

17      Q.    Did you meet in person with Mr. France at

18  any time in January of 2019?

19      **A.    I don't remember.**

20      Q.    How did you sign an SRA with Mr. France?

21      **A.    I don't remember.**

22      Q.    What was the process?  Did you sign it

23  with him in person or not?

24      **A.    Yeah, I told you I don't remember.**

25      Q.    Do you remember if Mr. France sent you the

1   SRA by email or sent you a copy for your records by

2   email?

3       **A.   I don't remember.**

4       Q.   Do you have a copy of the SRA that you

5   signed with Mr. France in January of 2019?

6       **A.   I don't know.**

7       Q.   Do you think that you should have a copy

8   of it?

9           MR. CLEMENTS:   Objection.   Not likely to

10  lead to discovery of admissible evidence,

11  argumentative, harassing the witness, but you can

12  answer.

13      **A.   I don't know if I have a copy or not.   If**

14  **I don't have a copy, I'm able to get a copy if I**

15  **need it.**

16          **We've got a couple more minutes.   I still**

17  **have stuff I've got to get to.**

18      Q.   Yeah, I'm trying to get through all this

19  stuff as fast as I can.

20          MR. CLEMENTS:   I think experienced

21  attorneys can estimate out of courtesy to a

22  third-party witness how much longer they have.

23  How much longer do you have?   An hour, two hours,

24  three hours?   You're asking your questions and

25  there aren't that many objections at all.   He's

1    trying to answer.

2              MR. COMERFORD:  Let's just keep going and

3    I'll try to get through everything as soon as I

4    can.

5              MR. CLEMENTS:  Out of courtesy you won't

6    tell us?

7              MR. COMERFORD:  I can't estimate.  I'm not

8    able to estimate.

9              THE WITNESS:  I mean, like another hour or

10   two?

11             MR. CLEMENTS:  He told you he's not going

12   to tell you.  He's going to keep us all in suspense

13   and keep asking you questions.

14             THE WITNESS:  I'm not going to be staying

15   here -- like I say, I've still got stuff -- things

16   for my body and everything.

17             MR. COMERFORD:  I understand.

18             THE WITNESS:  I'm trying to work with you,

19   John.  How many more questions?  How long do you

20   think?

21             MR. COMERFORD:  I'm getting through it.  I

22   need to talk about your new contract and stuff like

23   that.

24             MR. CLEMENTS:  Okay.

25             THE WITNESS:  New contract, $72 million.

```
 1   I wouldn't have got the contract if I didn't sign

 2   for Todd France.  Jason would have never been able

 3   to give me that contract.  That's why I switched.

 4           MR. CLEMENTS:  Why don't we let's take a

 5   three-minute break?  I don't think there's a

 6   question pending.

 7           MR. COMERFORD:  Sure.  I'll sit right here

 8   and be ready to continue.

 9           MR. CLEMENTS:  I mean, we really want to

10   get this done tonight.  We're going to do the best

11   that we can.  Let's take a quick three-minute

12   break.

13           THE VIDEOGRAPHER:  Off the record,

14   4:50 p.m.

15                   (Recess taken.)

16           THE VIDEOGRAPHER:  Back on the record,

17   5:02 p.m.

18   BY MR. COMERFORD:

19      Q.   Mr. Golladay, on the day of the signing,

20   do you remember where you were when you woke up

21   that morning?

22      A.   Chicago.  Where else would I be?  The day

23   of the signing?

24      Q.   Yes.

25      A.   I guess Chicago, right?
```

1     Q.   Okay.  Where were you staying that trip to

2     Chicago?

3     **A.   My mom's house.  By that time I didn't**

4     **have my own spot, so I was staying with my mom.**

5     Q.   And there's been some discussion that you

6     might have had to fly into Chicago on the day of

7     the signing, and you're telling me that's not how

8     you recall it, correct?

9     **A.   I said I don't remember.**

10    Q.   Do you remember being late to the signing?

11    **A.   I don't.**

12    Q.   Who was there at the signing when you got

13    there?

14    **A.   Who was there?**

15    Q.   Yes.  I'm talking about the January 21,

16    2019 signing that was set up through CAA Sports and

17    Boone Enterprises.  So who was physically there at

18    the signing when you arrived?

19    **A.   Me and my ex-girl went to the signing and**

20    **that was it.  People who was close to the private**

21    **signing were there.**

22    Q.   And who were those people?

23    **A.   I wouldn't be able to point those guys out**

24    **right now.  I was there to sign and to leave.**

25    Q.   Do you remember their -- did they identify

1   themselves with their names?

2       A.   If they did, I don't remember their names.

3       Q.   How many people were there other than you

4   and your ex-girlfriend?

5       A.   I have no clue.  I don't remember.

6       Q.   Was it more than five?

7       A.   I don't remember how many people.

8       Q.   It could have been more than five?

9       A.   I don't remember how many people.

10      Q.   What was the place where this took place?

11  Was it a hotel room?

12      A.   I don't remember.

13      Q.   It could have been a hotel, it could have

14  been a warehouse, you just can't recall, correct?

15      A.   I don't remember where it was at.

16      Q.   How many items did you sign?

17      A.   Who knows?  I don't know.

18      Q.   How much money did you make from the

19  signing?

20      A.   I don't remember.

21      Q.   Did anyone give you a check while you were

22  there at the signing?

23      A.   I don't remember.

24  (Thereupon, Plaintiff's Exhibits 17 and 18 were

25  marked for purposes of identification.)

1       Q.   Let's pull up a copy of the check and show

2  it to Mr. Golladay.  It's dated January 18, 2019.

3  It's made out to you.  It's from MVP Authentics,

4  LLC.  Did you ever receive this?

5       **A.   I must have received the check.**

6       Q.   It's in the amount of $7,750.  Did you

7  receive those funds?

8       **A.   If I did the signing, I received the funds**

9  **for sure.**

10      Q.   Do you remember anyone handing you this

11  check?

12      **A.   I don't.**

13      Q.   You see there's a place to endorse the

14  check on the back page.  Is that your handwriting

15  there?

16      **A.   If it's my name, then I signed the back of**

17  **the check.  No one signed it for me.**

18      Q.   Did you tell Mr. Saffold that CAA Sports

19  had arranged the signing for you?

20      **A.   No.**

21      Q.   Why didn't you tell him that?

22      **A.   Is it his business?**

23      Q.   You've described him, I think, as a

24  mentor, someone you talked with.

25      **A.   Okay.  I don't have to tell him about a**

1    **marketing event.**

2       Q.  Did you know that he was going to have to

3    testify in this arbitration that we've looked at

4    the transcript for?

5       **A.  No.**

6       Q.  You didn't know that he was going to be

7    put under oath and testify about these events?

8       **A.  Yeah, I said no.**

9       Q.  Did anyone talk to you about whether you

10   would have to testify in the arbitration that took

11   place in late 2019?

12      **A.  I'm on the call now, so of course I have**

13   **to get called by someone.**

14      Q.  So there was an arbitration between

15   Mr. Bernstein and Mr. France that took place in, I

16   think, November and December of 2019.  Were you

17   aware of that?

18      **A.  No.**

19      Q.  Were you aware that Mr. Bernstein was

20   asking you to testify in that arbitration?

21      **A.  No.**

22      Q.  Were you aware that Mr. France called

23   Mr. Saffold to testify at that arbitration and said

24   that he was going to speak on your behalf?

25      **A.  No.**

```
 1            MR. CLEMENTS:  Objection.  Who knows if
 2    Mr. France actually said that.
 3       Q.   Were you aware at all that Mr. Saffold was
 4    testifying on your behalf at the arbitration?
 5       A.   No.
 6            MR. CLEMENTS:  I'll object to that.  I'm
 7    not sure if it's a legal conclusion on your behalf.
 8    Mr. Saffold was placed under oath and testified as
 9    to his knowledge.  I don't know if he was
10    testifying -- if a witness can actually testify
11    on -- it's sort of a foundation objection.
12       Q.   So what you're telling me, Mr. Golladay,
13    is you weren't even aware that Mr. Saffold was
14    testifying at the 2019 arbitration, correct?
15       A.   Correct.
16       Q.   Other than this memorabilia signing that
17    took place on January 21, 2019, did CAA Sports
18    coordinate anything else with you before you signed
19    with Todd France, like any kind of other
20    memorabilia signings or events or anything?
21       A.   No.
22       Q.   Were you provided any shoes by anyone at
23    CAA Sports before you signed with Todd France?
24       A.   No.  They didn't give me anything.
25       Q.   Do you remember talking with Mr. Bernstein
```

1    on the day of the signing?

2        **A.   No.**

3        Q.   A discussion about the logistics of your

4    surgery rehab?

5        **A.   I don't remember talking to him.**

6        Q.   Do you remember that you called

7    Mr. Bernstein on the day after the January 21, 2019

8    memorabilia signing to tell him you were

9    terminating him?

10       **A.   I don't remember.   I don't remember the**

11   **date.**

12       Q.   Do you remember where you were when you

13   called Mr. Bernstein?

14           MR. CLEMENTS:   He asked and answered this

15   already.   Even I know it was at his mom's house in

16   Chicago.   Are we covering the same ground?

17       Q.   So you do remember you were at your mom's

18   house when you called Mr. Bernstein, right?

19       **A.   Right.**

20       Q.   And this is kind of a big deal because

21   Mr. Bernstein had been your agent for a couple

22   years and was your agent since you were entering

23   the draft, right?

24           MR. CLEMENTS:   Objection, argumentative,

25   hypothetical.

1      **A.    Okay.**

2      Q.    Would you agree with me?

3            MR. CLEMENTS:  Objection.

4      Q.   Did you feel bad about terminating

5      Mr. Bernstein at all?

6      **A.    I had to do what was best for me and my**

7      **family and that's what I did.**

8      Q.   Did you feel bad about it, though?

9            MR. CLEMENTS:  Objection.  Not reasonably

10     calculated to lead to the discovery of admissible

11     evidence.

12           You can answer.

13     **A.    I didn't feel bad about it because I have**

14     **to do what's best for me and my family.**

15           MR. CLEMENTS:  Also asked and answered.

16     Q.   You wrote an email to Mr. Bernstein --

17     let's pull that up.  It's dated January 24, 2019.

18     This will be Exhibit 18.

19           MR. HERBER:  John, the check is Exhibit

20     18.  This will be Exhibit 19.

21           MR. COMERFORD:  Thank you.  Sorry about

22     that.

23     (Thereupon, Plaintiff's Exhibit 19 was marked for

24     purposes of identification.)

25     Q.   Exhibit 19 is the January 24, 2019 email

1   from you to Mr. Bernstein.  It looks like you sent

2   this from ███████████████████; do you see that?

3        **A.    Okay.**

4        Q.   And it says, "Jason, per our conversation

5   and for formality, please let this email be written

6   confirmation as to the termination of our

7   agent/player SRA.  Please reply if you are willing

8   to waive the five-day period."  What's the five-day

9   period you're talking about there?

10       **A.    If you allow that to be waived, then I**

11  **don't have to wait the five days and I'll be able**

12  **to hire a new agent.**

13       Q.   Did you write this email or did you have

14  help with it?

15       **A.    I wrote it.**

16       Q.   Did anyone review it?

17       **A.    No.**

18       Q.   Did Mr. France or your mom or Mr. Saffold

19  or anybody review it?

20       **A.    No.**

21       Q.   What did you mean by that phrase, for

22  formality?  What does that mean?

23       **A.    I wanted to make sure the email**

24  **was proper.  Since I did have a conversation with**

25  **him on the phone, which I didn't have to, the**

1   **proper way to do it is to send an email.  I didn't**

2   **have to even give him a phone call, but I respect**

3   **from the relationship -- there was nothing wrong**

4   **with the relationship, to be honest, but to do**

5   **what's best for me and my family, I had to move on**

6   **from Jason, so I gave him a phone call, but to do**

7   **it the formal way, I put it in email, which I had**

8   **to do.**

9       Q.   Did you have any conversations with Todd

10  France about what you should say to Mr. Bernstein

11  in the email?

12          MR. CLEMENTS:  Objection.  It's been asked

13  and answered.

14      **A.   I said that already.  No, I didn't talk to**

15  **anybody about it.  I knew what I had to do and**

16  **that's what I did.**

17      Q.   All right.  Let's pull up some text

18  messages between your mom, Stacy Wright Whitaker,

19  and Mr. Bernstein.  These are going to be dated --

20  the following is dated 2019-01-02.  I think these

21  have already been used as -- these are already an

22  exhibit, Exhibit 9.  And I want to go page 6, and

23  these are some texts between Mr. Bernstein and your

24  mother, Stacy Wright Whitaker, and you can see on

25  January 23, 2019, Mr. Bernstein writes and says,

1  "Hey Stacy, let me know if you have a minute to
2  talk today and I will give you a call.  Thanks."
3          And she says, "Yes, I can call you when I
4  get in."
5          He says, "Okay, sounds good."
6          And then on January 24th, your mother
7  writes, "Hi, I'm blind-sided as well."
8          Did you have an understanding that your
9  mom was blind-sided by your decision to switch from
10  Mr. Bernstein to Mr. France?
11          MR. CLEMENTS:  Objection to these emails
12  as hearsay and any of the contents, but you can
13  answer.
14      **A.   I mean, to be honest, like I said, I had**
15  **already told friends at the beginning of December,**
16  **and then he went on to see my mom.  She was very**
17  **pleased with the meeting they had and the**
18  **conversation they had, but at the end of the day it**
19  **was still my choice.  It could have easily been no,**
20  **me being my own man, the type of person I am, I've**
21  **still got to make the decision I want to make, and,**
22  **yeah, I would still make the decision.  If she was**
23  **blind-sided, that's how she felt, okay?**
24      Q.   Let's go down a little bit in these texts.
25  She says, "We haven't talked extensively since

1    before the surgery and the rift with the girlfriend

2    SMH," which that means shaking my head.  "I feel so

3    bad because this isn't the Kenny we know.  He isn't

4    staying with me while in Chicago, first ever."  Do

5    you see where I read that?

6        **A.    Yep.**

7        Q.    Does this refresh your memory that you

8    were not staying with your mom during this trip in

9    January 2019 to Chicago?

10       **A.    At the end of the day if I stay with her**

11   **or my dad, it doesn't matter.  I mean, all my**

12   **family is from Chicago.  It wasn't like I was out**

13   **on the street.**

14       Q.    Sure.  I'm just wondering, you told me

15   earlier that you were staying with your mom when

16   you did the signing and when you sent the

17   termination email to Mr. Bernstein and when you

18   called Mr. Bernstein on January 22, 2019.  In this

19   text she's saying that you're not staying with her.

20   I'm just asking, does that refresh your memory --

21           MR. CLEMENTS:  Objection.

22       Q.    -- that maybe you remember staying

23   somewhere else?

24           MR. CLEMENTS:  I think he said -- these

25   are texts between Mr. Golladay's mother and

1    Mr. Bernstein.

2         MR. COMERFORD:  Sure.

3    Q.   So, Mr. Golladay, as you sit here, can you

4    remember who you were staying with when you went to

5    Chicago for the signing on January 21st 2019?

6    **A.   I don't remember.  I was staying with my**

7    **mom or staying with my dad or I could have got a**

8    **hotel.  It doesn't matter who I was staying with.**

9    **I'm from Chicago.  All my family is from Chicago.**

10   Q.   Let's go down a little bit and Mr.

11   Bernstein writes, "Hey, Stacy.  Yeah, obviously

12   disappointed and feels like it came out of nowhere,

13   especially after I was there with him for his

14   surgery.  You did nothing wrong.  I will give you a

15   call later or tomorrow if you're around."

16        And then she responds with kind of a sad

17   emoji face there.  Let's go down a little more.

18        And then on January 26th Mr. Bernstein

19   writes to your mom, Stacy Wright Whitaker, and she

20   responds and says, "I read it.  I don't understand

21   what's going on.  This isn't the same Kenny you

22   first met and that I thought I knew."

23        Do you see all that?

24   **A.   Yeah.**

25   Q.   Were you having any conversations with

1  your mom at this point about switching from

2  Mr. Bernstein to Mr. France?

3      **A.   At the end of the day, I'm my own man, I**

4  **have to make decisions, and I made a great**

5  **decision.  So, I mean, that's the conversation**

6  **between those two, which is totally fine, but it**

7  **doesn't matter to me.  I made one of the biggest**

8  **decisions of my life as of now.**

9          MR. CLEMENTS:  Late objection.  I didn't

10  want to step on his answer, but it's hearsay.

11      Q.   So we know that Mr. Silver had a role in

12  setting up this memorabilia signing on January 21,

13  2019, correct?

14          MR. CLEMENTS:  Objection, argumentative,

15  speculative.

16      Q.   Do you know that to be true, Mr. Golladay?

17      **A.   He told me about it.  I'm not sure who set**

18  **it up.  He told me about it and I went to it.**

19      Q.   And Mr. -- all the information you got

20  about this signing, did it come from Mr. Silver or

21  did it come from Mr. Silver and anybody else?

22      **A.   Jake.**

23      Q.   So let's go up to today, has anybody else

24  at CAA done any marketing work for you other than

25  Mr. Silver?

```
 1      A.    I'm no longer even with CAA.

 2      Q.    So let's go from January 2019 until the

 3   time that you severed your relationship with CAA,

 4   did anybody else --

 5      A.    Well, the thing is I was with Todd France,

 6   he was with CAA and he switched over to Athletes

 7   First, and all my trust is with Todd, so I went --

 8   now I'm with Athletes First, if that makes sense to

 9   you.

10      Q.    Yes, it does.  I want to focus on CAA for

11   the next few questions.

12            Who did you work with at CAA on marketing

13   opportunities?

14      A.    I don't remember.  If it came to my

15   attention, then if I wanted to do it, then I'll do

16   it.

17      Q.    What are the names of the people at CAA

18   that you worked with on marketing opportunities?

19      A.    I don't remember.

20      Q.    What sort of marketing events did CAA set

21   up for you while you were under a contract with

22   CAA?

23      A.    Different ones.

24      Q.    So please tell me what you remember.

25      A.    I can't remember the ones they sent up.
```

1     Q.   Can you name any marketing opportunities

2   or endorsement opportunities at all that CAA did

3   for you?

4     **A.   I can't remember.  I'm sorry.**

5     Q.   Did you make any money from marketing or

6   endorsement opportunities that CAA brought to you?

7     **A.   If I did marketing, yes, I made money.**

8     Q.   How much money did you make marketing or

9   endorsement deals that CAA brought to you?

10    **A.   I'm not about to guess.  I don't know.**

11    Q.   Was it more than 100,000?

12    **A.   I'm not about to guess.**

13    Q.   Can you give me your best estimate?

14    **A.   I don't want to.**

15    Q.   How many autograph signings have you done

16  since the January 21, 2019 signing until you and

17  Todd France left CAA?

18    **A.   Quite a bit.**

19    Q.   So can you do your best to estimate how

20  many?

21    **A.   No.**

22    Q.   Where did those signings take place?

23    **A.   I don't remember.**

24    Q.   Can you remember any signings that took

25  place from January 21, 2019 through the time that

1    you and Mr. France left CAA that you attended?

2        **A.    Yeah, I can't remember.**

3        Q.    There was a commercial that you did for

4    Pepsi.  Do you remember that?

5        **A.    Yeah.**

6        Q.    And it was like an ad campaign called

7    Happy Golladays?

8        **A.    Right.**

9        Q.    Did you make money from that?

10       **A.    Yeah.**

11       Q.    And did CAA have a role in setting that up

12   for you with Pepsi?

13       **A.    Yes.**

14       Q.    Who did you work with at CAA on the Happy

15   Golladays campaign with Pepsi?

16       **A.    I don't remember.**

17       Q.    Was Mr. France involved in those

18   discussions with you and Pepsi?

19           MR. CLEMENTS:  Objection, asked and

20   answered.

21       **A.    I haven't worked with Todd with marketing.**

22   **Still to this day I don't.**

23       Q.    How much money did you get from Pepsi for

24   that campaign?

25       **A.    I don't remember.**

1      Q.   Was it more than 100,000 or less?

2      **A.   I'm not guessing.**

3      Q.   Can you tell me if it was more or less

4   than 100,000?

5      **A.   I'm not guessing.  I don't remember.**

6      Q.   Do you have -- did you receive a paper

7   check or a direct deposit?

8      **A.   I don't remember.**

9      Q.   You know that you received money from

10   Pepsi, though, right?

11      **A.   I wouldn't do it for free.**

12      Q.   Right.  So we agree on that.  I'm just

13   trying to nail down some basics here because it's

14   difficult for you to remember these details, I

15   guess.

16           Was the Happy Golladays Pepsi campaign,

17   was that run through the NFL PA or was that just

18   through CAA?

19      **A.   I don't remember.**

20      Q.   Do you remember shooting the commercial?

21      **A.   Yeah.  It was great.**

22      Q.   Was there anybody else from CAA Sports to

23   hang out with you there while you were shooting the

24   commercial?

25      **A.   I don't remember.**

```
1        Q.   Did you have an assistant or anybody with
2    you for that Happy Golladays commercial shoot?
3        A.   I don't remember.
4        Q.   Has CAA negotiated any shoe deals for you?
5        A.   I have a Nike deal.
6        Q.   And did CAA negotiate that deal?
7        A.   Yes.
8        Q.   How much money have you made from the Nike
9    deal that CAA negotiated for you?
10       A.   I don't remember.
11       Q.   Was it more than 100,000 or less than
12   $100,000?
13       A.   I'm not guessing.
14       Q.   Okay.  How about any other apparel
15   companies, either shoes or clothing?
16       A.   I don't remember.
17       Q.   Like besides Nike, can you remember any
18   others?
19       A.   I can't.
20       Q.   Do you know what the terms of the
21   marketing and endorsement contract that you had
22   with CAA Sports were in terms of how CAA would get
23   paid?
24       A.   I don't remember the exact.  I'm not going
25   to guess on it.  I don't have it right in front of
```

1    me.

2        Q.    Was it commission based or did you have to

3    pay them a flat fee or how did it work?

4        A.    I don't remember the exact.  I don't have

5    it in front of me.  I don't want to guess.

6        Q.    So tell me what you remember generally

7    about it.

8        A.    I don't remember anything about it.

9        Q.    Have you told me everything you can

10   remember about marketing and endorsement work that

11   CAA Sports did for you during the time you were

12   under contract with CAA Sports?

13          MR. CLEMENTS:  Objection.  I believe it's

14   an improper question, everything.  As you sit here

15   today --

16       A.    I explained everything and then I said I

17   didn't remember.

18       Q.    We've talked about the fact that you got

19   money from Pepsi and from Nike and from some

20   memorabilia dealers for signing things, and that

21   all happened while you were under a contract with

22   CAA for marketing and endorsement work, right?

23       A.    So what are you asking me?

24       Q.    Is there any other companies that you can

25   recall that you got money from while you were under

1    a contract with CAA?

2         **A.    If I can recall, I would have told you.**

3         Q.    Right.   So that's what I'm asking.   Can

4    you recall any others?

5         **A.    No.**

6         Q.    Let's talk about your contract offers from

7    the Lions.   Did the Lions make any offers to you?

8         **A.    Yes.**

9         Q.    What were the terms of the deal offered by

10   the Lions?

11        **A.    Say what?**

12            MR. CLEMENTS:   I'm not so sure.   I got to

13   request to mark this part of the transcript

14   confidential if we're going to be talking about --

15   

Page 137

1





1







10      Q.    It is your intent to play out your

11  four-year contract with the Giants and then get

12  another contract after that for more money, right?

13      **A.    If my body allows, yes.**

14      Q.    Are you aware of anything that's going to

15  stop you from being able to get another contract

16  after your current four-year deal with the Giants

17  is over?

18          MR. CLEMENTS:  Objection, speculation.

19  We're talking about four years in the future?  To

20  the extent you can answer.

21      **A.    What are you talking about?**

22      Q.    That's your goal, to not only do this deal

23  for four years, $72 million, but then play through

24  that deal and then get another deal after that for

25  more years and more dollars, right?

1     **A.    I'll probably be 30-something.  If I still**

2     **have the desire to play, then, yes.**

3     Q.   And right now, as you sit here today,

4     that's your plan to continue playing past this

5     four-year contract, if you can, right?

6     **A.    I'm 27, I'm still young, yes, but that's**

7     **three years from now, four years from now, you know**

8     **what I mean, so who knows?**

9     Q.   It's your intent to continue to try to

10    make money off the field through marketing and

11    endorsement deals, however they are presented to

12    you, right?

13    **A.    Right.**

14    Q.   If you can do another deal with Nike or

15    another shoe company, then you're going to do that

16    deal if you feel like it's right, right?

17    **A.    Why not?**

18    Q.   Have you talked with Todd France about the

19    allegations that Mr. Bernstein and Clarity Sports

20    are making in this case?

21    **A.    The only thing they pretty much told me is**

22    **to tell the truth, which I'm doing.**

23    Q.   Have you talked -- how often do you talk

24    with Mr. France about this case?

25    **A.    Not much.  It's simply, tell the truth,**

1    **you've got to go through it, but just tell the**

2    **truth.  It will be over with, period.**

3         Q.   Did Mr. France tell you anything about why

4    he was moving from CAA Sports to Athletes First?

5         **A.   I don't remember.**

6         Q.   Are you telling me you don't remember

7    whether he told you anything or not, or you just

8    can't remember what he told you?

9         **A.   To be honest, my trust is with him and I**

10   **was going to go where he went.  It didn't really**

11   **matter to me.**

12        MR. CLEMENTS:  For hygiene on the

13   transcript, are we done with the money questions?

14   I don't think any of this is confidential if you

15   want to make it simpler.

16        MR. COMERFORD:  Yeah, if I come back to

17   the money --

18        MR. CLEMENTS:  I don't want to designate

19   it because it's annoying for all the lawyers, so

20   it's not confidential now.

21        Q.   Other than Mr. France, have you talked to

22   any other CAA employees or former CAA employees

23   about the allegations that Mr. Bernstein and

24   Clarity Sports are making?

25        **A.   No.**

1      Q.   Have you talked with Jake Silver about it?

2      **A.   No.**

3      Q.   Like Howard Skull, Bob Philp, anybody like

4  that?

5      **A.   I haven't talked to anyone about it.**

6      Q.   Have you ever talked -- without telling me

7  what was discussed, have you ever spoken with a

8  lawyer who works for CAA about these allegations?

9      **A.   No.**

10     Q.   Other than Mr. Iaconelli and Mr. Clements,

11  have you talked to any other lawyers about

12  Mr. Bernstein or Clarity Sports?

13     **A.   No.**

14     Q.   Have you referred any football players to

15  Todd France?

16     **A.   No.**

17     Q.   Have you ever talked to Todd France about

18  getting any discount on the agent fee that he

19  collects for any reason?

20     **A.   No.**

21     Q.   At some point in time we were provided

22  with a sworn declaration, a written declaration

23  that you signed.  Are you aware of that?

24     **A.   No.**

25     Q.   Do you have any recollection of signing a

 1   written declaration, making statements under oath

 2   about Mr. Bernstein and his allegations?

 3        A.   Yeah, I don't remember.

 4        Q.   Do you remember anyone that you spoke with

 5   about a written declaration that you would submit

 6   under oath about Mr. Bernstein and the allegations

 7   in this case?

 8        A.   Yeah, I don't remember.

 9        Q.   So I'm not -- I'm not going to ask you

10   whether you wrote the declaration yourself, because

11   you're telling me you just don't remember if you

12   did one or not, right?

13        A.   Say it again.

14        Q.   Do you have any memory of signing a

15   written --

16        A.   Say again.

17        Q.   Do you have any recollection of signing a

18   sworn statement where you made statements in

19   writing under oath --

20        A.   Yes.

21        Q.   -- concerning Mr. Bernstein and Clarity

22   Sports.

23        A.   Yes.

24        Q.   Who did you talk with about that written

25   sworn statement?

1      **A.    Well, I talked to Todd and told him I want**

2   **to tell my truth, and he sent it over to me and I**

3   **looked at it and signed it.   Everything was**

4   **correct.**

5      Q.   Did you make any edits to it?

6      **A.    No.**

7      Q.   Other than Mr. France, did you talk to

8   anybody else about the written sworn declaration

9   that you signed?

10     **A.    Not that I can recall.**

11     Q.   When you -- let's go back to your

12  discussions with Todd France from September of 2018

13  to January 2019 until the moment you signed with

14  him.

15     **A.    Say it again.**

16     Q.   I want to ask you about the time frame

17  from when you met Todd France on September 24th

18  2018, until you signed an SRA with him on or about

19  January 24th or 25, 2019, okay.   In that time

20  period, you told me that Mr. France never provided

21  you with any references, right?

22     **A.    Okay.**

23     Q.   Is that still your testimony?   Yes?

24     **A.    Of what?   What are you talking about?**

25     Q.   You told me earlier that Mr. France didn't

1   provide you with any references, right?

2       **A.   Okay.**

3       Q.   And that's still your recollection as you

4   sit here right now, right?

5       **A.   Right.**

6       Q.   And I asked you if Mr. France had

7   described any contracts that he had done for other

8   players and you told me that he did not, right?

9       **A.   Right.**

10          MR. CLEMENTS:  All these questions were

11  asked and answered.

12      Q.   And did you talk with Mr. France about the

13  success he had had as an agent in that time period?

14          MR. CLEMENTS:  Again, asked and answered.

15      **A.   I don't remember exactly what we talked**

16  **about.  Like I said, we talked a little bit of**

17  **ball, talked about life, feeling each other out.  I**

18  **don't remember exactly.  It was two, three years**

19  **ago.**

20      Q.   And we know that he didn't talk about

21  references and he never gave you references, and he

22  didn't talk about other contracts he had done for

23  other players, correct?

24          MR. CLEMENTS:  Objection, asked and

25  answered.

1      **A.    I answered that already.**

2      Q.   And the answer to that, to what I said is

3   correct, right, he didn't do any of those things?

4      **A.    I answered it already.**

5           MR. CLEMENTS:  It's over and over.  What's

6   the point of this.  They're all asked and answered.

7   It's in the record.

8           MR. COMERFORD:  I think I'm pretty close

9   to done.  Let me take a couple minutes and look at

10  my notes and then we'll get back on the record and

11  I'll either be done or have a little bit of

12  cleanup.

13          THE VIDEOGRAPHER:  We're going off the

14  record at 5:41 p.m.

15               (Recess taken.)

16          THE VIDEOGRAPHER:  Back on the record,

17  5:56 p.m.

18  BY MR. COMERFORD:

19      Q.   Mr. Golladay, do you know who DeAndre

20  Hopkins is?

21      **A.    Yes.**

22      Q.   He's a wide receiver in the NFL, plays for

23  the Cardinals, right?

24      **A.    Yes.**

25      Q.   Did you know that DeAndre Hopkins was

```
 1    represented by Todd France in the past?

 2         A.   Okay.

 3         Q.   Were you aware of that?

 4         A.   Yes.

 5         Q.   Do you know that Mr. Hopkins is no longer

 6    represented by Todd France?

 7         A.   No.  It don't really matter, but okay.

 8         Q.   Are you aware of that?

 9         A.   Huh-uh.  I don't know.  I don't care

10    really.

11         Q.   Have you ever spoken with DeAndre Hopkins

12    about Todd France?

13         A.   No.

14         Q.   Have you ever spoken with DeAndre Hopkins

15    about contracts with NFL teams?

16         A.   No.

17         Q.   Are --

18         A.   I don't know him personally.

19         Q.   Okay.

20              Are you aware of the contract that

21    Mr. Hopkins negotiated with the Arizona Cardinals

22    in 2020?

23         A.   Yeah.

24         Q.   Would you describe that contract as better

25    than your contract with the Giants or the same or
```

1   not as good?

2       **A.   I could care less.**

3       Q.   Yours is less?

4       **A.   I said I could care less.**

5       Q.   Do you know that Mr. Hopkins negotiated a

6   contract with the Cardinals for 27.5 million per

7   year for two years?

8       **A.   Good for him.**

9       Q.   Do you know whether Todd France negotiated

10  that contract?

11      **A.   I don't care who negotiated it.  I'm happy**

12  **to see everyone get paid.  I could care less who**

13  **did it or how much he got.**

14      Q.   Before I told you this, were you aware

15  that DeAndre Hopkins negotiated a contract for an

16  average per year of $27.5 million with the

17  Cardinals?

18      **A.   Yes.  I know he's the highest paid**

19  **receiver.  So what?**

20      Q.   You told me earlier that you could tell in

21  your gut that Jason Bernstein would not be able to

22  get you an $18 million-per-year contract.  Do you

23  remember that?

24      **A.   Okay.**

25      Q.   What was it that caused you to feel that

1    way about Mr. Bernstein?

2        A.    **That was just a feeling I had and it**

3    **really doesn't matter because that's the feeling I**

4    **felt, and I'm glad I made the decision I made.**

5        Q.    Can you point to any facts about

6    Mr. Bernstein that made you feel that he was not

7    going to be capable of getting you the contract you

8    wanted with an NFL team?

9            MR. CLEMENTS:  Hold on a second.

10    Objection.  It's argumentative.  I think it's

11    badgering the witness.  I mean, he testified that

12    he had a gut feeling, and I don't understand what

13    any of this means.  At some point it's going to be

14    harassing.

15            You can answer.

16        A.    **What was the question?**

17        Q.    Can you tell me any facts about

18    Mr. Bernstein that made you feel that he was not

19    capable of getting you the contract that you wanted

20    with an NFL team?

21        A.    **To be honest, it really doesn't matter.  I**

22    **mean, it's not like I made the wrong choice.  I**

23    **still made a great choice and I got what I felt**

24    **like I deserved.  Okay.**

25        Q.    Just to nail this down because I feel like

1    I need to get an answer on this, do you agree with

2    me that you can't tell me any facts about Jason

3    Bernstein that caused you to feel that he was not

4    capable of getting you the contract that you wanted

5    with an NFL team?

6            MR. CLEMENTS:  Objection, this calls for a

7    legal conclusion.  Its not reasonably calculated to

8    lead to discovery of admissible evidence.  As a

9    matter of fact, it's prohibited under the NFL regs

10   governing the termination of the SRAs, but you can

11   answer to the extent you can.

12      **A.    I answer to the best of my ability.**

13      Q.   So what's your answer?  Can you give me

14   any facts or not?

15      **A.    I didn't feel like he would be able to**

16   **give me the contract that I deserved so I made a**

17   **change and I'm happy with my change in picking Todd**

18   **France as my agent.**

19      Q.   So what are the facts about Mr. Bernstein

20   that made you feel that way?

21      **A.    It doesn't matter.  I didn't feel that way**

22   **and that's what I decided to stick with and I got**

23   **what I wanted in the end.**

24      Q.   I'm trying to give you every opportunity

25   to give me some facts.

```
 1          MR. CLEMENTS:  Objection.  You're
 2   badgering the witness because you're asking him
 3   about something that is completely irrelevant,
 4   Mr. Comerford, under the NFL regulations.  Are you
 5   accusing him of violating the regulations?
 6          MR. HERBER:  I'm going to join in the
 7   objection as well.
 8          MR. CLEMENTS:  It's an at-will contract,
 9   and as you know, one of Mr. Kaplan's findings,
10   which is, quite frankly, by collateral estoppel is
11   a player or an agent can terminate the other one
12   for any reason or no reason at all.
13          MR. COMERFORD:  Mr. Clements --
14          MR. CLEMENTS:  Mr. Comerford.
15          MR. COMERFORD:  -- one more outburst and
16   I'm going to move for sanctions again for improper
17   objection.
18          MR. CLEMENTS:  It's not an outburst,
19   Mr. Comerford.  That's a fact.
20          MR. COMERFORD:  Please conduct yourself in
21   accordance with Judge Schwab's order.
22          MR. CLEMENTS:  I am.  And you should also
23   conduct yourself in accordance with her order.
24   You're asking the same question over and over
25   again.  You're being argumentative and you're
```

1    badgering the witness.

2        Q.   Mr. Golladay, during the time period from

3    September 2018 through January 2019, did Mr. France

4    ever tell you that you should wait to sign with

5    him?

6        **A.   He said wait until the end of the season.**

7    **He was actually very patient and there was no rush**

8    **at all.**

9        Q.   Did he tell you why you should wait until

10   the end of the season?

11       **A.   Focus on the season, I mean, no**

12   **distractions.   Focus on the season, there was no**

13   **rush.**

14       Q.   Did he tell you anything else about why

15   you should wait?

16       **A.   No.**

17       Q.   I want to put one more document.   This

18   will be the last document.   This one is going to be

19   dated January 22, 2021.   It will be the subpoena to

20   you, Mr. Golladay, and this is the subpoena that is

21   bringing you here for this deposition.   I want to

22   go to page 7, please.   There are some documents

23   requested there.   You told me that you read the

24   subpoena, I think, right?

25       **A.   What do you want me to look at?**

 1      Q.   Do you see near the bottom of the page it

 2   says "Documents requested"?

 3      **A.   Okay.**

 4      Q.   Let's mark this as another exhibit, if we

 5   haven't already.

 6      **A.   What documents are you talking about?**

 7           MR. COMERFORD:   I think this is going to

 8   be Exhibit 20.

 9           THE REPORTER:   Yes.

10   (Thereupon, Plaintiff's Exhibit 20 was marked for

11   purposes of identification.)

12      Q.   So this subpoena was served on you,

13   Mr. Golladay, and it asked for you to produce

14   documents.  Do you understand that?

15      **A.   Okay.**

16      Q.   Number 1 is it asked for each and every

17   communication between you and Jake Silver.  The

18   documents are emails, text messages, direct

19   messages, anything in written format.  And what I

20   understand you told me earlier was that you didn't

21   look at your email account to see if you had emails

22   with Jake Silver, correct?

23      **A.   No.**

24      Q.   Am I right about that?

25      **A.   I didn't have anything.  I didn't have any**

1    **emails.  I didn't have any text messages.  I didn't**

2    **have anything.**

3        Q.   So what I understood you telling me

4    earlier is you didn't look because you don't look

5    at your email account, right?

6        **A.   I checked my email and I didn't have**

7    **anything from Jake Silver, didn't have any text**

8    **messages from Jake Silver.**

9        Q.   Did you check your -- so number 2 is each

10   and every communication between you and Todd

11   France.

12        Did you check your email account for

13   communications between you and Todd France?

14        **A.   I didn't have any.**

15        Q.   But did you check?

16        **A.   If I didn't have any then I checked.  I**

17   **don't have any.**

18        Q.   When did you check?

19        **A.   I don't remember.  I don't have any.**

20        Q.   So what I understood you told me earlier

21   was that you didn't look at your email account.

22   Are you telling me something different now?

23        **A.   I checked.  I don't have any.  I don't**

24   **have any emails from Jake Silver texting me, and I**

25   **don't have emails from Todd France.**

1     Q.   We looked at email you received on

2   January 8, 2019 from Todd France's email account at

3   CAA.  Do you remember that?

4     **A.   I don't remember.**

5     Q.   Do you know what happened to that email

6   account on your -- let me start over.

7          Do you know what happened to the

8   January 8, 2019 email that was sent from Todd

9   France's email account to your email account?

10    **A.   I don't.  I don't remember seeing the**

11   **email.  I don't know.**

12    Q.   Did you delete it?

13    **A.   No.  I don't remember seeing the email.  I**

14   **don't know if I got it.**

15    Q.   Is it still on your email account?

16    **A.   I don't know.**

17    Q.   And the reason you don't know is because

18   you didn't look, correct?

19          MR. CLEMENTS:  Objection, argumentative,

20   asked and answered.

21    Q.   Am I right?

22    **A.   I answered that question already.**

23    Q.   And the answer is that you didn't look,

24   right?

25          MR. CLEMENTS:  No.  It's asked and

1    answered.  Answer the question again.

2         **A.   I didn't have the email.**

3         Q.   Why don't you have that email anymore?

4         **A.   I don't remember getting an email.  I**

5    **don't know if I got the email.**

6         Q.   But you have no memory of deleting it,

7    right?

8         **A.   I didn't delete an email.  I don't**

9    **remember getting the email.  I didn't see the**

10   **emails.**

11        Q.   Does anyone other than you have access to

12   your email accounts?

13        **A.   No.**

14        Q.   Let's look at Number 3, each and every

15   communication between you and any employee of CAA

16   Sports, LLC or anyone acting its behalf.  So this

17   would include people like Bob Philp, Howard Skull

18   and other marketing employees of CAA.  Do you have

19   any emails from those people?

20        **A.   No.**

21        Q.   What happened to them?

22        **A.   I don't remember even seeing emails.  I**

23   **don't know if I've got the emails.**

24        MR. CLEMENTS:  Objection, foundation to

25   whether they're even --

1      Q.   Did anyone from CAA ever send you an email

2   with, for example, a contract from Nike that was

3   going to pay you a lot of money?

4      **A.   I don't remember seeing an email.**

5      Q.   Did you delete any emails that you

6   received from CAA?

7      **A.   No.**

8      Q.   Do you know whether or not there are any

9   emails from CAA on your email account right now?

10     **A.   I don't have any emails.  I don't send any**

11  **emails.**

12     Q.   Number 4, each and every document or

13  communication that concerns, relates to you or

14  mentions the July 21, 2019, appearance and

15  autograph signing by you in Lombard, Illinois that

16  is referenced in the complaint.

17          Did you look for emails and texts about

18  that?

19     **A.   I don't have any emails.  I don't remember**

20  **getting any emails.**

21     Q.   Obviously you got the January 8, 2019

22  email from Todd France's email account?

23     **A.   I don't know whose email that was.  I**

24  **don't remember seeing an email.  I don't know.**

25     Q.   Number 5, would your answer be the same?

1      **A.    What is it?**

2      Q.   Each and every document or communication

3    that concerns, relates to, or mentions the

4    negotiations and/or discussions for about or

5    concerning the January 21, 2019 appearance and

6    autograph signing by you in Lombard, Illinois that

7    is referenced in the complaint.

8           Same answer?

9      **A.    Are you talking about emails?**

10     Q.   Yes.

11     **A.    I don't -- I don't remember getting any**

12   **emails.  I don't remember.**

13     Q.   Do you have any texts about this?

14     **A.    No.  I don't remember seeing any texts**

15   **about it or getting any texts.**

16     Q.   Number 6, each and every communication

17   between you and Todd France that concerns, relates

18   to or mentions the January 21, 2019 appearance and

19   autograph signing by you in Lombard, Illinois that

20   is referenced in the complaint.

21          Same answer, you don't have any emails

22   like that anymore?

23     **A.    Yeah, me and Todd don't even talk about**

24   **marketing.**

25     Q.   Did you ever talk with Todd France about

1    the Nike deal?

2        **A.    No.**

3        Q.    Number 7, each and every communication

4    between you and Jake Silver that concerns, relates

5    to or mentions the January 21, 2019 appearance and

6    autograph signing by you in Lombard, Illinois that

7    is referenced in the complaint.

8            Do you have any emails or communications

9    between you and Jake Silver about the signing?

10       **A.    I don't have any emails.**

11       Q.    What about text messages?

12       **A.    I don't have any text messages.**

13       Q.    Let's go to Number 8.  Each and every

14   communication between you and any employee of CAA

15   Sports, LLC or anyone acting on its behalf that

16   concerns, relates to or mentions the January 21,

17   2019 appearance and autograph signing by you in

18   Lombard, Illinois that is referenced in the

19   complaint.

20           Do you have any emails or text messages

21   about that?

22       **A.    I didn't get any emails; don't have any**

23   **emails.**

24       Q.    Number 9, each and every communication

25   between you and any person acting on behalf of Todd

1  France.

2          Do you have any emails or text messages?

3      A.   I don't remember getting any emails.

4  Don't have any emails.

5      Q.   Do you remember exchanging text messages

6  with Todd France?

7      A.   About what?

8      Q.   About, you know, your interest in maybe

9  signing with him or just kind of how's it going in

10 that time period between when you started talking

11 with him and when you signed with him?

12     A.   If I told Todd that I was going to be with

13 him in December, I'm pretty sure we had some type

14 of line of communication.

15     Q.   So where are those texts?

16          MR. CLEMENTS:  Objection, foundation.

17     A.   Hello?

18     Q.   Where are those text messages between you

19 and Todd France?

20          MR. CLEMENTS:  Objection, foundation.

21     A.   I've never said we texted about it.  It

22 could have been FaceTime, FaceTime audio.  I stay

23 in a high-rise building so I use FaceTime audio.

24 Yeah, I never said anything about a text.

25     Q.   Do you have any texts between you and Todd

 1    France in your possession on either of your phones

 2    now?

 3         A.    Yeah.

 4         Q.    I mean -- I should be clear, let me try

 5    that again.

 6              Do you have any text messages between you

 7    and Todd France from the 2018 or 2019 time period

 8    on either of your phones?

 9         A.    No.

10         Q.    Why not?

11         A.    It's two, three years ago.  I went through

12    I don't know how many phones.

13         Q.    You still have the same number.  Don't

14    they -- don't the text messages move over?

15         A.    I don't back my phone up, use the iCloud,

16    I don't do that.  I have a phone here that is all

17    cracked up.  I need a new one now.

18         Q.    I want to bring up a document just to have

19    you say they're yours, but I don't think I'll have

20    any questions about it.  So this document is going

21    to be 2018 September 27, Golladay texts with

22    France.  Let's bring that up.  This is 38 pages of

23    text messages that were produced by Todd France.

24              Are these text messages that you exchanged

25    with Todd France to your knowledge?  And we can

1    flip through them as much as you want to.

2        **A.   Yeah, I guess.  I don't know.  Yes.  I see**

3    **my name, "Hey, Todd, what's up?"**

4        Q.   And so these look like text messages that

5    you exchanged with Mr. France, correct?

6        **A.   Okay.  Yes.**

7            MR. COMERFORD:  And for the record,

8    Mr. Martin, can you identify the Bates numbering,

9    the Clarity Bates numbering for the record?

10           MR. MARTIN:  Yes.  This is Clarity 2513

11   through Clarity 2550.

12       Q.   Let's bring up another document, 2018 --

13   so that's marked Exhibit 21, those 38 pages.

14   (Thereupon, Plaintiff's Exhibit 21 was marked for

15   purposes of identification.)

16           MR. COMERFORD:  Exhibit 22 is going to be

17   2018-10-05, Mr. Martin.

18   (Thereupon, Plaintiff's Exhibit 22 was marked for

19   purposes of identification.)

20       Q.   Is that a text message that you exchanged

21   with Todd France?

22       **A.   Okay.  Yeah.**

23       Q.   Does that look like your text messages

24   with Todd France from October 2018?

25       **A.   Yeah.  I mean, it says my name.  I see**

 1    that, yeah.

 2        Q.   And these are marked Clarity 2514.

 3             MR. COMERFORD:  And then the next one I

 4    want to look at is 2018-11-30, Mr. Martin.  This is

 5    Bates numbers Clarity 2446.  We'll mark this as

 6    Exhibit 23.

 7    (Thereupon, Defendant's Exhibit 23 was marked for

 8    purposes of identification.)

 9        Q.   Does this look like a text you exchanged

10    with Todd France?

11        A.   I don't know.  Yeah.

12        Q.   That's Exhibit 23.  And then I think we

13    just have one more of these.  Exhibit 24 is

14    2018-12-30.  The Bates numbering is Clarity 79

15    through Clarity 96.  Let's zoom in on these.  These

16    should be text messages between you and Jason

17    Bernstein from December and January --

18    December 2018 and January 2019.  Can you look at

19    those, Mr. Golladay, and verify that those are text

20    messages that you sent and received?

21        A.   I can't.  It's small.  I can't even see

22    it.

23    (Thereupon, Plaintiff's Exhibit 24 was marked for

24    purposes of identification.)

25        Q.   Let's do whatever we need to do so you

1   have a chance to look at them.

2       **A.   Okay.   Yeah.   What about it?**

3       Q.   Are these text messages that you received

4   and sent to and from Jason Bernstein?

5       **A.   Yeah.**

6       Q.   I've got one more -- no, I think that's

7   it.

8           MR. COMERFORD:  Those are all the

9   questions I have at this time, Mr. Golladay.

10          MR. CLEMENTS:  This is William Clements.

11  I'm going to ask a couple of questions.  I know

12  it's been a long day for everyone so I'll try to be

13  as quick as possible.

14              EXAMINATION OF KENNETH GOLLADAY

15  BY MR. CLEMENTS:

16      Q.   Mr. Golladay, I want you to focus on the

17  end of September 2018, the Lucky Strike bowling

18  event with Golden Tate.  Is there any doubt in your

19  mind that Todd France was at that event?

20      **A.   He was at that event.**

21      Q.   And there's no doubt in your mind that you

22  were at the event.

23      **A.   I was at the event.**

24      Q.   And is there any doubt in your mind that

25  you went up and introduced yourself to Todd France

1    first?

2       **A.    I definitely went up to him and introduced**

3    **myself to him.**

4       Q.   So Todd didn't seek you out, Mr. France

5    didn't seek you out at that event?

6           MR. COMERFORD:  Objection, leading.

7       **A.    No.**

8           MR. CLEMENTS:  It's a third-party witness

9    so I'm not so sure --

10          MR. COMERFORD:  He's your client.

11      Q.   Can you explain to me what happens in the

12   minutes before and the minutes after you introduce

13   yourself to Todd France.

14      **A.    Well, Golden and his wife pretty much just**

15   **thanked everybody for coming out and he pretty much**

16   **just shouted out his agent, Todd, and I was**

17   **already, you know, thinking about an agent change,**

18   **and I actually went up to Todd myself, you know,**

19   **introduced myself, and then, you know, told him --**

20   **pretty much asked him for his number and kind of**

21   **hit it off from there.**

22      Q.   Now, moving forward from that

23   September 2018, when did you first make the

24   decision that you wanted to move on and fire

25   Mr. Bernstein and go with another agent?

```
1          MR. COMERFORD:  Objection, asked and
2     answered.
3        Q.   You can answer.
4          MR. CLEMENTS:  That was almost all your
5     questions.
6          You can answer.
7        A.   I pretty much reached out to Todd, and he
8     came back out to Detroit, pretty much just felt
9     each other out, talked a little ball, and, I mean,
10    the conversation went -- the conversation went
11    good, and, I was, like, man, that's somebody who I
12    would love to pretty much work with or something I
13    would love to be a part of.
14       Q.   At what time did you come to that
15    conclusion, if you can remember?
16       A.   To be honest, right after we pretty much
17    had that little sit down, I was already thinking,
18    like, man -- it was like -- I don't want to say
19    love at first sight, but pretty much -- I mean, I
20    enjoyed the whole type of person he was, and just,
21    you know, had to pretty much keep making sure I
22    dotted all my I's and crossed all the Ts and
23    everything, and that's when I wanted to see if he
24    would go out there, meet my mom and that went
25    great.
```

1    Q.   So this would have been after

2  September 2018 and before Thanksgiving of 2018?

3    **A.   Say again.**

4    Q.   When you came to that conclusion, I'm just

5  trying to narrow down the time, it would have been

6  sometime after September 2018 but before

7  Thanksgiving of 2018?

8        MR. COMERFORD:  Objection, leading, asked

9  and answer?

10   Q.   Well, when was it?  Do you know if it was

11  in that span?

12   **A.   So I met with him sometime, maybe the end**

13  **of September, the beginning of November, I'm not**

14  **sure, and I know he met my mom in the beginning of**

15  **December, so that whole time right there was just**

16  **me still just brainstorming about it, but I knew I**

17  **loved the meeting that we had, and when we did**

18  **finally go out there and meet my mom, and she was**

19  **in with it as well, I knew, like, this was the guy.**

20   Q.   And when did you make the decision to move

21  on from Jason Bernstein and hire Todd France?

22   **A.   Well, I told Todd pretty much right after**

23  **him and my mom met, that was the cherry on top, I**

24  **told him right then, like, "I want you to be my**

25  **agent."**

 1      Q.   Could you narrow that down by month?  What

 2  month are we talking about?

 3      **A.   In my mind in September I already knew I**

 4  **was making an agent change.  In December I told**

 5  **Todd, you know, "I want you to be my agent," so**

 6  **that's, what October, November, December.**

 7      Q.   So was that in the beginning of December

 8  that you told Todd?

 9      **A.   The beginning of December.**

10      Q.   Was that prior to you hearing from

11  Mr. Silver or anybody about the signing event?

12      **A.   Yeah, that was way before.**

13      Q.   You telling Todd was way before you heard

14  about the memorabilia signing?

15      **A.   Right.**

16      Q.   Did the memorabilia signing event have

17  anything to do with your decision to change agents

18  and move on from Mr. Bernstein and hire Mr. France?

19      **A.   Absolutely not.  To be honest, it was**

20  **almost like a slap in the face.**

21      Q.   Why is that?

22      **A.   To say that I would even change**

23  **agents for -- what was it -- I don't even remember**

24  **right now, $7,000.  That's -- changing agents for**

25  **$7,000, somebody just hanging $7,000 over my head,**

1    **I'm pretty smart with my money.  It's not like I'm**

2    **money hungry.  I wasn't going to do it.  What I**

3    **changed agents for is because I felt like Todd**

4    **would be able to get me the big contract that I**

5    **deserved and that I wanted.**

6        Q.   We understand that your former agent,

7    Mr. Bernstein, through his lawyer, Mr. Comerford,

8    is saying that the signing event was used as a

9    bribe to get you to change agents.

10       **A.   You can't bribe me with 7,000 bucks.**

11   **Yeah, that's kind of disrespectful.  It's okay.**

12           MR. COMERFORD:  I object.  That is a

13   mischaracterization of the allegations and we've

14   never said that and that's highly objectionable.  I

15   move to strike it.

16       Q.   Did you make the decision to change agents

17   before January 21, 2019?

18       **A.   Yes.**

19       Q.   And did anything that happened at the

20   signing event have anything to do with your

21   decision to change agents?

22       **A.   No.**

23       Q.   Do you recall anything that happened at

24   the signing event on January 21, 2019 where your

25   career was discussed by anybody at the memorabilia

1    signing event?

2        **A.    No.**

3        Q.    Can you recall whether they discussed what

4    agent represented you?

5        **A.    No.**

6        Q.    Did anybody at that signing event on

7    January 21, 2019 tell you that you should change

8    agents?

9        **A.    No.**

10       Q.    Did anybody who was in attendance at that

11   signing event mention Mr. Bernstein at all?

12       **A.    No.**

13       Q.    Did anybody mention Mr. France at all?

14       **A.    No.**

15       Q.    In the entire time, from the end of

16   September 2018 to your decision to change agents,

17   which I believe you testified was in December 2018,

18   did anybody badmouth Mr. Bernstein to you?

19       **A.    No.**

20       Q.    Anybody at all?

21       **A.    No.**

22       Q.    Did anybody cheerlead Mr. France to you?

23       **A.    No.**

24       Q.    Who made the decision to change agents?

25       **A.    Me.**

1      Q.   Was it Mr. Saffold?

2      **A.   No.**

3      Q.   Was it your mother?

4      **A.   No.**

5      Q.   It was solely you, correct?

6      **A.   Correct.**

7      Q.   Clarity Sports, who you were with, during

8   that time period from when you decided in

9   September when you first met France to the

10  beginning of December when you decided to change

11  agents, did anybody badmouth Clarity Sports?

12     **A.   No.**

13     Q.   At the signing event on January 21st, did

14  anybody badmouth Clarity Sports?

15     **A.   No.**

16     Q.   Did anybody mention Clarity Sports?

17     **A.   No.**

18     Q.   In your own words, can you -- in your own

19  head, is there any connection between the signing

20  event and the decision to change agents?

21     **A.   None at all.**

22     Q.   How about your decision to move on from

23  Clarity Sports, any connection between the signing

24  event and your decision to move on from Clarity

25  Sports?

1      **A.   My decision was made before the signing**

2   **event.**

3      Q.   And you are correct, it was a little bit

4   more, $7,750.  In your dealings with Clarity Sports

5   prior, they obtained marketing events for you,

6   correct?

7      **A.   Yeah.  I mean, they did -- 7700?**

8      Q.   7750.

9      **A.   As a rookie I was getting more than that,**

10  **you know what I mean?**

11     Q.   So Clarity Sports paying for your

12  marketing events made you more money than the

13  signing event.

14     **A.   Yes.**

15     Q.   Can you explain for me in your own words

16  why you didn't immediately tell Jason Bernstein

17  that you were moving on from him and going with

18  Todd France?  Because there is -- I don't think

19  there's any dispute in the record that, you know,

20  January 22nd was the day of the phone call.  That

21  is not in dispute.

22     **A.   I mean, like I said earlier, really just**

23  **no distractions to me or the team.  I didn't really**

24  **want to do it during the year.  I just kind of**

25  **wanted to finish the season out.  I had more**

1   football to play, you know.   I was in my second

2   year, I believe it was, having a good year, and I

3   didn't want to deal with that right there.

4       Q.   Was that a pleasant conversation to have,

5   to make?

6       A.   It wasn't, but just being a grown man, I

7   think I did it respectfully.   I didn't have to even

8   have that phone conversation with him, but as far

9   as it being business, I had to do it for me and my

10  family.

11      Q.   Did you ever talk to Jason Bernstein about

12  your New York Giants contract?

13      A.   I haven't talked to him.

14      Q.   As far as you know did he do anything to

15  obtain for you that New York Giants contract?

16      A.   No.

17      Q.   Who got that contract for you?

18      A.   Todd.

19      Q.   Now we see documents and it's another

20  thing that's probably not in dispute.   You may not

21  know.   Do you remember the Facebook post --

22      A.   Yes.

23      Q.   -- about the signing event that

24  Mr. Comerford showed you?

25      A.   Uh-huh.

1      Q.   Did you have any knowledge of that

2  Facebook post?

3      A.   **No.**

4      Q.   When it was posted?

5      A.   **No, I don't get on Facebook.**

6      Q.   And I believe you said that Emily Ries

7  might have brought it to your attention.

8      A.   **Right.**

9      Q.   I'm trying to think how to phrase this.

10          Your dealings with Clarity, do you have

11 any reason to disagree with me that if an event was

12 covered under the Clarity Sports agreement, they

13 would get a 15 percent sports commission; is that

14 your recollection?

15     A.   **Right.**

16     Q.   Did they ever ask you to remit 15 percent

17 of what you made at that signing event to them?

18     A.   **No.**

19     Q.   But your understanding is they knew about

20 the signing event, right, because Emily Ries gave

21 you the advertisement for it?

22     A.   **Right.**

23     Q.   And this is in -- from January of 2019

24 until today, has anybody from Clarity Sports ever

25 said, "You owe us 15 percent of the signing"?

1      **A.    No.**

2      Q.    Has Clarity Sports commenced any action

3   against you to recover that?

4      **A.    No.**

5      Q.    Has Mr. Bernstein ever asked you to remit

6   that 15 percent?

7      **A.    No.**

8      Q.    Has he initiated any action --

9      **A.    No.**

10     Q.    -- against you?

11            Was Mr. Bernstein the only agent who

12   negotiated the rookie contract with the Detroit

13   Lions?

14     **A.    Yes.**

15     Q.    And that deal was terminated at the end of

16   the 2020 season or end --

17     **A.    I finished it out.**

18     Q.    So is it your understanding that

19   Mr. Bernstein was paid his commission for all the

20   monies -- all the monies you eared from the Lions

21   under the rookie contract that he negotiated for

22   you?

23     **A.    Yes, I paid every bit of it.**

24     Q.    Has he ever tried to come after you for

25   more money?

1        **A.    No.**

2            MR. CLEMENTS:  Let's go off the record a

3    second.

4            THE VIDEOGRAPHER:  We're going off the

5    record at 6:31 p.m.

6                    (Recess taken.)

7            THE VIDEOGRAPHER:  We're back on the

8    record at 6:35 p.m.

9    BY MR. CLEMENTS:

10       Q.   Just a few more questions.

11           Do you personally, and I just mean you,

12   Ken Golladay, owe CAA any money arising out of your

13   former business relationship with CAA?

14       **A.    No.**

15       Q.   To the best of your knowledge, has Todd

16   France ever received any compensation from anyone

17   pertaining in any way to the rookie contract with

18   the Detroit Lions that Mr. Bernstein obtained for

19   you?

20       **A.    No.**

21           MR. CLEMENTS:  Ms. Marsh, are you still

22   with us?  Can you put up Mr. Golladay's affidavit,

23   declaration from Kenny Golladay?  It might be at

24   this point Exhibit 22 or 23.

25               THE REPORTER:  25.

1    (Thereupon, Plaintiff's Exhibit 25 was marked for

2    purposes of identification.)

3        Q.   We would like to mark this

4    Exhibit Golladay 25.  It's the declaration of

5    Kenneth Golladay.

6             MR. CLEMENTS:  Lauren, can you scroll

7    down?

8        Q.   Please take a look at it as she scrolls.

9    And I believe Mr. Comerford asked you some

10   questions about this declaration.  He didn't mark

11   it as an exhibit or show it to you as far as I

12   could remember, but this is the document you were

13   answering questions about, the declaration.

14            And was everything in that document true

15   and correct as of the date you signed it?

16   **A.   Yes.**

17       Q.   To the best of your knowledge, has it

18   remained true and correct as you sit here today?

19   **A.   Yes.**

20       Q.   One final question, the signing event and

21   the $7,750 check, did you ever -- if you could

22   elaborate on this.  Have you ever understood that

23   that signing event, that $7,750 check you got for

24   appearing at the signing event to be a bribe or

25   some attempt to get you to switch agents from

1    Mr. Bernstein to Mr. France?

2         MR. COMERFORD:  Form.

3    **A.    No, I didn't.  To be honest, I thought it**

4    **was an opportunity and I just accepted it and went**

5    **about my day.**

6    Q.   And when you were done with the signing

7    event, you stayed in Chicago, right, went to either

8    your dad's house or your mom's house?

9    **A.    Yeah.  I don't really remember, but I**

10   **stayed in Chicago.**

11        MR. CLEMENTS:  I don't have any other

12   questions.  J.T. may have some.

13             EXAMINATION OF KENNETH GOLLADAY

14   BY MR. HERBER:

15   Q.   Mr. Golladay, my name is J.T. Herber.  I'm

16   here on behalf of Gerry Ochs and Redland Sports.

17   I've just kind of been hanging out here in the

18   background as everybody else is asking questions.

19   I realize it's getting late today and I've got some

20   questions for you, but I'm going to move through

21   these as quickly as I can.

22        Because everybody's covered various things

23   I'm going to jump around a little bit, so stick

24   with me here, if you could.

25        Prior to the day of the memorabilia

1   signing for which we're here, did you know Gerry

2   Ochs?

3        A.   No.   I still don't know who he is.

4        Q.   Did you ever know anyone that operated

5   under the name Redland Sports?

6        A.   No.

7        Q.   And based on your prior answer, am I clear

8   that prior to the memorabilia signing, to your

9   knowledge you never met anyone by the name of Gerry

10  Ochs?

11       A.   No.

12       Q.   Prior to the memorabilia signing, had you

13  met anyone who said they were acting on behalf of

14  Redland Sports?

15       A.   No.

16       Q.   At the memorabilia signing or at any other

17  time, did you ever talk to Gerry Ochs about the SRA

18  that you had with Jason Bernstein?

19       A.   No.

20       Q.   Prior to the memorabilia signing or at any

21  other time, did you ever talk to Gerry Ochs about

22  the EMA that you had with Clarity Sports?

23       A.   No.

24       Q.   Did you ever talk to Gerry Ochs about Todd

25  France?

1       **A.    No.**

2       Q.   Did you ever talk to Gerry Ochs about CAA

3   Sports?

4       **A.    No.**

5       Q.   At the memorabilia signing, did you talk

6   to anyone about Jason Bernstein?

7       **A.    No.**

8       Q.   At the memorabilia signing, did you talk

9   to anyone about the EMA which you had with Clarity

10   Sports?

11      **A.    No.**

12      Q.   Was there any discussion you had with

13   anyone during the memorabilia signing about your

14   relationship with Clarity Sports?

15      **A.    No.**

16      Q.   Was there any discussion you had during

17   the memorabilia signing with anyone about your

18   relationship with Jason Bernstein?

19      **A.    No.**

20      Q.   Since the memorabilia signing, have you

21   ever talked to Gerry Ochs?

22      **A.    No.**

23      Q.   Since the memorabilia signing, have you

24   ever talked to anyone with Redland Sports?

25      **A.    No.**

```
 1       Q.   What role, if any, did Gerry Ochs play in
 2  your decision to terminate the SRA with Jason
 3  Bernstein?
 4       A.   He didn't play a role.
 5       Q.   What role, if any, did Gerry Ochs play in
 6  your decision to terminate the EMA with Clarity
 7  Sports?
 8       A.   He didn't play a role.
 9       Q.   What role, if any, did the memorabilia
10  signing play in your decision to terminate the SRA
11  with Jason Bernstein?
12       A.   It didn't play a role.
13       Q.   What role, if any, did the memorabilia
14  signing play in your decision to terminate the EMA
15  with Clarity Sports?
16       A.   It didn't play no role at all.  It was
17  just a quick signing and be done with it.  They did
18  nothing pertaining to nothing.
19            MR. HERBER:  Thank you, sir.  I have no
20  other questions for you.
21            MR. COMERFORD:  Mr. Golladay, this is John
22  Comerford.  I just have a couple more questions.
23            THE WITNESS:  How many questions you got?
24            MR. COMERFORD:  Just a couple more.
25            THE WITNESS:  I've got to start some of my
```

1    day.  You all done took up my time.  If you've got

2    one or two questions.

3            EXAMINATION OF KENNETH GOLLADAY

4    BY MR. COMERFORD:

5        Q.   Mr. Golladay, I'm going to ask Mr. Martin

6    to bring up a document dated 2019 July 10 that

7    concerns marketing with the Nike deal, and we'll

8    mark this as Exhibit 26.

9    (Thereupon, Plaintiff's Exhibit 26 was marked for

10   purposes of identification.)

11       Q.   I know you're not on this email, but the

12   email of July 10, 2019, Howard Skull of CAA is

13   writing to Molly King of CAA.  Do you ever work

14   with Molly King?

15       **A.   No.**

16       Q.   And Howard Skull says, "Molly, have you or

17   Todd caught up with Kenny yet?  They just asked us

18   again on this one.  We're still trying to get other

19   offers from this rep."  And the subject of those

20   email exchanges is "Kenny Golladay Nike offer

21   June 13, 2019."  Do you see that?

22       **A.   Yeah, I see it.**

23       Q.   And then the top email is from Todd

24   France, that same email address we looked at

25   earlier, Todd.France@CAA.com, and he writes:

1    "Kenny and I are speaking tomorrow.  He is

2    traveling to LA to throw with," name redacted, "and

3    knows we will walk through it.  Thank you."  Signed

4    Todd France.

5         Do you remember talking with Todd France

6    about the Nike offer in July 2019?

7    **A.   Me and Todd don't discuss marketing.  I**

8    **don't know who sent the email.  I see it says Todd**

9    **France.  I don't know who sent the email.  I don't**

10   **know.**

11   Q.   Do you have any explanation for why Todd

12   France sent this email to his colleagues at CAA

13   saying that you and him were going to talk about

14   the offer that you had gotten from Nike?

15   **A.   I don't know who sent the email.**

16   Q.   Do you have any explanation for why Todd

17   France said that in this email?

18   **A.   I don't know who sent the email.  I see it**

19   **says Todd France.  I don't know if he sent the**

20   **email or not.  I don't know.**

21        MR. CLEMENTS:  Objection, speculation.

22   Q.   And so what you're telling me today is

23   that you never talked with Todd France about the

24   Nike offer in mid-2019, correct?

25   **A.   I've been telling you all day, me and him**

1   **don't discuss marketing.**

2       Q.   We know that the last game of your 2018

3   season was December 30th versus the Green Bay

4   Packers.  And then you called Mr. Bernstein and

5   told him you were terminating him about three weeks

6   later on January 22, 2019, right, as we discussed?

7       **A.   Okay.**

8       Q.   So why did you wait for three weeks after

9   the season ended to tell Mr. Bernstein you were

10  switching?

11          MR. CLEMENTS:  Asked and answered, but you

12  can answer it again.

13      **A.   Why did I wait what?**

14      Q.   Why did you wait --

15      **A.   I didn't want any distractions during the**

16  **regular season.  I finished the season and I wanted**

17  **to continue finishing it out.  I deal with it when**

18  **I got a chance to.  I didn't want the distractions.**

19  **I answered that already.**

20      Q.   Right.  And then the Lions' season ended

21  on December 30, 2018, and you then waited three

22  more weeks to terminate Mr. Bernstein.

23          Why did you wait three more weeks?

24      **A.   What difference does it make?**

25      Q.   You can answer.

1      **A.    What difference does it make?   That's when**

2    **I decided to do it.**

3      Q.    Why did you wait until three weeks after

4    the regular season ended?

5      **A.    I just answered that question.**

6      Q.    Have you told me all the reasons that you

7    waited?  You're telling me "What difference does it

8    make?" but that's not a reason.

9           MR. CLEMENTS:  Objection, argumentative,

10   you're badgering the witness.

11          You can answer.  Whatever you want to add

12   or not add.

13     **A.    I answered it already.**

14     Q.    And your answer is "What difference does

15   it make?"

16     **A.    I terminated him when I terminated him.**

17     Q.    Do you have any explanation for why you

18   waited three -- over three weeks after the regular

19   season ended to finally terminate Mr. Bernstein?

20     **A.    What difference does it make?**

21     Q.    Is that your full explanation you want to

22   give me today?

23          MR. CLEMENTS:  Objection, argumentative,

24   badgering the witness.

25     Q.    Any other explanation you want to give me

1    today for why you waited for three weeks after the

2    regular season ended?

3        A.    No.

4        Q.    You terminated Mr. Bernstein the very next

5    day after this memorabilia signing that CAA

6    arranged for you, correct?

7        A.    I don't know.

8        Q.    Why did you terminate Mr. Bernstein the

9    very next day after you did the memorabilia signing

10   that CAA arranged for you?

11       A.    First off, I had already made up my mind

12   that he was no longer my agent, and then I had to

13   get ready to have surgery and get ready for

14   training, so I was making sure I had all my

15   business taken care of.  If that's how it turned

16   out, that's how it turned out.

17       Q.    But why did you wait until after you did

18   the memorabilia signing that CAA arranged for you?

19            MR. CLEMENTS:  Objection.  I think he just

20   answer it.

21       A.    I answered.

22       Q.    Why didn't you terminate Mr. Bernstein

23   before you did the memorabilia signing?

24            MR. CLEMENTS:  Objection, it's

25   argumentative and you're badgering the witness,

1    Mr. Comerford.  How many times are you going to ask

2    the same thing over and over?

3        Q.   You can answer.

4        **A.   I just answered it.**

5        Q.   Why did you not terminate Mr. Bernstein on

6    January 20th 2019?

7        **A.   I did it when I did it.**

8        Q.   So you can't offer me any reason, correct?

9            MR. CLEMENTS:  Objection, mischaracterizes

10   his testimony.

11       Q.   Can you offer me any reason why you didn't

12   do it January 20, 2019?

13           MR. CLEMENTS:  Objection, asked and

14   answered.

15       Q.   Go ahead.

16           MR. CLEMENTS:  Do you have anything to

17   add?

18           THE WITNESS:  No.

19           MR. COMERFORD:  Okay.  Those are all the

20   questions I have, Mr. Golladay.  Thank you for your

21   time today.

22           MR. CLEMENTS:  I have a couple I just want

23   to clarify.

24                 EXAMINATION OF KENNETH GOLLADAY

25   BY MR. CLEMENTS:

```
 1        Q.   The season ended for the Lions the end of
 2   December.  You're saying that you had a medical
 3   procedure to be done after that?
 4        A.   Right.
 5        Q.   What was the date of that, do you
 6   remember?
 7        A.   I don't remember.
 8        Q.   But the medical procedure was before the
 9   signing, correct?
10        A.   Right.
11        Q.   Was it an operation?  I don't want to pry
12   too much.  Did they knock you out?
13        A.   Yeah.
14        Q.   Local, anesthetic?
15        A.   I was put to sleep.
16        Q.   So it wasn't a minor procedure.
17        A.   Right.
18        Q.   And when did you get out of the hospital
19   for that?
20        A.   The same day.
21        Q.   You had to recuperate a little?
22        A.   Yeah.
23        Q.   How long was this before the signing, if
24   you remember?
25        A.   I don't remember.
```

1      Q.   Let me just concentrate because I don't

2  want to ask a bunch of questions.

3           Boone Enterprises, Daryl Eisenhour, Jason

4  Smith, MVP Enterprises, did any of them, the people

5  or the entities, play any role in your decision --

6      A.   No.

7      Q.   -- to terminate Mr. Bernstein and hire

8  Mr. France?

9      A.   No.

10     Q.   Did any of those persons or entities ever

11 advise you --

12     A.   No.

13     Q.   -- with respect to anything that has to do

14 with your career?

15     A.   No.

16          MR. CLEMENTS:  That's the only questions.

17 I'm done.

18          MR. COMERFORD:  Thank you, Mr. Golladay.

19          THE VIDEOGRAPHER:  This concludes the

20 deposition.  We are going off the record at

21 6:52 p.m.

22          MR. CLEMENTS:  We'll reserve our right.

23          MR. COMERFORD:  For Plaintiffs, we will

24 send the court reporter the exhibits that we

25 marked, and we would ask, Stephanie, that you put

1    stickers on them and we'll do our best to label

2    them, and e-tran and PDFs of the exhibits with the

3    stickers and we don't need any hard copy, and then

4    we would like a synced video.

5            MR. CLEMENTS:  We'll take the same thing.

6            (Deposition concluded at 6:55 p.m.)

7                    ~ ~ ~ ~ ~ ~

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3          I, KENNY GOLLADAY, do verify that I have

4    read the foregoing transcript and have had the

5    opportunity to make corrections/changes; and that

6    the foregoing is a true and correct transcript of

7    my testimony given August 30, 2021

8

9    Corrections/Changes Made _____

10

11   No Corrections/Changes Made _____

12

13

14                    _____
                          KENNY GOLLADAY

15

16          Sworn to before me,
     _____,
17                              Notary Public

18   this _____ day of _____, _____.

19

20

21                    _____
                          Notary Public

22   My commission expires _____.

23                         - - -

24

25

```
 1               C E R T I F I C A T E

 2

 3      I, Stephanie R. Dean, Court Reporter and Notary
       Public, duly commissioned and qualified, do hereby
 4     certify that the deposition of KENNY GOLLADAY was
       taken by me and reduced to Stenotypy, afterwards
 5     prepared and produced by means of Computer-Aided
       Transcription and that the foregoing is a true and
 6     correct transcription of the deposition was so
       taken as aforesaid.
 7             I do further certify that these
       proceedings were taken at the time and place in the
 8     foregoing caption specified.
               I do further certify that I am not a
 9     relative, employee of or attorney for any party or
       counsel, or otherwise financially interested in
10     this action.
          I do further certify that I am not, nor is the
11     court reporting firm with which I am affiliated,
       under a contract as defined in Civil Rule 28(D).
12             IN WITNESS WHEREOF, I have hereunto set my
       hand and affixed my seal of office on this 9th day
13     of September, 2021.

14

15

16

17

18
                    _____
19                    Stephanie R. Dean, RPR

20        My commission expires August 30, 2025.
                          - - -
21

22

23

24

25
```